**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANIEL DIEHL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| OMEGA PROTEIN CORPORATION, BRET D. SCHOLTES, and ANDREW C. JOHANNESEN, | ) ) ) ) ) |
| Defendants. | ) ) ) ) |

**Case No.**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Daniel Diehl ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Omega Protein Corporation ("Omega" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Omega securities between June 4, 2013 and March 1, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Omega is a nutritional products company that purportedly develops, produces, and delivers products to improve the nutritional integrity of foods, dietary supplements, and animal feeds.

3.      Founded in 1913, the Company is headquartered in Houston, Texas. Omega's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "OME."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Omega's subsidiary was potentially not in compliance with its probation terms; (ii) the Company was not properly protecting whistleblower employees; (iii) as a result of the foregoing, the Company was vulnerable to an SEC investigation and potential civil and criminal liability; and (iv) as a result of the foregoing, Omega's public statements were materially false and misleading at all relevant times.

5.      On March 1, 2017, post-market, Omega disclosed that in December 2016 it received a subpoena from the U.S. Securities and Exchange Commission seeking information in connection with an investigation of an Omega subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees.  The Company also disclosed that the

investigation could result in a material adverse effect on the Company's business, reputation, results of operation, and financial condition.  In whole, the Company stated:

> ***The Company has received a subpoena from the SEC requesting information relating to a Company subsidiary's compliance with probation terms and the Company's protection of whistleblower employees.*** In December 2016, the Company received a subpoena from the SEC requesting information in connection with an investigation relating to a Company subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees. The Company is in the process of producing responsive documents to the SEC. The Company cannot predict the outcome of the investigation or the effect of the findings of the investigation on the Company, but it is possible that the foregoing matter could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition.

(Emphasis added.)

6.     On this news, Omega's share price fell $6.25, or 23.81%, to close at $20.00 on March 2, 2017.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

10.     Venue is properly laid in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Omega's common stock trades on the NYSE, located within this District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Omega securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Omega is incorporated in Nevada. The Company's principal executive offices are located at 2105 City West Boulevard, Suite 500, Houston, Texas 77042.  Omega's shares trade on the NYSE under the ticker symbol "OME."

14.     Defendant Bret D. Scholtes ("Scholtes") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and President since January 1, 2012.

15.     Defendant Andrew C. Johannesen ("Johannesen") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Executive Vice President since January 1, 2012.

16.     The Defendants referenced above in ¶¶ 14-15 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Omega is a nutritional products company that purportedly develops, produces, and delivers products to improve the nutritional integrity of foods, dietary supplements, and animal feeds.

**Materially False and Misleading Statements Issued During the Class Period**

18.     The Class Period begins on June 4, 2013, when the Company issued a press release

entitled "Omega Protein Subsidiary Reaches Agreement To Resolve Previously Disclosed Coast

Guard and EPA Investigation."  In the press release, the Company stated, in relevant part:

> HOUSTON, June 4, 2013 /PRNewswire/ -- Omega Protein Corporation (NYSE: OME), a nutritional product company and a leading integrated producer of omega-3 fish oils and specialty protein products, today announced that its subsidiary, Omega Protein, Inc., has reached an agreement with the United States Attorney's Office for the Eastern District of Virginia that resolves a pending U.S. Coast Guard and Environmental Protection Agency ("EPA") investigation related to its Reedville, Virginia fishing vessels and operations.
>
> As previously disclosed, in April 2010, the Company received a request for information from the EPA concerning its subsidiary's bail wastewater practices used in fishing operations at its Reedville facility. Also as previously disclosed, in February 2011, the U.S. Coast Guard conducted inspections at the Reedville facility regarding the Reedville vessels' bilge water discharge practices. Omega Protein's subsidiary's agreement with the U.S. Attorney's Office resolves both issues.
>
> Pursuant to terms of the agreement, Omega Protein's subsidiary has pleaded guilty to two Clean Water Act violations. The plea agreement requires Omega Protein's subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary will be required to make a $2 million payment to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement has been approved by the U.S. District Court for the Eastern District of Virginia.
>
> "Omega Protein, Inc. is committed to ensuring that we operate in compliance with federal and state environmental requirements. The Company has expended significant resources to strengthen its environmental compliance systems across its operations." said Bret Scholtes, the Company's Chief Executive Officer. "We are committed to being a responsible corporate citizen and protecting the ocean waters upon which we all rely."

19.     On March 10, 2014, the Company issued a press release, attached as Exhibit 99.1

on Form 8-K filed with the SEC, entitled "Omega Protein Announces Fourth Quarter and Full

Year 2013 Financial Results" (the "March 2013 8-K"). In the press release, the Company stated,

in relevant part:

**Fourth Quarter and Full Year 2013 Highlights**

- **Revenues**: $66.0 million for the quarter and $244.3 million for the year
- **Gross profit margin**: 42.4% for the quarter and 33.9% for the year
- **Net income:** $9.7 million, or $14.2 million excluding plant closure charges and net gain on disposal of assets, for the quarter, and $30.5 million, or $35.0 million excluding plant closure charges and net loss on disposal of assets, for the year
- **Earnings:** Earnings per diluted share of $0.45, or $0.66 excluding plant closure charges and net gain on disposal, for the quarter, and $1.45, or $1.66 excluding plant closure charges and net loss on disposal, for the year
- **Adjusted EBITDA**: $26.7 million for the quarter and $75.6 million for the year

"We are pleased with the progress made on our strategic objectives in 2013, as we continued to build a more balanced nutrition company focused on value-added products that allow families to live healthier lives through nutrition. Our strong financial performance during the year included increased revenues, as well as record gross profit and gross margin," commented Bret Scholtes, Omega Protein's President and Chief Executive Officer. "In the quarter, our financial results benefited from record human nutrition revenue, attractive animal nutrition forward contract pricing, and a productive end to the 2013 fishing season."

Mr. Scholtes concluded, "We are excited to build on this progress in 2014 as we introduce additional capacity and capabilities to capitalize on our market opportunities."

**Fourth Quarter 2013 Results**

The Company's revenues increased 4% from $63.1 million in the same period last year to $66.0 million. This increase was due to a $4.4 million increase in human nutrition revenue, partially offset by a $1.6 million decrease in animal nutrition revenues. The increase in human nutrition revenues was primarily due to sales of protein products from Wisconsin Specialty Protein ("WSP"), a business acquired by the Company in the first quarter of 2013. The decrease in animal nutrition revenues was primarily due to a 33% decrease in the Company's fish meal sales volumes, partially offset by a 109% increase in fish oil sales volumes and increased sales prices of 19% and 15% for the Company's fish meal and fish oil, respectively. The composition of revenue by nutritional product line for the fourth quarter of 2013 was 59% fish meal, 26% fish oil, 14% specialty nutraceutical and food ingredients and products, and 1% fish solubles and other.

Fourth quarter of 2013 revenues decreased 25% from $87.6 million in the third quarter of 2013 to $66.0 million. This decrease was due to a $23.2 million decrease in animal nutrition revenues, which reflected decreased sales volumes of 19% and 53% for fish meal and fish oil, respectively, and a 5% decrease in fish meal sales prices, partially offset by a 30% increase in fish oil sales prices. The increase in fish

6

oil sales prices was primarily due to a change in the product mix of higher priced refined and lower priced crude oils, and higher prices on those crude oil volumes. Human nutrition revenues increased $1.6 million to $9.4 million in the fourth quarter compared to $7.8 million in the third quarter. The increase in human nutrition revenues primarily reflects higher sales of OmegaActiv fish oil and other nutraceutical ingredients.

The Company reported gross profit of $28.0 million, or 42.4% as a percentage of revenues, for the fourth quarter of 2013, versus $12.9 million, or 20.5% as a percentage of revenues, in the fourth quarter of 2012. The increase was due to an increase in the animal nutrition segment gross profit as a percentage of revenues from 20.1% to 47.1% as a result of increased fish oil and fish meal sales prices and greater than anticipated fish catch in the fourth quarter. As a result of this greater fish catch and production, standard cost for 2013 inventory, for which sales commenced largely in the third quarter of 2013, was decreased and all previous sales of 2013 inventory production were adjusted during the fourth quarter ended December 31, 2013. This increase in gross profit as a percentage of revenues was partially offset by a decrease in the human nutrition segment gross profit as a percentage of revenues from 24.9% to 13.6%, due primarily to lower gross profit as a percentage of revenues for other nutraceuticals and the addition of the protein products business.

Compared to the third quarter of 2013, fourth quarter gross profit decreased from $29.4 million to $28.0 million; however, gross profit as a percentage of revenues increased from 33.6% to 42.4%. The increase in gross profit as a percentage of revenues was due to an increase in animal nutrition gross profit as a percentage of revenues from 34.5% to 47.1% primarily as a result of the lower inventory cost associated with greater than anticipated fish catch after September 30, 2013, as discussed above. The human nutrition segment gross profit as a percentage of revenues decreased from 24.6% to 13.6% primarily due to lower gross profit as a percentage of revenues for protein products and changes in product mix.

Selling, general and administrative expenses for the fourth quarter increased $0.5 million to $5.9 million compared to the fourth quarter of 2012, primarily as a result of the WSP acquisition. Selling, general and administrative expenses decreased from $6.9 million for the third quarter of 2013, primarily as a result of decreased employee compensation related costs.

In the fourth quarter of 2013, the Company closed its menhaden fish processing plant located in Cameron, Louisiana and re-deployed certain vessels from that facility to the Company's other Gulf Coast facilities located in Abbeville, Louisiana and Moss Point, Mississippi, as previously announced. In conjunction with the closure, the Company incurred charges of $6.6 million in the fourth quarter of 2013.

The fourth quarter of 2013 effective tax rate was 31.9% compared to 126.2% in the fourth quarter of 2012 and 34.6% in the third quarter of 2013. The higher effective

tax rate in the fourth quarter of 2012 was primarily the result of charges relating to a U.S. Attorney investigation that were non-deductible for tax purposes.

Net income for the fourth quarter of 2013 was $9.7 million ($0.45 per diluted share) compared to a net loss of $0.5 million ($0.03 loss per diluted share) for the same period last year and net income of $14.0 million ($0.66 per diluted share) for the third quarter of 2013. Excluding plant closure charges and net gain on disposal of assets, net income for the fourth quarter of 2013 would have been $14.2 million ($0.66 per diluted share) and excluding the impact of the charges related to the U.S. Attorney investigation and net loss on disposal of certain assets, net income for the fourth quarter of 2012 would have been $4.0 million ($0.20 per diluted share).

Adjusted EBITDA totaled $26.7 million for the fourth quarter of 2013, compared to $11.6 million for the same period last year and $27.1 million for the third quarter of 2013.

**Full Year 2013 Results**

Revenues for the year ended December 31, 2013 increased 4% to $244.3 million compared to revenues of $235.6 million for the year ended December 31, 2012. The increase in revenues for 2013 was due to a $9.1 million increase in human nutrition revenues partially offset by a $0.4 million decrease in animal nutrition revenues. The increase in human nutrition revenues was due primarily to the acquisition of WSP in the first quarter of 2013. The decrease in animal nutrition revenues was primarily due to decreased sales volumes of 28% for the Company's fish meal, partially offset by increased sales prices of 23% for the Company's fish meal and increased sales volumes and prices of 2% and 43%, respectively, for the Company's fish oil.

The Company reported record gross profit of $82.8 million, or 33.9% as a percentage of revenues, for the year ended December 31, 2013, versus gross profit of $42.1 million, or 17.8% as a percentage of revenues, for the year ended December 31, 2012. The increase in gross profit as a percentage of revenues was primarily due to an increase in animal nutrition segment gross profit as a percentage of revenues from 17.3% to 36.2%, reflecting an increase in animal segment revenues per unit as a result of higher fish meal and fish oil sales prices, partially offset by a decrease in human nutrition gross profit as a percentage of revenues from 22.8% to 18.2%.

Net income for the year ended December 31, 2013 was $30.5 million ($1.45 per diluted share) compared to $4.1 million ($0.20 per diluted share) for the same period last year. Excluding plant closure charges and net loss on disposal of assets, net income for 2013 would have been $35.0 million ($1.66 per diluted share) and excluding the impact of U.S. Attorney investigation charges and net gain on disposal of assets, net income for the year ended December 31, 2012 would have been $10.4 million ($0.52 per diluted share).

Adjusted EBITDA totaled $75.6 million for the year ended December 31, 2013, an increase from $35.6 million for the previous year.

**Balance Sheet**

The Company's balance sheet remains strong, and stockholders' equity increased $41.6 million to $247.2 million as of December 31, 2013 as compared to $205.6 million at December 31, 2012. Total debt decreased $3.1 million from December 31, 2012 to $24.2 million on December 31, 2013. The Company's December 31, 2013 cash balance decreased $21.9 million from December 31, 2012 to $34.1 million. This decrease was primarily due to the acquisition of WSP in the first quarter of 2013, as well as expenditures related to 2013 fishing season, capital spending and debt payments, and was partially offset by the sale of inventory.

20.     On the same day, the Company filed its annual report on Form 10-K with the SEC, reiterating the financial and operating results previously reported in the March 2013 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K"). In the 2013 10-K, the Company stated, in relevant part:

**If our Omega Protein subsidiary fails to comply with the terms of its probation under a plea agreement entered into in June 2013, we could be subject to criminal prosecution.** In June 2013, Omega Protein, the Company's principal subsidiary, entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia to resolve the previously disclosed government investigation related to its Reedville, Virginia fishing vessels and operations. Consistent with the terms of the plea agreement, the subsidiary pled guilty in the United States District Court for the Eastern District of Virginia to two felony counts under the Clean Water Act, paid a fine of $5.5 million, and made a $2.0 million contribution to an environmental fund.

The plea agreement and the terms of the court's sentencing order require Omega Protein to develop and implement an environmental compliance program at all of its facilities, and also imposed a three year period of probation. The Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement. The U.S. Probation Office, in consultation with the U.S. Attorney's Office for the Eastern District of Virginia and the Environmental Protection Agency, as necessary, have the right to monitor our compliance with these requirements during the term of probation.

In the event that Omega Protein does not comply with the terms of the plea agreement and the court's sentencing order, including the terms of probation, Omega Protein could be subject to additional criminal penalties or prosecution (including for the matters covered and resolved by the plea agreement). In addition, if Omega Protein fails to maintain compliance with the Clean Water Act or other

similar environmental regulatory requirements in the future, Omega Protein could become subject to additional criminal or civil liability in connection with any such non-compliance. Omega Protein could also experience increased compliance costs, or alterations to the conduct of its normal course operations, in connection with these matters. Any of the foregoing could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition.

In addition, the convictions under the Clean Water Act will adversely affect the Company's ability to secure government contracts with the United States, and possibly secure future loans under the NFMS Title XI loan program. The subsidiary has received notice from the EPA that it is ineligible, as a result of the convictions under the Clean Water Act, for receipt of government contracts or benefits if any part of the work will be performed at the facility where the offense occurred.

21.     The 2013 10-K contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by Individual Defendants, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

22.     On March 11, 2015, the Company issued a press release, attached as Exhibit 99.1 to Form 8-K filed with the SEC, entitled "Omega Protein Announces Fourth Quarter and Full Year 2014 Financial Results" (the "March 2014 8-K").   In the press release, the Company stated, in relevant part:

**Fourth Quarter and Full Year 2014 Highlights**

- **Revenues:** $102.5 million for the quarter and $308.6 million for the year
- **Gross profit margin**: 22.0% for the quarter and 25.1% for the year
- **Net income**: $3.2 million, or $7.8 million on an adjusted basis for the quarter and $18.5 million, or $29.9 million on an adjusted basis for the year
- **Earnings per diluted share**: $0.14, or $0.35 on an adjusted basis for the quarter and $0.85, or $1.37 on an adjusted basis for the year
- **Adjusted EBITDA**: $19.7 million for the quarter and $70.1 million for the year

"The fourth quarter of 2014 concluded a successful year for Omega Protein, both in terms of consolidated financial results and progress towards achieving our strategic objectives. While we faced headwinds in certain aspects of our business, the Company managed to generate its second highest annual gross profit and adjusted EBITDA," commented Bret Scholtes, Omega Protein's President and Chief Executive Officer. "As we enter 2015, we are focused on the integration of

Bioriginal and making strategic investments to support the growth of our more diversified human nutrition platform. We believe that we are better positioned than ever before to capitalize on the positive fundamentals in the specialty protein and oil sectors of the animal and human nutrition markets to increase profitability and enhance shareholder value long-term."

**Fourth Quarter 2014 Results**

The Company's revenues increased 55% from $66.0 million in the same period last year to $102.5 million. This increase was due to growth in animal nutrition revenues of $11.5 million and human nutrition revenues of $25.0 million. The increase in animal nutrition revenues was primarily due to higher fish oil and fish meal volumes of 34% and 17%, respectively, as well as higher fish meal sales prices of 3%, partially offset by 9% lower fish oil sales prices. The increase in human nutrition revenues was primarily attributable to the acquisition of Bioriginal Food & Science Corp. ("Bioriginal"), which was acquired on September 5, 2014. The composition of revenues by nutritional product line for the fourth quarter of 2014 was 45% fish meal, 21% fish oil, 33% dietary supplements and food, and 1% fish solubles and other.

Fourth quarter of 2014 revenues increased 45% from $70.8 million in the third quarter of 2014 to $102.5 million. This increase was due to growth in animal nutrition revenues of $13.0 million and human nutrition revenues of $18.7 million. The increase in animal nutrition revenues was primarily due to higher fish meal and fish oil volumes of 31% and 6%, respectively, as well as higher fish meal and fish oil sales prices of 2% and 4%, respectively. The increase in human nutrition revenues was primarily due to the acquisition of Bioriginal.

The Company reported gross profit of $22.5 million, or 22.0% as a percentage of revenues, for the fourth quarter of 2014, versus $28.0 million, or 42.4% as a percentage of revenues, in the fourth quarter of 2013. The decrease in gross profit as a percentage of revenues was due to reductions in both the animal and human nutrition segments. Animal segment gross profit as a percentage of revenues declined from 47.1% to 28.7%, due primarily to a higher cost per unit for current season production and greater than anticipated fish catch in the fourth quarter of 2013, which resulted in additional profit related to prior period sales. Human nutrition gross profit as a percentage of revenues decreased from 13.6% to 8.6% due primarily to lower gross profit as a percentage of revenues for protein products.

Compared to the third quarter of 2014, fourth quarter gross profit increased from $14.2 million, or 20.0% as a percentage of revenues, to $22.5 million, or 22.0% as a percentage of revenues. Animal nutrition gross profit as a percentage of revenues increased from 25.8% to 28.7% as a result of increased fish oil and fish meal sales prices. Human nutrition segment gross profit as a percentage of revenues increased from a gross loss of 0.1% to a gross profit of 8.6% due primarily to the acquisition of Bioriginal.

11

Selling, general and administrative expenses for the fourth quarter increased $2.8 million to $8.7 million compared to the fourth quarter of 2013, primarily as a result of the Bioriginal acquisition. Selling, general and administrative expenses decreased $1.5 million from $10.2 million in the third quarter of 2014 due primarily to non-recurring professional expenses related to the third quarter acquisition of Bioriginal.

Impairment of goodwill and other intangible assets increased from $0.2 million in the fourth quarter of 2013 to $4.7 million in the fourth quarter of 2014 due to impairment expenses related to the InCon and Cyvex reporting unit within the human nutrition segment.

In the fourth quarter of 2013, the Company closed its menhaden fish processing plant located in Cameron, Louisiana and re-deployed certain vessels from that facility to the Company's other Gulf Coast facilities. In conjunction with the closure, the Company incurred charges of $1.6 million and $6.6 million in the fourth quarters of 2014 and 2013, respectively.

The fourth quarter of 2014 effective tax rate was 46.5% compared to 31.9% in the fourth quarter of 2013 and 60.6% in the third quarter of 2014. The fourth quarter of 2014 effective tax rate reflected the impact of bonus depreciation rules enacted during the quarter, and the third quarter of 2014 effective tax rate reflected nondeductible expenses related to the acquisition of Bioriginal.

Net income for the fourth quarter of 2014 was $3.2 million ($0.14 per diluted share) compared to $9.7 million ($0.45 per diluted share) in the same period last year and $0.7 million ($0.03 per diluted share) for the third quarter of 2014. Excluding plant closure charges, impairment expenses, acquisition related costs and net gain or loss on disposal of assets, net income for the fourth quarter of 2014 would have been $7.8 million ($0.35 per diluted share), compared to $14.3 million ($0.67 per diluted share) in the same period last year and $4.8 million ($0.22 per diluted share) for the third quarter of 2014.

Adjusted EBITDA totaled $19.7 million for the fourth quarter of 2014, compared to $26.7 million for the same period last year and $13.1 million for the third quarter of 2014.

**Full Year 2014 Results**

Revenues in the twelve months ended December 31, 2014 increased 26% to $308.6 million compared to revenues of $244.3 million for the twelve months ended December 31, 2013. The increase in revenues was due to a $30.6 million increase in animal nutrition revenues and a $33.8 million increase in human nutrition revenues. The increase in animal nutrition related revenues was primarily due to increased sales volumes of 46% and 1% for the Company's fish oil and fish meal, respectively, and increased sales prices of 2% for the Company's fish meal, partially offset by decreased sales prices of 4% for the Company's fish oil. The

increase in human nutrition revenues was due primarily to the acquisition of Bioriginal.

The Company recorded gross profit of $77.6 million, or 25.1% as a percentage of revenues, in 2014, versus gross profit of $82.8 million, or 33.9% as a percentage of revenues, in 2013. The decrease in gross profit as a percentage of revenues was primarily due to a decrease in animal nutrition segment gross profit as a percentage of revenues from 36.2% to 29.8%, reflecting the impact of decreased fish oil yields and slower than anticipated early season fish catch on cost per unit of sales. In addition, human nutrition gross profit as a percentage of revenues decreased from 18.2% to 7.7% due primarily to lower gross profit as a percentage of revenues for protein products and the addition of Bioriginal including its one time acquisition-related inventory write-up to fair value.

The effective tax rate was 38.9% for the twelve months ended December 31, 2014 compared to 33.6% for the twelve months ended December 31, 2013. The effective tax rate in 2014 would have been approximately 36.2% were it not for non-deductible expenses related to the acquisition of Bioriginal.

Net income for the twelve months ended December 31, 2014 was $18.5 million ($0.85 per diluted share) compared to $30.5 million ($1.45 per diluted share) last year. Excluding plant closure charges, impairment expenses, acquisition related costs and net gain or loss on disposal of assets, net income for the twelve months ended December 31, 2014 would have been $29.9 million ($1.37 per diluted share) compared to $35.8 million ($1.70 per diluted share) for the year ended December 31, 2013.

Adjusted EBITDA totaled $70.1 million for twelve months ended December 31, 2014, a decrease from $76.6 million for the previous year.

**Balance Sheet**

Due in large part to the Bioriginal acquisition, the Company's December 31, 2014 cash balance decreased $32.6 million from December 31, 2013 to $1.4 million, and total debt increased $11.0 million from December 31, 2013 to $35.2 million on December 31, 2014. Stockholders' equity increased $18.7 million to $265.9 million as of December 31, 2014 compared to $247.2 million as of December 31, 2013.

23.    On the same day, the Company filed its annual report on Form 10-K with the SEC, reiterating the financial and operating results previously reported in the March 2014 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").  In the 2014 10-K, the Company stated, in relevant part:

**If our Omega Protein subsidiary fails to comply with the terms of its probation under a plea agreement entered into in June 2013, we could be subject to criminal prosecution**. In June 2013, Omega Protein, the Company's principal subsidiary, entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia to resolve the previously disclosed government investigation related to the fishing vessels and operations of its Reedville, Virginia facility. Consistent with the terms of the plea agreement, the subsidiary pled guilty in the United States District Court for the Eastern District of Virginia to two felony counts under the Clean Water Act, paid a fine of $5.5 million, and made a $2.0 million contribution to an environmental fund.

The plea agreement and the terms of the court's sentencing order require Omega Protein to develop and implement an environmental compliance program at all of its facilities, and also imposed a three year period of probation. The Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement. The U.S. Probation Office, in consultation with the U.S. Attorney's Office for the Eastern District of Virginia and the Environmental Protection Agency, as necessary, have the right to monitor our compliance with these requirements during the term of probation.

In the event that Omega Protein does not comply with the terms of the plea agreement and the court's sentencing order, including the terms of probation, Omega Protein could be subject to additional criminal penalties or prosecution (including for the matters covered and resolved by the plea agreement). In addition, if Omega Protein fails to maintain compliance with the Clean Water Act or other similar environmental regulatory requirements in the future, Omega Protein could become subject to additional criminal or civil liability in connection with any such non-compliance. Omega Protein could also experience increased compliance costs, or alterations to the conduct of its normal course operations, in connection with these matters. Any of the foregoing could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition.

In addition, the convictions under the Clean Water Act will adversely affect the Company's ability to secure government contracts with the United States, and secure future loans under the NFMS Title XI loan program in connection with the affected facility. The subsidiary has received notice from the EPA that it is ineligible, as a result of the convictions under the Clean Water Act, for receipt of government contracts, loans or benefits if any part of the work will be performed, or the loan collateral will be located, at the facility where the offense occurred.

24.    The 2014 10-K contained signed certifications pursuant to SOX by Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

14

25.    On March 9, 2016, the Company issued a press release, attached as Exhibit 99.1 to Form 8-K filed with the SEC, entitled "Omega Protein Announces Fourth Quarter and Full Year 2015 Financial Results" (the "March 2015 8-K").  In the press release, the Company stated, in relevant part:

**Fourth Quarter and Full Year 2015 Highlights**

- Revenues: $82.3 million for the quarter and $359.3 million for the year
- Gross profit margin: 28.0% for the quarter and 27.5% for the year
- Net income: $2.9 million, or $6.5 million on an adjusted basis, for the quarter and $24.0 million, or $33.4 million on an adjusted basis, for the year
- Earnings per diluted share: $0.13, or $0.29 on an adjusted basis, for the quarter and $1.07, or $1.50 on an adjusted basis, for the year
- Adjusted EBITDA: $18.9 million for the quarter and $79.6 million for the year

"2015 was a transformational year for Omega Protein as our financial results, including a record Adjusted EBITDA, reflect contributions from a robust fish harvest, continued strong demand for our products, efficient operational performance and the Bioriginal acquisition," commented Bret Scholtes, Omega Protein's President and Chief Executive Officer. "We continue to take strategic actions to build on these accomplishments and better position our business for future growth. These efforts include our plan to invest an additional $18 million of growth capital to further improve the efficiency of our animal nutrition business, and our decision to refocus our human fish oil business by exiting concentrated oils manufacturing. We remain confident about our opportunities to generate improved volumes and profitability, and in turn increase shareholder value in 2016."

**Fourth Quarter 2015 Results**

The Company's revenues decreased 20% from $102.5 million in the same period last year to $82.3 million. This decrease was due to decreases in animal nutrition and human nutrition revenues of $14.9 million and $5.3 million, respectively. The decrease in animal nutrition revenues was primarily due to decreased sales volumes of 74% and 2% for the Company's fish oil and fish meal, respectively, and decreased fish meal sales prices of 3%, partially offset by 36% higher fish oil sales prices. The increase in fish oil sales prices was primarily due to a change in the product mix of higher priced refined and lower priced crude oils, as well as higher prices on each. The decrease in human nutrition revenues was largely due to decreased sales of specialty oils. The composition of revenues by nutritional product line for the fourth quarter of 2015 was 54% fish meal, 35% dietary supplements, 9% fish oil, and 2% fish solubles and other.

15

Fourth quarter of 2015 revenues decreased 27% from $112.2 million in the third quarter of 2015 to $82.3 million. This decrease was due to a $19.9 million decrease in animal nutrition revenues and a $10.0 million decrease in human nutrition revenues. The decrease in animal nutrition revenues was primarily due to lower fish oil and fish meal volumes of 76% and 6%, respectively, and lower fish meal sales prices of 3%, partially offset by 40% higher fish oil sales prices. The decrease in human nutrition revenues was largely due to decreased sales of specialty oils.

The Company reported gross profit of $23.1 million, or 28.0% as a percentage of revenues, for the fourth quarter of 2015, versus $22.5 million, or 22.0% as a percentage of revenues, in the fourth quarter of 2014. The increase in gross profit as a percentage of revenues was due to an improvement in the animal nutrition segment, partially offset by lower human nutrition results. Animal nutrition gross profit as a percentage of revenues increased from 28.7% to 39.4%, due primarily to higher fish catch and production in 2015, which led to a decrease in the cost per unit of sales. Human nutrition gross profit as a percentage of revenues decreased from 8.6% to 7.2% due primarily to decreased gross profit as a percentage of revenues for menhaden omega-3 concentrates and tolling.

Compared to the third quarter of 2015, fourth quarter gross profit decreased from $35.2 million, or 31.4% as a percentage of revenues, to $23.1 million, or 28.0% as a percentage of revenues, due to a reduction in the human nutrition segment. Animal nutrition gross profit as a percentage of revenues increased slightly from 39.3% to 39.4%. Human nutrition gross profit as a percentage of revenues decreased from 16.6% to 7.2% due largely to decreased gross profit as a percentage of revenues for specialty oils, including menhaden omega-3 concentrates and tolling, and protein products.

Selling, general and administrative expense, including research and development expense ("SG&A"), for the fourth quarter increased $1.5 million to $10.8 million compared to the fourth quarter of 2014, primarily due to increases in labor and professional services expenses. SG&A decreased $1.6 million from $12.4 million in the third quarter of 2015, due to decreases in expenses related to labor and the human nutrition segment.

The Company recorded impairment and plant closure expenses of $5.3 million and $6.3 million in the fourth quarters of 2015 and 2014, respectively. The fourth quarter of 2015 expense is primarily due to the Company's decision to focus its omega-3 oils manufacturing operations on nonconcentrated oils and dispose of its oil concentration facility.

Gain on foreign currency related to Bioriginal Food & Science ("Bioriginal") was $0.1 million for the fourth quarter of 2015 compared to loss on foreign currency of $0.8 million in the third quarter of 2015.

The fourth quarter of 2015 effective tax rate was 52.0% compared to 46.5% in the fourth quarter of 2014 and 33.6% in the third quarter of 2015. The increase from

the third to fourth quarters of 2015 is due largely to the impact of a 2.7% increase in the year-to-date effective tax rate on earnings, as the tax expense impact of the higher rate on earnings from the first nine months of 2015 was recognized in the fourth quarter.

Net income for the fourth quarter of 2015 was $2.9 million ($0.13 per diluted share) compared to $3.2 million ($0.14 per diluted share) in the same period last year and $10.6 million ($0.47 per diluted share) in the third quarter of 2015. Excluding adjustments for certain items, adjusted net income for the fourth quarter of 2015 would have been $6.5 million ($0.29 per diluted share), compared to $7.8 million ($0.35 per diluted share) in the same period last year and $14.8 million ($0.66 per diluted share) for the third quarter of 2015.

Adjusted EBITDA totaled $18.9 million for the fourth quarter of 2015, compared to $19.7 million for the same period last year and $28.7 million for the third quarter of 2015.

**Full Year 2015 Results**

Revenues for the year ended December 31, 2015 increased 16% to $359.3 million compared to revenues of $308.6 million for the year ended December 31, 2014. The increase in revenues was due to a $74.3 million increase in human nutrition revenues partially offset by a $23.7 million decrease in animal nutrition revenues. The increase in human nutrition revenues was primarily due to the acquisition of Bioriginal in September 2014. The decrease in animal nutrition revenues was primarily due to decreased sales volumes of 45% for the Company's fish oil, partially offset by increased sales prices of 24% and 3% for the Company's fish oil and fish meal, respectively.

The Company recorded gross profit of $98.9 million, or 27.5% as a percentage of revenues, for the year ended December 31 2015, versus gross profit of $77.6 million, or 25.1% as a percentage of revenues, for the prior year. The increase in gross profit as a percentage of revenues was due to improved results from both the animal and human nutrition segments, partially offset by a decrease in the proportion of revenues attributable to the animal nutrition segment. Animal segment gross profit as a percentage of revenues increased from 29.8% to 36.8%, and human nutrition gross profit as a percentage of revenues increased from 7.7% to 12.8%.

SG&A for the year ended December 31, 2015 increased $10.3 million to $44.1 million compared to the prior year, largely as a result of the Bioriginal acquisition.

The effective tax rate was 37.9% for the year ended December 31, 2015 compared to 38.9% in the prior year.

Net income for the year ended December 31, 2015 was $24.0 million ($1.07 per diluted share) compared to $18.5 million ($0.85 per diluted share) for the prior year. Excluding adjustments for certain items, adjusted net income for the year ended

December 31, 2015 would have been $33.4 million ($1.50 per diluted share) compared to $29.9 million ($1.37 per diluted share) for the prior year. Adjusted EBITDA totaled $79.6 million for the year ended December 31, 2015, an increase from $70.1 million for last year.

**Balance Sheet**

Total debt decreased $11.1 million from $35.2 million on December 31, 2014 to $24.1 million on December 31, 2015. Stockholders' equity increased $29.3 million to $295.2 million as of December 31, 2015 compared to $265.9 million as of December 31, 2014.

26.     On the same day, the Company filed its annual report on Form 10-K with the SEC,

reiterating the financial and operating results previously reported in the March 2015 8-K and

reporting in full the Company's financial and operating results for the quarter and year ended

December 31, 2015 (the "2015 10-K").  The annual report stated, in relevant part:

**If the Company's Omega Protein subsidiary fails to comply with the terms of its probation under a plea agreement entered into in June 2013, we could be subject to criminal prosecution.** In June 2013, Omega Protein, the Company's principal subsidiary, entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia to resolve the previously disclosed government investigation related to the fishing vessels and operations of its Reedville, Virginia facility. Consistent with the terms of the plea agreement, the subsidiary pled guilty in the United States District Court for the Eastern District of Virginia to two felony counts under the Clean Water Act, paid a fine of $5.5 million, and made a $2.0 million contribution to an environmental fund.

The plea agreement and the terms of the court's sentencing order require Omega Protein to develop and implement an environmental compliance program at all of its facilities, and also imposed a three year period of probation which will end in June 2016. The Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement. The U.S. Probation Office, in consultation with the U.S. Attorney's Office for the Eastern District of Virginia and the E.P.A., as necessary, have the right to monitor the Company's compliance with these requirements during the term of probation.

In the event that Omega Protein does not comply with the terms of the plea agreement and the court's sentencing order, including the terms of probation, Omega Protein could be subject to additional criminal penalties or prosecution (including for the matters covered and resolved by the plea agreement). In addition, if Omega Protein fails to maintain compliance with the Clean Water Act or other similar environmental regulatory requirements in the future, Omega Protein could become subject to additional criminal or civil liability in connection with any such

non-compliance. Omega Protein could also experience increased compliance costs, or alterations to the conduct of its normal course operations, in connection with these matters. Any of the foregoing could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition.

In addition, the convictions under the Clean Water Act will adversely affect the Company's ability to secure government contracts with the United States, and secure future loans under the NFMS Title XI loan program in connection with the affected facility. The subsidiary has received notice from the E.P.A. that it is ineligible, as a result of the convictions under the Clean Water Act, for receipt of government contracts, loans or benefits if any part of the work will be performed, or the loan collateral will be located, at the facility where the offense occurred.

27.    The 2015 10-K contained signed certifications pursuant to SOX by Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

28.    The statements referenced in ¶¶ 18-27 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Omega's subsidiary was potentially not in compliance with its probation terms; (ii) the Company was not properly protecting whistleblower employees; (iii) as a result of the foregoing, the Company was vulnerable to an SEC investigation and potential civil and criminal liability; and (iv) as a result of the foregoing, Omega's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

29.    On March 1, 2017, post-market, Omega disclosed that in December 2016 it received a subpoena from the U.S. Securities and Exchange Commission seeking information in connection with an investigation of an Omega subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees.  The Company also disclosed that the

investigation could result in a material adverse effect on the Company's business, reputation, results of operation, and financial condition. In whole, the Company stated:

> ***The Company has received a subpoena from the SEC requesting information relating to a Company subsidiary's compliance with probation terms and the Company's protection of whistleblower employees.*** In December 2016, the Company received a subpoena from the SEC requesting information in connection with an investigation relating to a Company subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees. The Company is in the process of producing responsive documents to the SEC. The Company cannot predict the outcome of the investigation or the effect of the findings of the investigation on the Company, but it is possible that the foregoing matter could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition.

(Emphasis added.)

30.     On this news, Omega's share price fell $6.25, or 23.81%, to close at $20.00 on March 2, 2017.

31.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Omega securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Omega securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Omega or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

36.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Omega;

- whether the Individual Defendants caused Omega to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

21

- whether the prices of Omega securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

37.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

38.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Omega securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Omega securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

39.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

40.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

41.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

43.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Omega securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Omega securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

44.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Omega securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Omega's finances and business prospects.

45.     By virtue of their positions at Omega, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

46.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Omega, the Individual Defendants had knowledge of the details of Omega's internal affairs.

47.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

24

Omega.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Omega's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Omega securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Omega's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Omega securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

48.    During the Class Period, Omega securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Omega securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Omega securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Omega securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

49.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

50.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

51.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.     During the Class Period, the Individual Defendants participated in the operation and management of Omega, and conducted and participated, directly and indirectly, in the conduct of Omega's business affairs.  Because of their senior positions, they knew the adverse non-public information about Omega's misstatement of income and expenses and false financial statements.

53.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Omega's financial condition and results of operations, and to correct promptly any public statements issued by Omega which had become materially false or misleading.

54.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Omega disseminated in the marketplace during the Class Period concerning Omega's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Omega to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Omega within the meaning of

Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Omega securities.

55.    Each of the Individual Defendants, therefore, acted as a controlling person of Omega.  By reason of their senior management positions and/or being directors of Omega, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Omega to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Omega and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

56.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Omega.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 5, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**GOLDBERG LAW PC**
Michael Goldberg
Brian Schall
Sherin Mahdavian
1999 Avenue of the Stars
Los Angeles, California 90067
Suite 1100
Telephone: 1-800-977-7401
Fax: 1-800-536-0065
Email: michael@goldberglawpc.com
Email: brian@goldberglawpc.com
Email: sherin@goldberglawpc.com

*Attorneys for Plaintiff*

28

# Plaintiff's Certification

I, Daniel Diehl, certify that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in the security that is the subject of the complaint during the class period specified in the complaint are as follows:

I bought 200 shares on 02/03/2017 at $25.63
I sold 200 shares on 03/02/2017 at $23.57

5. Plaintiff has not sought to serve, or served, as a representative party on behalf of a class under this title during the 3-year period preceding the date on which this certification is signed, except as follows:

6. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3/3/2017



(redacted)

**OMEGA PROTEIN CORPORATION (OME)**                                          **Diehl, Daniel**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 2/3/2017 | Purchase | 200 | $25.6300 |