UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL DIEHL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>OMEGA PROTEIN CORPORATION, BRET D. SCHOLTES and ANDREW C. JOHANNESEN,<br><br>Defendants. | Civil Action No. 1:17-cv-02448-PKC<br><br>CLASS ACTION<br><br>CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ....................1

JURISDICTION AND VENUE ....................4

PARTIES ....................4

SUBSTANTIVE ALLEGATIONS ....................6

The Company and its Business ....................6

Omega Violates the Clean Water Act and Subsequently Fails to Comply with the Virginia Plea Agreement ....................9

Defendants Failed to Disclose that the Company Had Been Violating the Terms of Its Probation Under the Virginia Plea Agreement and the Associated Risks of Such Violation ....................15

Defendants Failed to Disclose that Omega's Reported Operating Results Significantly Benefited From Its Failure to Comply with the Virginia Plea Agreement ....................17

The SEC's Probe into the Company's Violation of Its Probation and Its Accounting Compliance ....................18

MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD ....................19

August 6, 2013 Earnings Press Release and Form 10-Q ....................19

November 6, 2013 Earnings Press Release and Form 10-Q ....................25

March 10, 2014 Earnings Press Release and Form 10-K ....................27

May 7, 2014 Earnings Press Release and Form 10-Q ....................31

August 6, 2014 Earnings Press Release and Form 10-Q ....................33

November 17, 2014 Earnings Press Release and Form 10-Q ....................35

March 11, 2015 Earnings Press Release and Form 10-K ....................36

May 11, 2015 Earnings Press Release and Form 10-Q ....................40

August 5, 2015 Earnings Press Release and Form 10-Q ....................42

**Page**

November 4, 2015 Earnings Press Release and Form 10-Q ..........44

March 9, 2016 Earnings Press Release and Form 10-K ..........46

May 4, 2016 Earnings Press Release and Form 10-Q ..........50

August 3, 2016 Earnings Press Release and 10-Q ..........51

November 2, 2016 Earnings Press Release and Form 10-Q ..........52

THE COMPANY DISCLOSES THE SEC'S INVESTIGATION INTO OMEGA'S PROBATION VIOLATIONS ..........53

ADDITIONAL SCIENTER ALLEGATIONS ..........55

LOSS CAUSATION ..........56

PLAINTIFF'S CLASS ACTION ALLEGATIONS ..........58

COUNT I ..........61

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ..........61

COUNT II ..........64

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ..........64

PRAYER FOR RELIEF ..........65

DEMAND FOR TRIAL BY JURY ..........65

Lead Plaintiff IBEW Local 98 Pension Fund ("Lead Plaintiff" or "Plaintiff") alleges the following based on the investigation of its counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Omega Protein Corporation ("Omega" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company and media reports about the Company and believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Omega securities between August 6, 2013 and March 1, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top executives.

2. Omega describes itself as a nutritional products company that develops, produces, and delivers products that improve the nutritional integrity of foods, dietary supplements and animal feeds. The Company is comprised of two major business segments: animal nutrition and human nutrition. Omega's animal nutrition segment processes menhaden – a small species of fish found in the Atlantic Ocean and the Gulf of Mexico – and uses this fish to manufacture specialty fish meals, fish oils and fish solubles.

3. Omega operates 38 vessels to harvest menhaden. Menhaden is processed *via* the following steps: (i) the fish are unloaded into storage boxes and then placed in steam cookers; (ii) the fish are pressed to remove the oil and water; (iii) the solid portions of the fish are dried and ground into fish meal; and (iv) the remaining liquid is further processed to produce solubles and fish oil.

4. Between 2008 and 2011, Omega repeatedly violated the Federal Water Pollution Control Act ("Clean Water Act") by improperly managing contaminated water that was used in the processing of the menhaden at the Company's Reedsville, Virginia plant. Specifically, the Company: (i) failed to go beyond the required distance before discharging the contaminated water into the ocean; (ii) failed to properly equip its vessels with the appropriate equipment to filter, monitor and record the oil content of water that was used to process the menhaden; and (iii) failed to maintain required oil record books.

5. On June 4, 2013, Omega entered into a plea agreement with the United States Attorney for the Eastern District of Virginia (the "Virginia Plea Agreement") in which the Company pled guilty to several violations of the Clean Water Act and committed itself to developing and implementing an extensive environmental program entitled the "Environmental Management System" ("EMS") at all of its facilities. As part of this program, Omega was required to maintain an "open reporting system" wherein employees could anonymously report any issues of Omega's non-compliance without retaliation.

6. Throughout the Class Period, Defendants reported positive financial results and certified the effectiveness of Omega's internal disclosure controls. During this time, however, Defendants failed to disclose that the Company continued to violate the terms of the Virginia Plea Agreement to the extent that it: (i) exposed Omega to a substantial risk that it would incur financial penalties and/or reputational harm related to further regulatory intervention or censure; and (ii) dramatically increased the likelihood that the SEC would open an investigation into the Company.

7. On March 1, 2017, after the close of regular trading, the Company filed its Form 10-K for the year ended December 31, 2016 with the SEC (the "2016 Form 10-K") in which it disclosed that, several months before, in December 2016, the Company received a subpoena from the SEC

requesting information in connection with an investigation "relating to a Company subsidiary's compliance with probation terms and the Company's protection of whistleblower employees." Omega further revealed that "it is possible that the foregoing matter could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition."

8. On this news, shares of Omega fell $6.25 per share, or over 23.81%, from its previous closing price to close at $20.00 per share on March 2, 2017, causing substantial loss to investors. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other class members have suffered significant losses and damages.

9. Analysts expressed surprise and disappointment that the Company had again violated its probation and the related SEC investigation. On March 2, 2017, Pivotal Research Group issued a report noting that the disclosure of the SEC investigation presented an additional risk to the Company commenting: "[w]e are uncomfortable with the company violating its probation and negotiating criminal pleas twice in the past five years."

10. Then, on May 17, 2017, Omega disclosed that it received an additional subpoena from the SEC that called for, among other things, the production of documents concerning Omega's calculation of its cost of sales for fiscal years 2014 through 2016 including documents related to its statement that "[t]he decrease in cost per unit of sales is primarily due to lower cost per unit for beginning of year inventory as a result of higher fish catch and production in the 2015 fishing season compared to 2014." The subpoena also sought documents reflecting Omega's accounting policies and procedures for inventories and cost of sales for fiscal years 2014 through 2016, including its methodologies for calculating and allocating direct and indirect costs.

11. In response to this disclosure, shares of Omega declined as much as $1.58 per share, or 8.5%, from the previous day's closing price of $19.10, to a low of $17.47 per share.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

14. Venue is properly laid in the District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Omega's securities trade on the NYSE, located within this District.

15. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16. Plaintiff, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased Omega securities at artificially inflated prices during the Class Period and was damaged thereby.

17. Defendant Omega is incorporated in Nevada. The Company's principal executive offices are located at 2105 City West Boulevard, Suite 500, Houston, Texas 77042. Omega's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "OME."

18. Defendant Bret D. Scholtes ("Scholtes") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and President since January 1, 2012.

19. Defendant Andrew C. Johannesen ("Johannesen") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Executive Vice President since January 1, 2012.

20. Defendants referenced above in ¶¶18-19 are sometimes referred to herein as the "Individual Defendants." The Company and the Individual Defendants together are referred to as "Defendants."

21. During the Class Period, the Individual Defendants were privy to confidential and proprietary information concerning Omega, its operations, finances, financial condition and present and future business prospects. Because of their positions with Omega, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

22. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Omega's business.

23. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations

to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

24. As controlling persons of a publicly-traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Omega's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Omega securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## SUBSTANTIVE ALLEGATIONS

### The Company and its Business

25. Omega describes itself as a nutritional products company that develops, produces, and delivers products that improve the nutritional integrity of foods, dietary supplements, and animal feeds. Omega's main products are Omega-3 fish oil and specialty fish meal products. The Company is headquartered in Houston, Texas and operates seven manufacturing facilities located in the United States, Canada and Europe. Omega's securities trades on the NYSE under the ticker symbol "OME."

26. The Company operates in two primary industry segments: animal nutrition and human nutrition. Omega's animal nutrition segment is comprised primarily of two subsidiaries:

(i) Omega Protein Inc., the largest U.S. producer of protein rich meal and oil derived from marine sources; and (ii) Omega Shipyard, a company in Moss Point, Mississippi that operates a dry-dock facility which provides shore side maintenance for the Company's fishing fleet. Omega's animal nutrition products are sold in the U.S. and in the international market. International sales consist of both fish meal and fish oil and are primarily sold to China, Norway, Canada, Saudi Arabia, Japan and Taiwan.

27. Omega's animal nutrition segment develops products such as specialty fish meal, crude and refined fish oil and fish solubles from menhaden, a herring-like species of fish found in commercial quantities in the U.S. coastal waters of the Atlantic Ocean and the Gulf of Mexico. Omega operates 38 vessels to harvest menhaden. Omega's fishing season runs from mid-April to the first of November in the Gulf of Mexico and from the beginning of May into December in the Atlantic. Government regulations generally preclude Omega from fishing during off-seasons.

28. Menhaden usually school in large, tight clusters and are commonly found in shallow waters. Omega uses spotter aircraft to locate the schools of menhaden and directs fishing vessels to them. The fishing vessels then transport boats and nets to encircle the school and capture the fish. The fish are then pumped from the net into "refrigerated holds" or containers on the fishing vessel and are subsequently unloaded into the processing plants.

29. Omega's fish meal is sold to feed producers as a high protein ingredient for the aquaculture, pet food and swine livestock industries. Omega's crude fish oil is sold to feed manufacturers, and its refined fish oil is used in food production, feed production, certain industrial applications, and in dietary supplements. Fish solubles are sold as attractants for animal feeds, baits and as fertilizer. Most of Omega's products are sold directly by Omega's agricultural products sales

department to approximately 200 customers, while a smaller amount are sold through independent sales agents and the Company's nutrition segment.

30. Omega operates meal and oil processing plants in Louisiana, Mississippi and Virginia. Each plant maintains a dock to unload fish, fish processing equipment and product storage facilities. The processing of menhaden is achieved through the following steps: (i) fish are first unloaded from the fishing vessels into storage boxes and then conveyed into steam cookers; (ii) the fish are then passed through presses to remove most of the oil and water; (iii) the solid portions of the fish are dried and ground into fish meal; (iv) the liquid that is produced in the cooking and pressing operations (which contains oil, water, dissolved protein and some fish solids) is decanted to remove the solids and is put through a centrifugal oil and water separation process; (v) the separated fish oil is a finished product called crude oil; and (vi) the separated water and protein mixture is further processed through evaporators to recover the soluble protein, which can be sold as solubles or added to the solid portions of the fish for processing into fish meal.

31. The Company's human nutrition segment develops and markets products, including plant oils, fish oils, dairy proteins and nutraceuticals, to human nutrition markets.

32. Throughout the Class Period, the human nutrition business failed to perform to expectations and Omega was under increasing pressure to sell the failing segment of the Company. As a result, on September 25, 2015, Omega announced that its Board of Directors was in the process of a review of strategic alternatives including a sale, merger, spin-off, business combination, strategic transaction or possible share re-purchase program.

33. On May 4, 2016, the Board of Directors announced that it had completed its strategic review and would invest $18 million in high return capital projects in the animal nutrition business and continue to refocus its human fish oil business by exiting concentrated oils manufacturing.

Additionally, Omega announced that the Board authorized a share re-purchase program in which the Company planned to re-purchase up to $40 million of its outstanding common stock over the next 36 months.

34. To the dismay of many investors and analysts, by the end of the Class Period, Omega had not yet re-purchased a single share through the share re-purchase program. During Omega's conference call on March 2, 2017 to discuss the Company's financial results for the fourth quarter and full-year, the periods ended December 31, 2016, Tim Ramey of Pivotal Research Group commented that "it ought to be a source of embarrassment for the Board to have come out last May and said, yes, we got a share repurchase program in place, we are going to do this; you didn't acquire that first share."

**Omega Violates the Clean Water Act and Subsequently Fails to Comply with the Virginia Plea Agreement**

35. Contaminated water is a byproduct of the processing of mehaden into fish oil, fish meal and fish solubles. "Bilge water" is water contaminated with fish oil that collects inside the area on the outer surface of the ship's hull. "Refrigerating water" is water that is in compartments or "fish holds" where fish is stored before it is offloaded from the vessel and processed. "Bail water" is water that the Company uses to offload fish into the port. "Processing water" is water that is used to process the fish in the plant.

36. The Company's vessels at its Reedsville plant used fresh water to "bail" the fish from the fishing vessels into the processing plant. The resultant bail water contained fish wastes, such as scales, fins and excrement. The bail water was also used to convey the fish through the entire processing operation in the plant. As the bail water entered the processing plant and circulated through the fish processing equipment, it combined with pollutants and caustic substances used for cleaning the processing equipment. Once the combined bail and processing water became too thick

to convey fish off the vessels and through the processing equipment, it was stored until it could be loaded onto vessels for off-shore discharge.

37. Bail water contains an excess of nutrients which creates an abundance of nitrogen, phosphorous and ammonia. This can spark an algae bloom, which in turn, eliminates oxygen from the water and can lead to fish kills and dead zones where aquatic life cannot flourish.

38. The Reedsville based Omega vessels, the "Gulf Island" and the "G.P. KIMBERLY," were used to transport and dispose of the combined bail and processing water off shore. The vessels or "water boats" were required, consistent with the "fish waste" exclusion contained in the Marine Protection Research and Sanctuaries Act, 33 U.S.C. §1401, *et seq*., to discharge fish waste "beyond three nautical miles from the baseline from which the territorial sea is measured."

39. During the relevant time period, Omega discharged a harmful quantity of oil into the ocean. Specifically, from May 2008 through December 2010, the water boats ***routinely*** failed to go beyond three nautical miles as required before discharging the combined bail and processing water.[1] During this same time period, the fishing vessels routinely discharged the combined bail and processing water into the ocean in violation of the Clean Water Act, 33 U.S.C. §§1311(a), 1319(c)(2)(A), 1321(b)(3) and 1319(c)(2)(A).

40. In April of 2010, Omega received a request for information from the Environmental Protection Agency ("EPA") concerning the Company's "bail water" practices at its Reedsville plant. Likewise, in February of 2011, the U.S. Coast Guard ("Coast Guard") conducted inspections at the Company's Reedsville facility regarding the vessel's "bilge water" discharge practices.

41. Between February 9 and 11, 2011, Coast Guard Station Portsmouth Virginia boarded seven of Omega's fishing vessels and determined that, in violation of the Act to Prevent Pollution

---

[1] Unless otherwise noted, emphasis is added throughout and internal citations are omitted.

from Ships ("APPS"), 33 U.S.C. §1901 *et seq.*, the vessels over 400 gross tons did not have operable oily water separators ("OWSs") and oil content monitors ("OCMs"). Moreover, the Coast Guard inspectors observed oil mixtures in the machinery space bilges of the vessels and determined that bilge pumps aboard the vessels had been aligned in a manner that could cause contaminated water to be discharged into the ocean. Further, the vessel crew members were not able to produce oil record books for the period of April 2009 and September 2010, or any other period of time.

42. The Coast Guard also observed that, due to the age and condition of several of the vessels, they had more than a foot of oily water in the bilge and had leaking shaft seals. Further, the vessels' discharge points were not equipped with oil monitoring and filtering equipment. Inspectors discovered oily residue in the discharge hoses and oily residue on the external hull of the ship. All of these conditions evidence oily discharges from Omega's vessels.

43. According to the Virginia Plea Agreement, Omega employees and other sources indicated that it was common practice to discharge bilge water overboard at the onset of and regularly during fishing voyages. Omega employees would use pumps to discharge the bilge water overboard without the use of the OWSs or other filtering and monitoring equipment.

44. The U.S. Attorney's Office for the Eastern District of Virginia reviewed both the results of the Coast Guard inspection and the EPA request for information. Omega's numerous violations of the Clean Water Act in its Reedville plant resulted in the filing of a criminal action, *U.S. v. Omega Protein Corp.*, 2:13-cr-00043 (E.D.V.A. 2013).

45. On June 4, 2013, Omega entered into the Virginia Plea Agreement. Under the Virginia Plea Agreement, Omega pled guilty to the following counts: (i) count one: knowingly discharging pollutants from a point source into waters of the United States without a permit (a violation of the Clean Water Act, 33 U.S.C. §§1311 and 1319(c)(2)); and (ii) knowingly discharging

oil into waters of the United States in a quantity that may be harmful on numerous and discrete occasions (a violation of Clean Water Act, 33 U.S.C. §§1321(b)(3) and 1319 (c)(2)).

46. The Virginia Plea Agreement subjected the Company to the following penalties: (i) a $5,500,000.00 fine; (ii) probation for three years; (iii) community service at a cost which amounts to $2,000,000; and (iv) a special assessment of $400.

47. David G. McLeod, a special agent of the EPA who assisted with the case, commented on the severity of Omega's Clean Water Act violations as follows: "Today's sentence should serve as a strong deterrent and further demonstrates our resolve to vigorously prosecute those who despoil our natural resources by cutting corners and handling waste illegally."

48. Further, as a result of the Virginia Plea Agreement, Omega was required to develop and implement the EMS at all of its facilities. Per the agreement, the U.S. Probation Office, in consultation with the EPA and the United States Attorney's Office had the right to periodically monitor the EMS during the probationary period and bring any violations to Omega and the court's attention.

49. The EMS program included a "Marine Safety & Environmental Compliance System" ("MS&ECS") that provided rules and guidelines pertaining to, *inter alia*, the maintenance of oil record books, safety inspections and equipment, bilge management, bilge off-loading and bail water management. MS&ECS also set forth the parameters of the "Open Reporting System" that Omega was required to maintain. Specifically, the program provided that "an employee may anonymously report issues of non-compliance or suspected non-compliance without risk of retaliation." The provision stated, as follows:

> Omega Protein utilizes an Open Reporting System to promote internal reporting of potential non-compliances with policies and procedures via the Company's Ethics Hotline. Any employee may anonymously report issues of non-compliance or suspected non-compliance without risk of retaliation. All employees are encouraged

> to use this system to notify Omega Protein Inc. of any potential deficiencies or violations of this Program or any applicable law or regulation if employees are not comfortable with or feel it would not be appropriate to report the issue to their supervisor.
>
> Upon receipt of a report, the HSS&E [Health, Safety, Security & Environmental] Representative must review, investigate, and document the report within one week from receipt, and take corrective action as appropriate. The HSS&E Representative may not release the name of any individual reporting a deficiency if it was known without that employee's approval.
>
> No employee may be terminated or otherwise retaliated against for reporting deficiencies except where an employee abuses the system or intentionally submits false reports.

50. Throughout the Class Period, Omega failed to comply with the probation terms set forth in the Virginia Plea Agreement. Specifically, Omega violated the Clean Water Act in the Company's Abbeville, Louisiana plant by making unauthorized discharges of contaminated water into the ocean. Omega's Abbeville plant maintains an "effluent" pond – a pond of liquid waste water from the processing plant. The Louisiana Department of Environmental Quality ("LDEQ") issued Omega a permit which allowed the Company to treat water from the effluent pond and then discharge it from a specified geographic location referred to as "Outfall 001" into the Vermillion River. Treatment of the contaminated water was meant to ensure that the water that is discharged from the pond meets the limits set forth in the plan's Clean Act permit issued by the LDEQ.

51. According to a plea agreement entered into by Omega with the U.S. Attorney's Office for the Western District of Louisiana (the "Louisiana Plea Agreement"), on December 8, 2014, at the direction of a manager at the Abbeville plant, employees violated the Clean Water Act permit issued by LDEQ by discharging pollutants from the effluent pond into an area of the water other than Outfall 001 and failing to monitor or sample that water. Similarly, on February 1, 2016, at the direction of a manager at the Abbeville plant, Omega employees again discharged pollutants from the effluent pond into the water in violation of the Clean Water Act permit issued by the LDEQ.

52. On June 1, 2016, Omega received a petition on probation from the Eastern District of Virginia which sought to revoke Omega's probation based on its Clean Water Act violations in the Abbeville, Louisiana plant. The petition referred to two counts of violations: "Count 1 – Knowing discharge of a pollutant in Violation of Clean Water Act, a Class E Felony;" and "Count 2 – Knowing Discharge of Oil in Violation of Clean Water Act, a Class E Felony." The petition extended Omega's probation for an additional three additional years and ordered the Company to pay a $5,500,000.00 fine and $800.00 special assessment.

53. In October of 2016, the Company's Clean Water Act violations again drew regulatory scrutiny when the Company received a Civil Investigative Demand ("CID") from the United States Department of Justice ("DOJ") requesting information in connection with False Claims Act violations. The investigation concerned whether the Company violated the False Claims Act in connection with Omega's May 2010 certification to the United States Department of Commerce that Omega's Reedville, Virginia facility was in compliance with federal environmental laws. The May 2010 certification was submitted in order to obtain a loan guarantee under the Department of Commerce's Title XI loan program.

54. On January 18, 2017, Omega entered into the Louisiana Plea Agreement wherein the Company pled guilty to the two counts of violations of the Clean Water Act and agreed to pay a fine to the U.S. in the amount of $1,000,000.00 and an additional amount of $200,000.00 in community service to the Louisiana State Police, Emergency Service Unit. The plea agreement further provided that Omega was required to serve a period of probation of 3 years during which the Company agreed to fully comply with the provisions of its environmental and safety compliance plans.

**Defendants Failed to Disclose that the Company Had Been Violating the Terms of Its Probation Under the Virginia Plea Agreement and the Associated Risks of Such Violation**

55. SEC rules and regulations govern the preparation and content of disclosures made by public companies in SEC filings. In failing to disclose material information about the Company's non-compliance with the Virginia Plea Agreement and related risks, Defendants violated these rules and regulations.

56. SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303"). The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

57. Item 303(a)(3) requires that the MD&A section of a company's periodic filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

(a) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(b) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of

labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

58. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

59. During the Class Period, Defendants caused Omega to violate its affirmative disclosure obligations imposed by Item 303 of Regulation S-K. Specifically, Omega filed with the SEC Forms 10-Q which were signed by Defendant Johannesen and Forms 10-K which were signed by the Individual Defendants which failed to disclose that the Company had been violating the terms of its probation under the Virginia Plea Agreement. These omissions concealed from the investing public the risks and uncertainties associated therewith, including, but not limited to, significant financial penalties, reputational harm and, indeed, the Company's ability to continue as a going concern. Moreover, Omega's Forms 10-Q and 10-K failed to disclose, in violation of Item 303 of Regulation S-K, that its reported operating results significantly benefited from its failure to comply with the Virginia Plea Agreement and that Omega's violations thereof were reasonably likely to have a material adverse effect on the Company's future financial performance and continuing operations.

60. Defendants also violated their affirmative disclosure duties imposed by Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), which governs disclosure of risk factors and requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky." Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a

subcaption that adequately describes the risk." Additionally, the SEC further instructs issuers, in Item 1A to Part I of the General Instructions governing the preparation of an issuer's annual report on Form 10-K, to "[s]et forth, under the caption 'Risk Factors,' where appropriate, the risk factors described in Item 503(c) of Regulation S-K," codified at 17 C.F.R. §229.503(c). Item 1A to Part II of the General Instructions governing the preparation of an issuer's quarterly report on Form 10-Q, similarly requires the issuer to "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10-K (§249.310) in response to Item 1A. to Part [I] of Form 10-K."

61. During the Class Period, Defendants violated their affirmative disclosure duties imposed by Item 503 of Regulation S-K. Specifically, Omega filed with the SEC Forms 10-Q signed by Defendant Johannesen and Forms 10-K signed by the Individual Defendants which failed to disclose that the Company had been violating the terms of its probation under the Virginia Plea Agreement. This was a substantial "risk factor" which could have an adverse impact on the Company's financial performance and result in significant financial penalties, reputational harm, and affect the Company's ability to continue as a going concern.

**Defendants Failed to Disclose that Omega's Reported Operating Results Significantly Benefited From Its Failure to Comply with the Virginia Plea Agreement**

62. By failing to comply with the terms of the Virginia Plea Agreement, Defendants avoided expending the necessary capital to: (i) adequately train Omega's plant managers and employees on proper waste water disposal; (ii) properly modernize Omega's vessels and equip them with appropriate OWSs and OCMs; (iii) implement adequate oil level recording practices and procedures; and (iv) implement adequate controls and procedures to ensure that the guidelines of the MS&ECS were complied with. As a result, during the Class Period, the Company's expenses were understated and its income was overstated.

**The SEC's Probe into the Company's Violation of Its Probation and Its Accounting Compliance**

63. On March 1, 2017, Omega filed its 2016 Form 10-K and revealed to the market that the Company received a SEC subpoena requesting information in connection with an investigation relating to its subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees. The Company further disclosed that "it is possible that the foregoing matter could result in a material adverse effect on the Company's business, reputation, results of operations and financial condition."

64. The market reacted to this revelation swiftly. On this news, shares of Omega fell $6.25 per share, or over 23.81%, from its previous closing price to close at $20.00 per share on March 2, 2017, causing substantial losses to investors.

65. Then, on May 17, 2017, Omega disclosed that it received an additional subpoena from the SEC that called for, among other things, the production of documents concerning Omega's calculation of its cost of sales for fiscal years 2014 through 2016, including documents related to its statement that: "[t]he decrease in cost per unit of sales is primarily due to lower cost per unit for beginning of year inventory as a result of higher fish catch and production in the 2015 fishing season compared to 2014." The subpoena also sought documents reflecting Omega's accounting policies and procedures for inventories and cost of sales for fiscal years 2014 through 2016, including its methodologies for calculating and allocating direct and indirect costs.

66. In response to this disclosure, shares of Omega declined as much as $1.58 per share, or 8.5%, from the previous day's closing price of $19.10, to a low of $17.47 per share.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

**August 6, 2013 Earnings Press Release and Form 10-Q**

67. The Class Period begins on August 6, 2013. On that day, Omega issued a press release reporting its financial results for the second quarter, the period ended June 30, 2013. The Company reported revenues of $41.8 million for the quarter (compared to $48.9 million in the first quarter and $47.5 million in the second quarter), gross profit margin of 31.8% for the quarter (an increase from 24.7% in the first quarter and 14.4% in the 2012 second quarter), earnings per diluted share of $0.19 for the quarter (compared to $0.14 in the first quarter and $0.13 in the 2012 second quarter), net income of $4.0 million for the quarter (compared to $2.8 million in the first quarter and $2.5 million in the 2012 second quarter) and adjusted EBITDA of $11.8 million for the quarter (compared to $10.0 million for the first quarter and $5.2 million in the 2012 second quarter). Commenting on these results, defendant Scholtes stated: "[w]e are pleased with the Company's increased earnings in the second quarter as we continued to benefit from better animal nutrition sales prices which helped drive higher revenue per ton and consolidated gross margin expansion versus the comparable period last year."

68. The statements referenced above in ¶67 regarding the Company's positive financial performance and growth were materially false and misleading and/ or omitted material information when made because the following true facts that were concealed from investors were known by Defendants or recklessly disregarded by them during the Class Period:

(a) that the Company continued to violate the Clean Water Act and was not in compliance with the terms of its probation under the Virginia Plea Agreement;

(b) that the Company's reported operating results significantly benefited from Omega's failure to comply with the Virginia Plea Agreement;

(c) that there was a reasonable possibility that Defendants would be forced to admit wrongdoing and/or otherwise incur material financial penalties and/or reputational harm as a result of further regulatory scrutiny or censure;

(d) that Omega's violations were significant and were reasonably likely to have a material adverse effect on the Company's future financial performance and continuing operations;

(e) that in failing to disclose material information about the Company's violation of its probation under the Virginia Plea Agreement and the extent of such violations: (i) Defendants were violating their disclosure obligations under SEC regulations; and (ii) the likelihood that the SEC would open an investigation into the Company had dramatically increased;

(f) as a result of the foregoing, Defendants' statements regarding the Company's financial condition and operations were materially false and misleading when made.

69. On August 6, 2013, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the second quarter, the period ended June 30, 2013 ("Q2 2013 10-Q"). In addition to reiterating the quarterly results reported on August 6, 2013, the Q2 2013 10-Q also represented that the Company's disclosure controls and procedures were effective. Specifically, the Company stated, in relevant part, as follows:

> **Item 4. Controls and Procedures.**
>
> (a) Evaluation of Disclosure Controls and Procedures
>
> As of the end of the period covered by this report, the Company conducted an evaluation of the effectiveness of its "disclosure controls and procedures," as that phrase is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934. The evaluation was carried out under the supervision and with the participation of management, including the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO").
>
> Based on and as of the date of that evaluation, the Company's CEO and CFO have concluded that (i) the Company's disclosure controls and procedures are designed to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Securities Exchange Act of 1934,

> is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure, and (ii) that the Company's disclosure controls and procedures are effective.
>
> Notwithstanding the foregoing, there can be no assurance that the Company's disclosure controls and procedures will detect or uncover all failures of persons within the Company and its consolidated subsidiaries to disclose material information otherwise required to be set forth in the Company's periodic reports. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures.
>
> (b) Changes in Internal Control Over Financial Reporting
>
> There were no changes in the Company's internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

70. The Q2 2013 10-Q was signed by Defendant Johannesen and also contained certifications by Defendants Scholtes and Johannesen pursuant to the Sarbanes-Oxley Act of 2002 ("SOX certifications") attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's controls over financial reporting, and the disclosure of all fraud.

71. As part of these SOX certifications, the Individual Defendants each represented as follows:

> 1. I have reviewed this quarterly report on Form 10-Q of Omega Protein Corporation;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

72. The statements referenced above in ¶¶69 and 71 regarding the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over

financial reporting, and the disclosure of all fraud were materially false and misleading and/or omitted material information when made because the following true facts that were concealed from investors were known by Defendants or recklessly disregarded by them during the Class Period:

(a) that Omega continued to violate its obligations under the Virginia Plea Agreement and was not adequately maintaining the environmental, safety or reporting controls that were mandated by the terms of its probation;

(b) that there was a reasonable possibility that Defendants would be forced to admit wrongdoing and/or otherwise incur material financial penalties or suffer reputational harm as a result of further regulatory scrutiny or censure;

(c) that the Company's reported operating results significantly benefited from Omega's failure to comply with the Virginia Plea Agreement;

(d) that Omega's violations were significant and were reasonably likely to have a material adverse effect on the Company's future financial performance and continuing operations;

(e) that in failing to disclose material information about the Company's violations of its probation under the Virginia Plea Agreement and the extent of such violations: (i) Defendants were violating their disclosure obligations under SEC regulations; and (ii) the likelihood that the SEC would open an investigation into the Company had dramatically increased; and

(f) as a result of the foregoing, Defendants' statements regarding the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud were materially false and misleading when made.

73. With respect to the Virginia Plea Agreement, the Q2 2013 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility.
>
> In June 2013, the Company's subsidiary, Omega Protein, Inc., resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013.

74. The Company's statements referenced above in ¶73 regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made because the following true facts that were concealed from investors were known by Defendants or recklessly disregarded by them during the Class Period:

(a) that the Company continued to violate the Clean Water Act and was not in compliance with the terms of its probation under the Virginia Plea Agreement;

(b) that the Company's reported operating results significantly benefited from Omega's failure to comply with the Virginia Plea Agreement;

(c) that there was a reasonable possibility that Defendants would be forced to admit wrongdoing and/or otherwise incur material financial penalties and/or reputational harm as a result of further regulatory scrutiny or censure;

(d) that Omega's violations were significant and were reasonably likely to have a material adverse effect on the Company's future financial performance and continuing operations;

(e) that in failing to disclose material information about the Company's violations of its probation under the Virginia Plea Agreement and the extent of such violations; (i) Defendants were violating their disclosure obligations under SEC regulations; and (ii) the likelihood that the SEC would open an investigation into the Company had dramatically increased; and

(f) as a result of the foregoing, Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading when made.

**November 6, 2013 Earnings Press Release and Form 10-Q**

75. On November 6, 2013, Omega issued a press release announcing its financial results for the third quarter, the period ended September 30, 2013. The Company reported revenues of $87.6 million for the quarter (compared to $84.0 million in the same period of the prior year and $41.8 million in the second quarter of 2013), gross profit margin of 33.6% for the quarter (an increase from 16.0% in the same period of the prior year and 31.8% in the second quarter of 2013), net income of $14.0 million for the quarter (compared to $0.2 million in the same period of the prior year and $4.0 million in the second quarter of 2013), earnings per diluted share of $0.66 for the quarter (compared to $0.01 in the same period of the prior year and $0.19 in the second quarter 2013) and adjusted EBITDA of $27.1 million for the quarter (compared to $11.6 million in the same period of the prior year and $11.8 million in the second quarter of 2013). Commenting on these results, defendant Scholtes stated: "[i]n the third quarter, we reported the highest quarterly revenues and gross profits in the Company's history, reflecting strong pricing and yields in our animal nutrition segment and contributions from the protein business recently acquired by our human nutrition segment."

76. The statements set forth above in ¶75 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶68.

77. On November 6, 2013, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the third quarter, the period ended September 30, 2013 ("Q3 2013 10-Q"). In addition to reiterating the quarterly results reported in the Company's press release, the Q3 2013 10-Q stated that the Company's "Evaluation of Disclosure Controls and Procedures" was effective as set forth in ¶69.

78. The Q3 2013 10-Q was signed by defendant Johannesen and contained SOX certifications by defendants Scholtes and Johannesen attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

79. The statements set forth above in ¶¶77 and 78 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶72.

80. With respect to the Virginia Plea Agreement, the Q3 2013 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility.
>
> In June 2013, the Company's subsidiary, Omega Protein, Inc., resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an

> environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein, Inc. will be on probation until June 2016, unless the probation period is terminated earlier by the court.

81. The Company's statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/ or omitted material information for the reasons set forth in ¶74.

**March 10, 2014 Earnings Press Release and Form 10-K**

82. On March 10, 2014, the Company issued a press release reporting its financial results for the fourth quarter and the full year, the periods ended December 31, 2013. The Company reported revenues of $66.0 million for the quarter and $244.3 million for the year, gross profit margin of 42.4% for the quarter and 33.9% for the year, net income of $9.7 million for the quarter and $30.5 million for the year, earnings per diluted share of $0.45 for the quarter and $1.45 for the year, adjusted EBITDA of $26.7 million for the quarter and $75.6 million for the year.

83. Commenting on these results, defendant Scholtes stated: "[w]e are pleased with the progress made on our strategic objectives in 2013, as we continued to build a more balanced nutrition company focused on value-added products that allow families to live healthier lives through nutrition. Our strong financial performance during the year included increased revenues, as well as record gross profit and gross margin."

84. The statements set forth above in ¶¶82-83 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶68.

85. On March 10, 2014, the Company filed its Annual Report on Form 10-K, which formally presented its financial results for the fourth quarter and full-year, the periods ended

December 31, 2013 ("2013 Form 10-K"). In addition to reiterating the results reported in the March 10, 2014 press release, the 2013 Form 10-K addressed the cost of environmental compliance, as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that newly enacted or existing environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations.

86. The statement set forth above in ¶85 that "[i]t is possible that newly enacted or existing environmental laws and regulations ***could*** require material expenditures" was materially misleading in the absence of additional disclosures of the Company's active and ongoing violation of its environmental, safety and reporting obligations mandated by the Virginia Plea Agreement and the attendant risk that these violations would adversely affect Omega.

87. The 2013 Form 10-K also represented that the Company's disclosure controls and procedures were effective. Specifically, the Company stated, in relevant part, as follows:

> **Item 9A.** ***Controls and Procedures***
>
> (a) Evaluation of Disclosure Controls and Procedures
>
> As of the end of the period covered by this report, the Company conducted an evaluation of the effectiveness of its "disclosure controls and procedures," as that phrase is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934. The evaluation was carried out under the supervision and with the participation of management, including the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO").
>
> Based on and as of the date of that evaluation, the Company's CEO and CFO have concluded that (i) the Company's disclosure controls and procedures are designed to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Securities Exchange Act of 1934, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure, and (ii) that the Company's disclosure controls and procedures are effective.

Notwithstanding the foregoing, there can be no assurance that the Company's disclosure controls and procedures will detect or uncover all failures of persons within the Company and its consolidated subsidiaries to disclose material information otherwise required to be set forth in the Company's periodic reports. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures.

(b) Management's Annual Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting, and for performing an assessment of the effectiveness of internal control over financial reporting as of December 31, 2013. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's system of internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Management performed an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2013 based upon criteria set forth in 1992 in a report entitled "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on that assessment and those criteria, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2013. Management has excluded Wisconsin Specialty Protein, L.L.C., from its assessment of internal control over financial reporting as of December 31, 2013 because it was acquired by the Company in a purchase business combination during 2013. Wisconsin Specialty Protein, L.L.C., is a wholly-owned subsidiary whose total assets and total revenues represent 11.6% and 4.0%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2013.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2013 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein. (See Item 8. Financial Statements and Supplementary Data.)

> (c) Changes in Internal Control Over Financial Reporting
>
> There were no changes in the Company's internal control over financial reporting during the quarter ended December 31, 2013 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

88. The 2013 Form 10-K was signed by the Individual Defendants and contained their signed SOX certifications, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

89. The statements set forth in ¶¶87-88 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶72.

90. With respect to the Virginia Plea Agreement, the 2013 Form 10-K stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, the Company's subsidiary, Omega Protein, resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July

> 2013. Omega Protein will be on probation until June 2016, unless the probation period is terminated earlier by the court. The Company recorded charges related to the investigation of $8.0 million and $0.5 million for the years ended 2012 and 2011, respectively.

91. The Company's statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/ or omitted material information for the reasons set forth in ¶74.

**May 7, 2014 Earnings Press Release and Form 10-Q**

92. On May 7, 2014, the Company issued a press release reporting its financial results for the first quarter, the period ended March 31, 2014. The Company reported revenues of $63.5 million for the quarter (compared to $48.9 million in the same period of the prior year), gross profit margin of 32.3% for the quarter (compared to 24.7% in the same period of the prior year), net income of $8.0 million (compared to $2.8 million in the same period of the prior year), earnings per diluted share of $0.37 (compared to $0.14 in the same period of the prior year) and adjusted EBITDA of $19.1 million for the quarter (compared to $10.0 million in the same period of the prior year).

93. Commenting on these results, defendant Scholtes stated: "[w]e continue to see strong momentum in both our animal and human nutrition segments. These results helped us generate yet another quarter of year-over-year margin and earnings growth." Defendant Scholtes further stated that: "[o]ur business continues to benefit from favorable animal nutrition supply and demand dynamics and we are increasingly pleased with our improved human nutrition results as we further execute on our strategic initiatives to expand our value-added product offering for consumers."

94. The statements set forth in ¶¶92-93 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶68.

95. On May 7, 2014, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the first quarter, the period ended March 31, 2014 ("Q1

2014 10-Q"). In addition to reiterating the quarterly results reported in the Company's press release, the Q1 2014 10-Q also included statements regarding the Company's "Evaluation of Disclosure Controls and Procedures" as set forth in ¶69.

96. The Q1 2014 10-Q was signed by defendant Johannesen and contained SOX certifications by defendants Scholtes and Johannesen attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

97. The statements set forth in ¶¶95-96 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶72.

98. With respect to the Virginia Plea Agreement, the Q1 2014 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, the Company's subsidiary, Omega Protein, resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the

> subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016, unless the probation period is terminated earlier by the court.

99. The Company's statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶74.

**August 6, 2014 Earnings Press Release and Form 10-Q**

100. On August 6, 2014, the Company issued a press release reporting its financial results for the second quarter, the period ended June 30, 2014. The Company reported revenues of $71.9 million for the quarter (compared to $41.8 million in the same period of the prior year), gross profit margin of 28.4% for the quarter (compared to 31.8% in the same period of the prior year), net income of $6.6 million (compared to $4.0 million in the same period of the prior year), earnings per diluted share of $0.31 (compared to $0.19 in the same period of the prior year) and adjusted EBITDA of $18.3 million for the quarter (compared to $11.8 million in the same period of the prior year). Commenting on the Company's performance, defendant Scholtes stated: "[w]e are pleased with our solid performance in the second quarter. Positive supply and demand fundamentals in our animal nutrition segment fueled our strong revenue and earnings performance."

101. The statements set forth in ¶100 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶68.

102. On August 6, 2014, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the second quarter, the period ended June 30, 2014 ("Q2 2014 10-Q"). In addition to reiterating the quarterly results reported in the Company's press release, the Q2 2014 10-Q also included statements regarding the Company's "Evaluation of Disclosure Controls and Procedures" as set forth in ¶69.

103. The Q2 2014 10-Q was signed by defendant Johannesen and contained SOX certifications by defendants Scholtes and Johannesen attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

104. The statements set forth in ¶¶102-103 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶72.

105. With respect to the Virginia Plea Agreement, the Q2 2014 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, the Company's subsidiary, Omega Protein, resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016, unless the probation period is terminated earlier by the court.

106. The Company's statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/ or omitted material information for the reasons set forth in ¶74.

**November 17, 2014 Earnings Press Release and Form 10-Q**

107. On November 17, 2014, the Company issued a press release reporting its earnings for the third quarter, the period ended September 30, 2014. The Company reported revenues of $70.8 million for the quarter (compared to $87.6 million in the prior year), gross profit margin of 20.0% for quarter (compared to 33.6% in the same period in the prior year), net income of $0.7 million (compared to $14.0 million in same period of the prior year), earnings per diluted share of $0.03 (compared to $0.66 in the same period of the prior year) and adjusted EBITDA of $9.3 million for the quarter (compared to $27.1 million in the same period of the prior year).

108. The statements set forth in ¶107 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶68.

109. On November 17, 2014, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the third quarter, the period ended September 30, 2014 ("Q3 2014 10-Q"). In addition to reiterating the quarterly results reported in the Company's press release, the Q3 2014 10-Q also included statements regarding the Company's "Evaluation of Disclosure Controls and Procedures" as set forth in ¶69.

110. The Q3 2014 10-Q was signed by defendant Johannesen and contained SOX certifications by defendants Scholtes and Johannesen attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

111. The statements set forth in ¶¶109-110 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶72.

112. With respect to the Virginia Plea Agreement, the Q3 2014 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, the Company's subsidiary, Omega Protein, resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016, unless the probation period is terminated earlier by the court.

113. The Company's statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/ or omitted material information when made for the reasons set forth in ¶74.

**March 11, 2015 Earnings Press Release and Form 10-K**

114. On March 11, 2015, Omega issued a press release reporting the Company's earnings for the year and fourth quarter, the periods ended December 31, 2014. The Company reported revenues of $102.5 million for the quarter and $308.6 million for the year, gross profit margin of

22.0% for the quarter and 25.1% for the year, net income of $3.2 million for the quarter and $18.5 million for the year, earnings per diluted share of $0.14 for the quarter and $0.85 for the year and adjusted EBITDA of $19.7 million for the quarter and $70.1 million for the year. Commenting on these results, defendant Scholtes stated: "[t]he fourth quarter of 2014 concluded a successful year for Omega Protein, both in terms of consolidated financial results and progress towards achieving our strategic objectives. While we faced headwinds in certain aspects of our business, the Company managed to generate its second highest annual gross profit and adjusted EBITDA." Further, defendant Scholtes stated: "[w]e believe that we are better positioned than ever before to capitalize on the positive fundamentals in the specialty protein and oil sectors of the animal and human nutrition markets to increase profitability and enhance shareholder value long-term."

115. The statements set forth in ¶114 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶68.

116. On March 11, 2015, the Company filed its Annual Report on Form 10-K, which formally presented its financial results for the fourth quarter and full-year, the periods ended December 31, 2014 ("2014 Form 10-K"). In addition to reiterating the results reported in the press release, the Company's 2014 Form 10-K included disclosures regarding its environmental compliance as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations.

117. The statement above which discloses that "it is ***possible*** that environmental laws could result in material expenditures" is materially misleading in the absence of additional disclosures of the Company's ongoing and active violation of its environmental, safety and reporting

obligations mandated by the Virginia Plea Agreement and the attendant risks that these violations would adversely affect the Company.

118. The 2014 Form 10-K further set forth that the Company's disclosure controls and procedures were effective stating, in pertinent part, as follows:

> **Item 9A.** ***Controls and Procedures***
>
> (a) Evaluation of Disclosure Controls and Procedures
>
> As of the end of the period covered by this report, the Company conducted an evaluation of the effectiveness of its "disclosure controls and procedures," as that phrase is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934. The evaluation was carried out under the supervision and with the participation of management, including the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO").
>
> Based on and as of the date of that evaluation, the Company's CEO and CFO have concluded that (i) the Company's disclosure controls and procedures are designed to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Securities Exchange Act of 1934, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure, and (ii) that the Company's disclosure controls and procedures are effective.
>
> Notwithstanding the foregoing, there can be no assurance that the Company's disclosure controls and procedures will detect or uncover all failures of persons within the Company and its consolidated subsidiaries to disclose material information otherwise required to be set forth in the Company's periodic reports. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures.
>
> (b) Management's Annual Report on Internal Control Over Financial Reporting
>
> Management is responsible for establishing and maintaining adequate internal control over financial reporting, and for performing an assessment of the effectiveness of internal control over financial reporting as of December 31, 2014. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's system of internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of

> records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.
>
> Management performed an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2014 based upon criteria set forth in 2013 in a report entitled "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on that assessment and those criteria, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2014. Management has excluded Bioriginal Food & Science Corp. from its assessment of internal control over financial reporting as of December 31, 2014 because it was acquired by the Company in a purchase business combination during 2014. Bioriginal Food & Science Corp. is a wholly-owned subsidiary whose total assets and total revenues represent 24.3% and 11.7%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2014.
>
> The effectiveness of the Company's internal control over financial reporting as of December 31, 2014 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein. (See Item 8. Financial Statements and Supplementary Data.)
>
> (c) Changes in Internal Control Over Financial Reporting
>
> There were no changes in the Company's internal control over financial reporting during the quarter ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

119. The 2014 Form 10-K was signed by the Individual Defendants and contained signed SOX certifications by the Individual Defendants, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

120. The statements set forth in ¶¶118 and 119 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶72.

121. With respect to the Virginia Plea Agreement, the 2014 Form 10-K stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, the Company's subsidiary, Omega Protein, resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016, unless the probation period is terminated earlier by the court. The Company recorded charges related to the investigation of $8.0 million for the year ended 2012.

122. The Company's statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶74.

**May 11, 2015 Earnings Press Release and Form 10-Q**

123. On May 11, 2015, the Company issued a press release announcing its financial results for the first quarter, the period ended March 31, 2015. The Company reported revenues of $71.6 million (compared to $63.5 million in the same period of the prior year), gross profit margin of

20.7% for the quarter (compared to 32.3% in the same period of the prior year), net income of $1.7 million (compared to $8.0 million in the same period of the prior year), earnings per diluted share of $0.08 (compared to $0.37 in the same period of the prior year) and adjusted EBITDA of $10.4 million for the quarter (compared to $19.1 million in the same period of the prior year).

124. The statements set forth in ¶123 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶68.

125. On May 11, 2015, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the first quarter, the period ended March 31, 2015 (the "Q1 2015 10-Q"). In addition to reiterating the results reported in the May 11, 2015 press release, the Q1 2015 10-Q made statements regarding the effectiveness of Omega's "Evaluation of Disclosure Controls and Procedures" as stated in ¶69.

126. The Q1 2015 10-Q was signed by defendant Johannesen and contained SOX certifications by defendants Scholtes and Johannesen attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in paragraph ¶71.

127. The statements set forth in ¶¶125-26 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶72.

128. With respect to the Virginia Plea Agreement, the Q1 2015 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water

> discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, the Company's subsidiary, Omega Protein, resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016, unless the probation period is terminated earlier by the court.

129. The Company's statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶74.

**August 5, 2015 Earnings Press Release and Form 10-Q**

130. On August 5, 2015, Omega issued a press release reporting the Company's earnings for the second quarter, the period ended June 30, 2015. The Company reported revenues of $93.2 million for the quarter (compared to $71.9 million in the same period of the prior year), gross profit margin of 27.7% for the quarter (compared to 28.4% in the same period of the prior year), net income of $8.8 million (compared to $6.6 million in the same period of the prior year), earnings per diluted share of $0.40 (compared to $0.31 in the same period of the prior year) and adjusted EBITDA of $21.6 million for the quarter (compared to $18.3 million in the same period of the prior year). Commenting on these results, defendant Scholtes stated as follows: "[b]oth of our animal and

human nutrition segments performed well in the quarter, driving solid growth in consolidated revenues and earnings over the prior year period."

131. The statements set forth in ¶130 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶68.

132. On August 5, 2015, the Company filed its Quarterly Report on Form 10-Q, which formally presented its results for the second quarter, the period ended June 30, 2015 (the "Q2 2015 10-Q"). In addition to reiterating the results reported in the August 5, 2015 press release, the Q2 2015 10-Q stated that the Company's "Evaluation of Disclosure Controls and Procedures" were effective as stated in ¶69.

133. The Q2 2015 10-Q was signed by defendant Johannesen and contained SOX certifications by defendants Scholtes and Johannesen attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in paragraph ¶71.

134. The statements set forth in ¶¶132-33 were materially false and misleading and/ or omitted material information when made for the reasons set forth in ¶72.

135. With respect to the Virginia Plea Agreement, the Q2 2015 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail water practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently

> reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, the Company's subsidiary, Omega Protein, resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016.

136. The Company's statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶74.

**November 4, 2015 Earnings Press Release and Form 10-Q**

137. On November 4, 2015, Omega issued a press release reporting the Company's earnings for the third quarter, the period ended September 30, 2015. The Company reported revenues of $112.2 million for the quarter (compared to $70.8 million in the same period of the prior year), gross profit margin of 31.4% for the quarter (compared to 20.0% in the same period of the prior year), net income of $10.6 million (compared to $0.7 million in the same period of the prior year), earnings per diluted share of $0.47 (compared to $0.03 in the same period of the prior year) and adjusted EBITDA of $28.7 million for the quarter (compared to $13.1 million in the same period of the prior year). Commenting on these results, defendant Scholtes stated: "[w]e are pleased to report the highest quarterly revenues and Adjusted EBITDA in the Company's history." Defendant Scholtes further stated: "[o]ur solid animal nutrition profitability was fueled by strong season-to-date fish catch and pricing for fish meal and fish oil that remains well above levels seen a few years ago.

In addition, our ongoing efforts to improve results in the human nutrition business resulted in growth in both revenues and gross margin. Our team remains committed to creating additional value for shareholders through further integration and the disciplined pursuit of organic growth opportunities."

138. The statements set forth in ¶137 were materially false and misleading and/ or omitted material information when made for the reasons set forth in ¶68.

139. On November 4, 2015, the Company filed its Quarterly Report on Form 10-Q, which formally presented its results for the third quarter, the period ended September 30, 2015 (the "Q3 2015 10-Q"). In addition to reiterating the results reported in the November 4, 2015 press release, the Q3 2015 10-Q stated that the Company's "Evaluation of Disclosure Controls and Procedures" were effective as stated in ¶69.

140. The Q3 2015 10-Q was signed by defendant Johannesen and contained SOX certifications by defendants Scholtes and Johannesen attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

141. The statements set forth in ¶¶139-40 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶72.

142. With respect to the Virginia Plea Agreement, the Q3 2015 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail water practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at Omega Protein's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail water and bilge water practices at its Reedville

> facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, Omega Protein resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, Omega Protein pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and Omega Protein paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016.

143. The Company's statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information for the reasons set forth in ¶74.

**March 9, 2016 Earnings Press Release and Form 10-K**

144. On March 9, 2016, the Company issued a press release announcing its financial results for the fourth quarter and year, the periods ended December 31, 2015. The Company reported revenues of $82.3 million for the quarter and $359.3 million for the year, gross profit margin of 28.0% for the quarter and 27.5% for the year, net income of $2.9 million for the quarter and $24.0 million for the year, earnings per diluted share of $0.13 for the quarter and $1.07 for the year and adjusted EBITDA of $18.9 million for the quarter and $79.6 million for the year. Commenting on the Company's results, Defendant Scholtes stated: "2015 was a transformational year for Omega Protein as our financial results, including a record Adjusted EBITDA, reflect contributions from a robust fish harvest, continued strong demand for our products, efficient operational performance and the Bioriginal acquisition." Scholtes further stated: "[w]e continue to take strategic actions to build on these accomplishments and better position our business for future

growth. These efforts include our plan to invest an additional $18 million of growth capital to further improve the efficiency of our animal nutrition business, and our decision to refocus our human fish oil business by exiting concentrated oils manufacturing. We remain confident about our opportunities to generate improved volumes and profitability, and in turn increase shareholder value in 2016."

145. The statements set forth in ¶144 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶68.

146. On March 9, 2016, the Company filed its Annual Report on Form 10-K, which formally presented its financial results for the fourth quarter and full-year, the periods ended December 31, 2015 ("2015 Form 10-K"). In addition to reiterating the results reported in the press release, the Company's 2015 Form 10-K included disclosures regarding its environmental compliance setting forth as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations, financial condition and results of operations.

147. The statement above stating that "it is ***possible*** that environmental laws and regulations could require material expenditures" is materially false and misleading in the absence of additional disclosures of the Company's ongoing and active violation of its environmental, safety and reporting obligations mandated by the Virginia Plea Agreement and the attendant risks that the these violations would adversely affect the Company.

148. The 2015 Form 10-K further set forth that the Company's disclosure controls and procedures were effective as follows:

> **Item 9A. *Controls and Procedures***
>
> (a) Evaluation of Disclosure Controls and Procedures

As of the end of the period covered by this report, the Company conducted an evaluation of the effectiveness of its "disclosure controls and procedures," as that phrase is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934. The evaluation was carried out under the supervision and with the participation of management, including the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO").

Based on and as of the date of that evaluation, the Company's CEO and CFO have concluded that (i) the Company's disclosure controls and procedures are designed to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Securities Exchange Act of 1934, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure, and (ii) that the Company's disclosure controls and procedures are effective.

Notwithstanding the foregoing, there can be no assurance that the Company's disclosure controls and procedures will detect or uncover all failures of persons within the Company and its consolidated subsidiaries to disclose material information otherwise required to be set forth in the Company's periodic reports. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or override of the controls and procedures.

(b) Management's Annual Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting, and for performing an assessment of the effectiveness of internal control over financial reporting as of December 31, 2015. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's system of internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Management performed an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2015 based upon criteria

> set forth in 2013 in a report entitled "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on that assessment and those criteria, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2015.
>
> The effectiveness of the Company's internal control over financial reporting as of December 31, 2015 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein. (See Item 8. Financial Statements and Supplementary Data.)
>
> (c) Changes in Internal Control Over Financial Reporting
>
> There were no changes in the Company's internal control over financial reporting during the quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

149. The 2015 Form 10-K was signed by the Individual Defendants and contained their signed SOX certifications, attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

150. The statements set forth in ¶¶148-49 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶72.

151. With respect to the Virginia Plea Agreement, the 2015 Form 10-K stated, in relevant part as follows:

> In April 2010, Omega Protein received a request for information from the E.P.A concerning its bail water practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at Omega Protein's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the E.P.A. request for information.

> In June 2013, Omega Protein resolved both the U.S. Coast Guard and E.P.A. investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, Omega Protein pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and Omega Protein paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016.

152. The Company's statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶74.

**May 4, 2016 Earnings Press Release and Form 10-Q**

153. On May 4, 2016, Omega issued a press release announcing the Company's financial results for the first quarter, the period ended March 31, 2016. The Company reported revenues of $84.8 million (compared to $71.6 million in the same period of the prior year), gross profit margin of 29.3% (compared to 20.7% in the same period of the prior year), net income of $8.4 million (compared to $1.7 million in the same period of the prior year), earnings per diluted share of $0.37 (compared to $0.08 in the same period of the prior year) and adjusted EBITDA of $20.4 million (compared to $10.4 million in the same period of the prior year). Commenting on these results, defendant Scholtes stated: "[w]e saw great momentum across our business as we started 2016 with $20 million of Adjusted EBITDA, the highest operating profitability seen in any of the Company's first quarter results. These strong financial results reflect our ability to leverage our core nutritional capabilities to supply customers in the feed, food and supplement sectors."

154. The statements set forth in ¶153 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶68.

155. On May 4, 2016, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the first quarter, the period ended March 31, 2016 (the "Q1 2016 10-Q"). In addition to reiterating the results reported in the May 4, 2016 press release, the Q1 2016 10-Q further stated that the Company's "Evaluation of Disclosure Controls and Procedures" was effective as stated in ¶69.

156. The Q1 2016 10-Q was signed by defendant Johannesen and contained SOX certifications by defendants Scholtes and Johannesen attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

157. The statements set forth in ¶¶155-56 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶72.

**August 3, 2016 Form 10-Q**

158. On August 3, 2016, the Company filed a Quarterly Report on Form 10-Q which formally presented its financial results for the second quarter, the period ended June 30, 2016 ("Q2 2016 10-Q"). In addition to reiterating the results reported in the August 3, 2016 press release, the Q2 2016 10-Q stated that the Company's "Evaluation of Disclosure Controls and Procedures" was effective as stated in ¶69.

159. The Q2 2016 10-Q was signed by defendant Johannesen and contained SOX certifications by defendants Scholtes and Johannesen attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial

reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

160. The statements set forth in ¶¶158-159 were materially false and misleading and/or omitted material information when made because: (a) they failed to disclose that the Company had violated the terms of its probation as set forth in the Virginia Plea Agreement through improper wastewater disposal activities at the Abbeville, Louisiana plant; and (b) that in failing to disclose material information about the Company's violations of its probation under the Virginia Plea Agreement and the extent of such violations: (i) Defendants were violating their disclosure obligations under SEC regulations; and (ii) the likelihood that the SEC would open an investigation into the Company had dramatically increased.

**November 2, 2016 Form 10-Q**

161. On November 2, 2016, the Company filed a Quarterly Report on Form 10-Q which formally presented its financial results for the third quarter, the period ended September 30, 2016 ("3Q 2016 10-Q"). In addition to reiterating the results reported in the November 2, 2016 press release, the 3Q 2016 10-Q further stated that the Company's "Evaluation of Disclosure Controls and Procedures" was effective as stated in ¶69.

162. The 3Q 2016 10-Q was signed by defendant Johannesen and contained SOX certifications by defendants Scholtes and Johannesen attesting to the accuracy of the Company's financial reporting, the design, strength and effectiveness of Omega's disclosure controls and procedures, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. These certifications repeated in substance the same representations as set forth in ¶71.

163. The statements set forth in ¶¶161-162 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶160.

## THE COMPANY DISCLOSES THE SEC'S INVESTIGATION INTO OMEGA'S PROBATION VIOLATIONS

164. On March 1, 2017, after the close of regular trading, Omega filed the 2016 Form 10-K with the SEC disclosing that several months earlier, in December 2016, it received a subpoena from the SEC requesting information in connection with an investigation relating to its subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees. Omega further revealed that "it is possible that the foregoing matter could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition."

165. On this news, shares of Omega fell $6.25 per share, or over 23.81% from its previous closing price, to close at $20.00 per share on March 2, 2017, causing substantial loss to investors. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

166. Following the issuance of the 2016 Form 10-K, Omega held a conference call with analysts and investors to discuss the Company's financial performance. Defendants Scholtes and Johannesen participated in the call. During the question and answer period, Mitch Pinheiro, an analyst at Wunderlich, raised questions about the SEC investigation. The following exchange took place:

> **Mitch Pinheiro** - Wunderlich – Analyst
>
> Okay. And then, two more questions, again another regulatory issues. Reading the K, you disclosed that you received the subpoena from the SEC relating to I guess your probation terms. And that was back in December. Why wouldn't that have been something you had disclosed back at that time? I mean it is two months. Why so long or is it not material?
>
> **John Held** - Omega Protein Corporation - EVP and General Counsel
>
> Hi, It is John Held, General Counsel. There is no requirement to disclose an event like that. We have put that in voluntarily just as additional information. And again,

language in the 10-K really would have been the same in December as it is now. We received a subpoena and we are in the process of responding to it.

**Mitch Pinheiro** - Wunderlich - Analyst

Okay. So, just curious, is there some element of materiality in the decision to disclose that or is that not part of the decision, just curious how that works? Does it imply immateriality?

**John Held** - Omega Protein Corporation - EVP and General Counsel

It could. I mean, there is some element of materiality in making that decision. Yes.

167. John Held's statements in response to an analyst question about the disclosure of the SEC investigation acknowledges that the Company's decision to disclose the SEC investigation was itself an admission of the investigation's materiality.

168. Analysts further expressed surprise over the Company's repeated violation of its probation and the SEC investigation. On March 2, 2017, Pivotal Research Group issued a report, noting that the disclosure of the SEC investigation presented an additional risk to the Company commenting: "[w]e are uncomfortable with the company violating its probation and negotiating criminal pleas twice in the past five years."

169. On May 17, 2017, the Company disclosed that it had drawn more regulatory scrutiny and that it had received an additional subpoena from the SEC that called for, among other things, the production of documents concerning Omega's calculation of its cost of sales for fiscal years 2014 through 2016, including documents related to its statement that: "[t]he decrease in cost per unit of sales is primarily due to lower cost per unit for beginning of year inventory as a result of higher fish catch and production in the 2015 fishing season compared to 2014." The subpoena also sought documents reflecting Omega's accounting policies and procedures for inventories and cost of sales for fiscal years 2014 through 2016, including its methodologies for calculating and allocating direct and indirect costs.

## ADDITIONAL SCIENTER ALLEGATIONS

170. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Omega, their control over, and/or receipt and/or modification of Omega's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Omega, participated in the fraudulent scheme alleged herein.

171. Moreover, knowledge of the Company's ongoing violation of its obligations under the Virginia Plea Agreement can be imputed to each of the Individual Defendants whom, as executive officers, knew or recklessly ignored facts related to a core aspect of the Company's operations – its menhaden processing plants. In 2016, 43.4% of Omega's revenue was derived from its processing of menhaden into fish meal, fish oil, refined oil and fish solubles. Moreover, the Company operated only ***three*** menhaden processing plants – one in Louisiana, Mississippi and Virginia.

172. In June of 2013, the Company entered in the Virginia Plea Agreement to resolve the myriad violations of the Clean Water Act and agreed to develop and implement MS&ESC which provided explicit rules regarding, among other things, the maintenance of oil record books, bilge water management and bail water management. Omega's management was then on high alert of the severity of the Company's past criminal violations of the Clean Water Act and the importance of future compliance and the impact that a violation could have on Omega going forward. As such, the

Individual Defendants had a duty to closely monitor the activities at the Company's three menhaden processing plants and to ensure compliance before making their public statements.

173. Defendant Johannesen's scienter is further supported by the substantial and suspicious nature of his sales of stock during the Class Period. While Omega was violating its probation under the Virginia Plea Agreement, Defendant Johannsen sold 33,998 shares of his personally held Omega stock at artificially inflated prices, yielding $754,639 in proceeds (including one sale in December 2016, around the time that the Company had received – but not disclosed – a subpoena from the SEC). Defendant Johannesen's trading is set forth below:

**Johannesen's Trading During Class Period**

| | | | |
|---|---|---|---|
| 07/18/14 | 2,700 | $13.96 | $37,692 |
| 08/25/14 | 1,100 | $15.00 | $16,500 |
| 08/26/14 | 1,900 | $15.03 | $28,557 |
| 04/01/15 | 1,000 | $14.00 | $14,000 |
| 08/05/15 | 1,000 | $14.50 | $14,500 |
| 08/06/15 | 1,000 | $15.24 | $15,240 |
| 08/10/15 | 1,000 | $16.00 | $16,000 |
| 12/04/15 | 1,170 | $23.84 | $27,893 |
| 12/04/15 | 4,128 | $23.10 | $95,357 |
| 09/08/16 | 17,000 | $25.70 | $436,900 |
| 12/13/16 | 2,000 | $26.00 | $52,000 |
| | 33,998 | | $754,639 |

## LOSS CAUSATION

174. As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Omega securities and operated as a fraud or deceit on purchasers of such securities by failing to disclose and misrepresenting adverse facts. As such misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Omega securities declined significantly as the prior artificial inflation came out of the Company's share price.

175. As a result of its purchases of Omega securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Omega securities to trade at artificially inflated levels throughout the Class Period.

176. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Omega's business and future financial prospects. When the truth about the Company was revealed to the market, the price of Omega securities fell significantly. Such declines removed the inflation from the price of Omega securities, causing real economic loss to investors who had purchased Omega securities during the Class Period.

177. The declines in the price of Omega securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Omega securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

178. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Omega securities and the subsequent significant declines in the value of Omega securities when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

179. Specifically, on March 1, 2017, the Company announced that several months before, in December of 2016, the Company received a subpoena "requesting information in connection with an investigation relating to a Company subsidiary's compliance with probation terms and the Company's protection of whistleblower employees." On this news, shares of Omega fell $6.25 per

share, or over 23.81%, from its previous closing price to close at $20.00 per share on March 2, 2017, causing substantial loss to investors. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other class members have suffered significant losses and damages.

180. On May 17, 2017, the Company disclosed that it had drawn more regulatory scrutiny and that it had received an additional subpoena from the SEC that called for, among other things, the production of documents concerning Omega's calculation of its cost of sales for fiscal years 2014 through 2016, including documents related to its statement that: "[t]he decrease in cost per unit of sales is primarily due to lower cost per unit for beginning of year inventory as a result of higher fish catch and production in the 2015 fishing season compared to 2014." The subpoena also sought documents reflecting Omega's accounting policies and procedures for inventories and cost of sales for fiscal years 2014 through 2016, including its methodologies for calculating and allocating direct and indirect costs.

181. In response to this disclosure, shares of Omega declined as much as $1.58 per share, or 8.5%, from the previous day's closing price of $19.10, to a low of $17.47 per share.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

182. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Omega securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

183. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Omega securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Omega or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

184. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

185. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

186. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Omega;
- whether the Individual Defendants caused Omega to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Omega securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

187. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

188. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Omega securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased or acquired Omega securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

189. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

190. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United*

*States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

191. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

192. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

193. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Omega securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Omega securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

194. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above,

including statements made to securities analysts and the media that were designed to influence the market for Omega securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Omega's finances and business prospects.

195. By virtue of their positions at Omega, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

196. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives of Omega, the Individual Defendants had knowledge of the details of Omega's internal affairs.

197. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Omega. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Omega's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Omega securities was artificially inflated throughout the Class Period. In ignorance of the adverse

facts concerning Omega's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Omega securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

198. During the Class Period, Omega securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Omega securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Omega securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Omega securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

199. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and acquisitions of the Company's securities during the Class Period, upon the disclosure at the end of the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

200. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

201. During the Class Period, the Individual Defendants participated in the operation and management of Omega, and conducted and participated, directly and indirectly, in the conduct of Omega's business affairs. Because of their senior positions, they knew the adverse non-public information about Omega.

202. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Omega's financial condition and results of operations, and to correct promptly any public statements issued by Omega which had become materially false or misleading.

203. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Omega disseminated in the marketplace during the Class Period concerning Omega. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Omega to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Omega within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Omega securities.

204. Each of the Individual Defendants, therefore, acted as a controlling person of Omega. By reason of their senior management positions and/or being directors of Omega, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

Omega to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Omega and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

205. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Omega.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED: July 17, 2017

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
AVITAL O. MALINA

*/s/ David A. Rosenfeld*

DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
amalina@rgrdlaw.com

*Lead Counsel for Plaintiff*

MARINO ASSOCIATES
STEVEN F. MARINO
301 Wharton Street
Philadelphia, PA 19147
Telephone: 215/462-3200
215/462-4763 (fax)

*Additional Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on July 17, 2017, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD