UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL DIEHL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>OMEGA PROTEIN CORPORATION, BRET D. SCHOLTES and ANDREW C. JOHANNESEN,<br><br>Defendants. | Civil Action No. 1:17-cv-02448-PKC<br><br><u>CLASS ACTION</u><br><br>SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

**TABLE OF CONTENTS**

**Page**


NATURE OF THE ACTION ....................................................................................1

JURISDICTION AND VENUE ..............................................................................4

PARTIES ..................................................................................................................5

SUBSTANTIVE ALLEGATIONS ..........................................................................7

The Company and Its Business ................................................................................7

Clean Water Act Violations at the Virginia Plant (2008-2010).................................10

Omega Violates Its Probation Obligations Under the Virginia Plea Agreement..............15

Mississippi Plant Violations ..................................................................................15

Louisiana Plant Violations......................................................................................17

Defendants Violated Their Disclosure Requirements By Failing to Disclose Probation Violations and Their Attendant Risks ..................................................18

Defendants Failed to Disclose that Omega's Reported Operating Results Significantly Benefited From Its Failure to Comply with the Virginia Plea Agreement..................................................................................................................21

The SEC's Probe into the Company's Violation of Its Probation and Its Accounting Compliance.........................................................................................21

MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD...................................................................................................22

August 6, 2013 Earnings Press Release and Form 10-Q ..................................................22

November 6, 2013 Earnings Press Release and Form 10-Q...........................................25

March 10, 2014 Earnings Press Release and Form 10-K .................................................27

May 7, 2014 Earnings Press Release and Form 10-Q .....................................................30

August 6, 2014 Earnings Press Release and Form 10-Q ..................................................32

November 17, 2014 Earnings Press Release and Form 10-Q...........................................33

March 11, 2015 Earnings Press Release and Form 10-K .................................................34

May 11, 2015 Earnings Press Release and Form 10-Q ...................................................37

**Page**


August 5, 2015 Earnings Press Release and Form 10-Q ....................38

November 4, 2015 Earnings Press Release and Form 10-Q ....................40

March 9, 2016 Earnings Press Release and Form 10-K ....................41

May 4, 2016 Earnings Press Release and Form 10-Q ....................44

August 3, 2016 Earnings Press Release and Form 10-Q ....................44

November 2, 2016 Earnings Press Release and Form 10-Q ....................45

THE COMPANY DISCLOSES THE SEC'S INVESTIGATION INTO OMEGA'S PROBATION VIOLATIONS ....................47

ADDITIONAL SCIENTER ALLEGATIONS ....................49

LOSS CAUSATION ....................53

PLAINTIFF'S CLASS ACTION ALLEGATIONS ....................54

COUNT I ....................57

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ....................57

COUNT II ....................59

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ....................59

Lead Plaintiff IBEW Local 98 Pension Fund ("Lead Plaintiff" or "Plaintiff") alleges the following based on the investigation of its counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Omega Protein Corporation ("Omega" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company and media reports about the Company. These allegations are further supported by the first-hand knowledge of a former employee ("FE") of Omega between 2012 and January 2015. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Omega securities between August 6, 2013 and March 1, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top executives.

2. Omega describes itself as a nutritional products company that develops, produces, and delivers products that improve the nutritional integrity of foods, dietary supplements and animal feeds. The Company is comprised of two major business segments: animal nutrition and human nutrition. Omega's animal nutrition segment processes menhaden – a small species of fish found in the Atlantic Ocean and the Gulf of Mexico – and uses this fish to manufacture specialty fish meals, fish oils and fish solubles.

3. For over a decade, Omega has continually flouted its environmental compliance obligations. In particular, between 2008 and 2011, Omega repeatedly violated the Federal Water

Pollution Control Act ("Clean Water Act") by improperly managing contaminated water that was used in the processing of the menhaden at the Company's Reedville, Virginia plant. Specifically, the Company: (i) failed to go beyond the required distance before discharging contaminated water into the ocean; (ii) failed to properly supply its vessels with appropriate equipment to filter, monitor and record the oil content of water that was used to process menhaden; and (iii) failed to maintain the required oil record books, which monitored the oil content in the water.

4. On June 4, 2013, Omega entered into a plea agreement with the United States Attorney for the Eastern District of Virginia (the "Virginia Plea Agreement") in which the Company pled guilty to several violations of the Clean Water Act and committed itself to developing and implementing an extensive environmental program entitled the "Environmental Management System" ("EMS") at all of its facilities. This program also required Omega to maintain an "open reporting system" wherein employees could anonymously report any issues of Omega's non-compliance without retaliation.

5. Even in the wake of the Virginia Plea Agreement, the Company continued to violate its environmental obligations. Indeed, throughout the Class Period, Defendants endorsed a corporate culture which placed a premium on cost-saving and expedience as opposed to environmental and legal compliance. As recounted by FE, who worked for Omega between 2012 and January 2015, water compliance regulations were regularly violated at FE's division in Moss Point, Mississippi. According to FE, the pH levels of the water at the plant were not monitored appropriately on a regular basis and the pH was only adjusted to its permissible levels when the plant was being inspected. FE stated that these issues were known by the plant management and he/she believed that the Individual Defendants (defined herein) were also aware. FE also reported that plant workers who reported compliance violations were terminated.

6. Moreover, as detailed further herein, the Company violated the terms of its probation under the Virginia Plea Agreement at its Louisiana plant by continuing to make improper discharges into bodies of water. This conduct ultimately resulted in the extension of Omega's probation and its entry into yet another plea agreement for the Company's Louisiana environmental violations.

7. Notwithstanding these violations, throughout the Class Period, Omega represented to the public that the Company had implemented the required systems to ensure its compliance with the Virginia Plea Agreement and reported positive financial results. Particularly, in the Company's annual filings, Defendants stated that ***"[t]he Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement."*** [1] During this time, however, Defendants failed to disclose that the Company continued to violate the terms of the Virginia Plea Agreement to the extent that it: (i) exposed Omega to a substantial risk that it would incur financial penalties and/or reputational harm related to further regulatory intervention or censure; and (ii) dramatically increased the likelihood that the SEC would open an investigation into the Company.

8. On March 1, 2017, after the close of regular trading, the Company filed its Form 10-K for the year ended December 31, 2016 with the SEC (the "2016 Form 10-K") in which it disclosed that, several months before, in December 2016, the Company received a subpoena from the SEC requesting information in connection with an investigation "relating to a Company subsidiary's compliance with probation terms and the Company's protection of whistleblower employees." Omega further revealed that "it is possible that the foregoing matter could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition."

[1] Unless otherwise noted, emphasis is added throughout.

9. On this news, shares of Omega fell $6.25 per share, or over 23.81%, from its previous closing price to close at $20.00 per share on March 2, 2017, causing substantial loss to investors. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other class members have suffered significant losses and damages.

10. Analysts expressed surprise and disappointment at the Company's repeated environmental violations and the related SEC investigation. On March 2, 2017, Pivotal Research Group issued a report noting that the disclosure of the SEC investigation presented an additional risk to the Company, commenting: "[w]e are uncomfortable with the company violating its probation and negotiating criminal pleas twice in the past five year[s]."

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) .

13. Venue is properly laid in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Omega's securities trade on the New York Stock Exchange ("NYSE"), located within this District.

14. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

15. Plaintiff, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased Omega securities at artificially inflated prices during the Class Period and was damaged thereby.

16. Defendant Omega is incorporated in Nevada. The Company's principal executive offices are located at 2105 City West Boulevard, Suite 500, Houston, Texas 77042. Omega's shares trade on the NYSE under the ticker symbol "OME."

17. Defendant Bret D. Scholtes ("Scholtes") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and President since January 2012.

18. Defendant Andrew C. Johannesen ("Johannesen") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Executive Vice President since January 2012.

19. Defendants referenced above in ¶¶17-18 are sometimes referred to herein as the "Individual Defendants." The Company and the Individual Defendants together are referred to herein as "Defendants."

20. During the Class Period, the Individual Defendants were privy to confidential and proprietary information concerning Omega, its operations, finances, financial condition and present and future business prospects. Because of their positions with Omega, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Omega's business.

22. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23. As controlling persons of a publicly-traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Omega's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Omega securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

24. Omega describes itself as a nutritional products company that develops, produces, and delivers products that improve the nutritional integrity of foods, dietary supplements, and animal feeds. Omega's main products are Omega-3 fish oil and specialty fish meal products. The Company is headquartered in Houston, Texas and operates seven manufacturing facilities located in the United States, Canada and Europe.

25. The Company operates in two primary industry segments: animal nutrition and human nutrition. Omega's animal nutrition segment is comprised primarily of two subsidiaries: (i) Omega Protein, Inc., the largest U.S. producer of protein rich meal and oil derived from marine sources; and (ii) Omega Shipyard, a company in Moss Point, Mississippi that operates a dry-dock facility which provides shore side maintenance for the Company's fishing fleet. Omega's animal nutrition products are sold in the U.S. and in the international market. International sales consist of both fish meal and fish oil and are primarily marketed to China, Norway, Canada, Saudi Arabia, Japan and Taiwan.

26. Omega's animal nutrition segment develops products such as specialty fish meal, crude and refined fish oil and fish solubles from menhaden – a herring-like species of fish found in commercial quantities in the U.S. coastal waters of the Atlantic Ocean and the Gulf of Mexico. Omega's principal operating subsidiary is Omega Protein, Inc. The Company owns 100% of the common stock of Omega Protein, Inc., and, as reflected in the chart below, a significant majority of the Company's revenue comes from the operations of this subsidiary:

| Year | Company-Wide Revenue | Omega Protein, Inc. Revenue | Omega Protein, Inc. % of Company-Wide Revenue |
|---|---|---|---|
| 2012 | $235.6 m | $213.6 m | 91% |
| 2013 | $244.3 m | $213.2 m | 87% |
| 2014 | $308.6 m | $242.8 m | 79% |
| 2015 | $359.3 m | $220.1 m | 61% |
| 2016 | $390.8 m | $262.5 m | 67% |

27. Omega operates 38 vessels to harvest menhaden. Omega's fishing season runs from mid-April to the first of November in the Gulf of Mexico and from the beginning of May into December in the Atlantic. Government regulations generally preclude Omega from fishing during off-seasons.

28. Menhaden usually school in large, tight clusters and are commonly found in shallow waters. Omega uses spotter aircraft to locate the schools of menhaden and directs fishing vessels to them. The fishing vessels then transport boats and nets to encircle the school and capture the fish. The fish are then pumped from the net into "refrigerated holds" or containers on the fishing vessels and are subsequently unloaded into the processing plants.

29. Omega's fish meal is sold to feed producers as a high protein ingredient for the aquaculture, pet food and swine livestock industries. Omega's crude fish oil is sold to feed manufacturers, and its refined fish oil is used in food production, feed production, certain industrial applications, and in dietary supplements. Fish solubles are sold as attractants for animal feeds, baits and as fertilizer. Most of Omega's products are sold directly by Omega's agricultural products sales department to approximately 200 customers, while a smaller amount are sold through independent sales agents and the Company's nutrition segment.

30. Omega operates meal and oil processing plants in Louisiana, Mississippi and Virginia. Each plant maintains a dock to unload fish, fish processing equipment and product storage facilities. The processing of menhaden is achieved through the following steps: (i) fish are first unloaded from the fishing vessels into storage boxes and then conveyed into steam cookers; (ii) the fish are then passed through presses to remove most of the oil and water; (iii) the solid portions of the fish are dried and ground into fish meal; (iv) the liquid that is produced in the cooking and pressing operations (which contains oil, water, dissolved protein and some fish solids) is decanted to remove the solids and is put through a centrifugal oil and water separation process; (v) the separated fish oil is a finished product called crude oil; and (vi) the separated water and protein mixture is further processed through evaporators to recover the soluble protein, which can be sold as solubles or added to the solid portions of the fish for processing into fish meal.

31. The Company's human nutrition segment develops and markets products, including plant oils, fish oils, dairy proteins and nutraceuticals, to human nutrition markets.

32. Throughout the Class Period, the human nutrition business failed to perform to expectations and Omega was under increasing pressure to sell the failing segment of the Company. As a result, on September 25, 2015, Omega announced that its Board of Directors was in the process of a review of strategic alternatives including a sale, merger, spin-off, business combination, strategic transaction or a possible share re-purchase program.

33. On May 4, 2016, the Board of Directors announced that it had completed its strategic review and would invest $18 million in high-return capital projects in the animal nutrition business and continue to refocus its human fish oil business by exiting concentrated oils manufacturing. Additionally, Omega announced that the Board authorized a share re-purchase program in which the

Company planned to re-purchase up to $40 million of its outstanding common stock over the next 36 months.

34. To the dismay of many investors and analysts, by the end of the Class Period, Omega had not yet re-purchased a single share through the share re-purchase program. During Omega's conference call on March 2, 2017, which addressed the Company's financial results for the fourth quarter and full-year, the periods ended December 31, 2016, Tim Ramey of Pivotal Research Group commented as follows: "it ought to be a source of embarrassment for the Board to have come out last May and said, yes, we got a share repurchase program in place, we are going to do this; you didn't acquire that first share."

35. Omega's review of strategic alternatives culminated in its recent decision to sell the Company. On October 6, 2017, Omega announced that it entered into an agreement under which Cooke Inc., a parent of Cooke Aquaculture Inc., will acquire all outstanding shares of Omega for $22 per share in cash.

**Clean Water Act Violations at the Virginia Plant (2008-2010)**

36. The processing of mehaden into fish oil, fish meal and fish solubles produces many types of contaminated water. "Bilge water" is water contaminated with fish oil that collects inside the area on the outer surface of a ship's hull. "Refrigerating water" is water that is in compartments or "fish holds" where fish is stored before it is offloaded from the vessel and processed. "Bail water" is water that is used to offload fish into the port. "Processing water" is water that is used to process fish in the plant.

37. The Company's vessels at its Reedville plant used fresh water to "bail" the fish from the fishing vessels into the processing plant. The resultant bail water contained fish wastes, such as scales, fins and excrement. The bail water was also used to convey the fish through the entire processing operation in the plant. As the bail water entered the processing plant and circulated

through the fish processing equipment, it combined with pollutants and caustic substances used for cleaning the processing equipment. Once the combined bail and processing water became too thick to convey fish off the vessels and through the processing equipment, it was stored until it could be loaded onto vessels for off-shore discharge.

38. Bail water contains an excess of nutrients which creates an abundance of nitrogen, phosphorous and ammonia. This can spark an algae bloom, which in turn, eliminates oxygen from the water and can lead to "fish kills" and "dead zones," which are areas where aquatic life cannot flourish.

39. The "Gulf Island" and the "G.P. KIMBERLY" were Reedville based vessels used to transport and dispose of the combined bail and processing water off shore. The vessels or "water boats" were required, consistent with the "fish waste" exclusion contained in the Marine Protection Research and Sanctuaries Act, 33 U.S.C. §1401, *et seq*., to discharge fish waste "beyond three nautical miles from the baseline from which the territorial sea is measured."

40. During the relevant time period, Omega discharged a harmful quantity of oil into the ocean. Specifically, from May 2008 through December 2010, Omega water boats ***routinely*** failed to go beyond three nautical miles as required before discharging the combined bail and processing water. During this same time period, the fishing vessels routinely discharged the combined bail and processing water into the ocean in violation of the Clean Water Act, 33 U.S.C. §§1311(a), 1319(c)(2)(A), 1321(b)(3) and 1319(c)(2)(A).

41. In April of 2010, Omega received a request for information from the Environmental Protection Agency ("EPA") concerning the Company's "bail water" practices at its Reedville plant. Likewise, in February of 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the vessel's "bilge water" discharge practices.

42. Specifically, between February 9 and 11, 2011, Coast Guard Station Portsmouth, Virginia boarded seven of Omega's fishing vessels and determined that, in violation of the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §1901 *et seq.*, the Reedville, Virginia vessels of over 400 gross tons did not have operable oily water separators ("OWSs") and oil content monitors ("OCMs"). Moreover, the Coast Guard inspectors observed oil mixtures in the machinery space bilges of the vessels and determined that bilge pumps aboard the vessels had been aligned in a manner that could cause contaminated water to be discharged into the ocean. Further, the vessel crew members were not able to produce oil record books for the period of April 2009 and September 2010, or any other period of time.

43. The Coast Guard also observed that, due to the age and condition of several of the vessels, they had more than a foot of oily water in the bilge and had leaking shaft seals. Further, the vessels' discharge points were not equipped with oil monitoring and filtering equipment. Inspectors discovered oily residue in the discharge hoses and oily residue on the external hull of the ship. All of these conditions evidence oily discharges from Omega's vessels.

44. According to the Virginia Plea Agreement, Omega employees and other sources indicated that it was common practice to discharge bilge water overboard at the onset of and regularly throughout fishing voyages. Omega employees would use pumps to discharge the bilge water overboard without the use of the OWSs or other filtering and monitoring equipment.

45. The U.S. Attorney's Office for the Eastern District of Virginia reviewed both the results of the Coast Guard inspection and the EPA request for information. Omega's numerous violations of the Clean Water Act in its Reedville plant resulted in the filing of a criminal action, *U.S. v. Omega Protein Inc.*, 2:13-cr-00043 (E.D.V.A. 2013). The criminal information stated that between May 2008 and approximately December 2010, "on numerous separate and discrete

occasions," Omega "knowingly discharged and caused the discharge of pollutants" and "a harmful quantity of oil from certain fishing vessels into waters of the United States, resulting in pecuniary gain...."

46. On June 4, 2013, Omega entered into the Virginia Plea Agreement. Under the Virginia Plea Agreement, Omega pled guilty to the following counts: (i) count one: knowingly discharging pollutants from a point source into waters of the United States without a permit (a violation of the Clean Water Act, 33 U.S.C. §§1311 and 1319(c)(2)); and (ii) count two: knowingly discharging oil into waters of the United States in a quantity that may be harmful on numerous and discrete occasions (a violation of Clean Water Act, 33 U.S.C. §§1321(b)(3) and 1319(c)(2)).

47. The Virginia Plea Agreement subjected the Company to the following penalties: (i) a $5,500,000 fine; (ii) probation for three years; (iii) community service at a cost which amounts to $2,000,000; and (iv) a special assessment of $800.

48. Responding to the Company's entry into the Virginia Plea Agreement, Defendant Scholtes stated: "Omega Protein, Inc. is committed to ensuring that we operate in compliance with federal and state environmental requirements. The Company has expended significant resources to strengthen its environmental compliance systems across its operations." Defendant Scholtes continued by saying: "[w]e are committed to being a responsible corporate citizen and protecting the ocean waters upon which we all rely."

49. David G. McLeod, Jr., a special agent of the EPA who assisted with the case, commented on the severity of Omega's Clean Water Act violations as follows: "[t]oday's sentence should serve as a strong deterrent and further demonstrates our resolve to vigorously prosecute those who despoil our natural resources by cutting corners and handling waste illegally."

50. Further, as a result of the Virginia Plea Agreement, Omega was required to develop and implement the EMS at all of its facilities. Per the agreement, the U.S. Probation Office, in consultation with the EPA and the United States Attorney's Office has the right to periodically monitor the EMS during the probationary period and bring any violations to Omega and the court's attention.

51. The EMS program included a "Marine Safety & Environmental Compliance System" ("MS&ECS") that provided rules and guidelines pertaining to, *inter alia*, the maintenance of oil record books, safety inspections and equipment, bilge management, bilge off-loading and bail water management. MS&ECS also set forth the parameters of the "Open Reporting System" that Omega was required to maintain to protect whistleblowers. Specifically, the program provided that "an employee may anonymously report issues of non-compliance or suspected non-compliance without risk of retaliation." The provision stated, as follows:

> Omega Protein Inc. utilizes an Open Reporting System to promote internal reporting of potential non-compliances with policies and procedures via the Company's Ethics Hotline. ***Any employee may anonymously report issues of non-compliance or suspected non-compliance without risk of retaliation***. All employees are encouraged to use this system to notify Omega Protein Inc. of any potential deficiencies or violations of this Program or any applicable law or regulation if employees are not comfortable with or feel it would not be appropriate to report the issue to their supervisor.
>
> Upon receipt of a report, the HSS&E [Health, Safety, Security & Environmental] Representative must review, investigate, and document the report within one week from receipt, and take corrective action as appropriate. The HSS&E Representative may not release the name of any individual reporting a deficiency if it is known without that employee's approval.
>
> No employee may be terminated or otherwise retaliated against for reporting deficiencies except where an employee abuses the system or intentionally submits false reports.

**Omega Violates Its Probation Obligations Under the Virginia Plea Agreement**

52. Throughout the Class Period, Omega violated the terms of its probation under the Virginia Plea Agreement.

**Mississippi Plant Violations**

53. FE worked as an electrician in Moss Point, Mississippi from 2012 until January 2015. FE was an outside contractor until 2013 when he/she became a full time employee. FE stated that he/she personally observed various Clean Water Act violations at the Mississippi plant and that these violations would have been evident to anyone who worked there. FE explained that water is used to process fish at the plant and, throughout this process, chemicals get into the water and do not filter out the way they are supposed to. Water discharged into public waterways needs to be at a particular pH level to be in compliance. FE explained that the pH of the water at the Mississippi plant was not maintained at the appropriate levels and was not monitored according to requirements. FE recounted that, often, one could see chemicals in the water spilling out in the public waterways. FE stated that he/she saw this on a daily basis.

54. FE stated that everyone was aware of these problems and that the pH level was only correct when the plant was about to be audited. FE explained that workers were given a heads-up the day before anyone came out to check on them and they had an opportunity to straighten up. FE reported that such inspections would generally occur every three to six months, depending on whether there were incidents or media attention and were mostly done as a result of the Virginia Plea Agreement. FE reported that, prior to an inspection, in order to correct the pH levels, workers would recalibrate all the machines and add clean water so results read within normal rates. According to FE, this was how they controlled the results for the inspectors. When there were no inspections, the pH levels of the water were not monitored and were outside the normal range. According to FE, this

was a cost-saving measure on the part of the Company as monitoring is expensive because it involves making multiple corrections.

55. FE stated that everyone who worked in the water department or maintenance was aware of this issue. FE believed that the plant upper management was aware of these problems as well and had regular meetings about the water issues. FE recounted that his supervisor, a plant manager, and a plant CEO would inform him/her about the general topics of discussion at these meetings. One of the main discussion topics was the water and it was known by everyone who would come through the plant that there were problems with the water.

56. FE was aware of the Company's Clean Water Act violations at the Virginia plant and at the Louisiana plant but further stated that he/she was not aware of any compliance program that was put into effect to correct these issues; rather, according to FE, the Company adopted a "how to cover our ass" and not get caught approach. FE mentioned that there may have been a ten minute training video that plant workers were shown as a result of these violations, but no real changes were implemented after monitoring began.

57. FE stated that, as an electrician, FE was responsible for changing a lot of the plant's electronics which measured the pH level of the water and he/she did not really observe any changes implemented after the Company began to be monitored. FE added that there were a few occasions when his/her supervisor would "freak out" that the pH of the water was not right and that it must be fixed but after that, business kept running. FE also reported that the plant CEO did walk-throughs of the plant every few months and checked everything out. Defendant Scholtes, the Company CEO, would visit the plant two or three times a year during periods when the plant would be shut down and the employees were not there. FE believed that the issues pertaining to the water were communicated to upper management.

58. FE stated that whenever he/she saw problems, FE reported them to FE's supervisor who reported them to the plant managers. FE further explained that no one was ever shocked by the issues with the water, but discussions focused on how to prevent these problems from becoming "eye catching." FE also stated that there were employees who took pH samples on a regular basis and reported them to plant upper management and the chemical lab.

59. FE added that they parked a fleet of boats to block the spillway so that one could not see the chemicals in the water. In the shallow water, boats would kick up dirt to make it difficult to see the chemicals in the water being dumped into the spillway.

60. FE described that any employee who ever lodged a complaint against the Company or reported any type of issue was terminated, "period." According to FE, employees were told that they were being let go for old infractions but FE believed that it was related to reporting.

**Louisiana Plant Violations**

61. During the Class Period, the Company continued to violate the terms of its probation under the Virginia Plea Agreement at its Louisiana plant. As a result, on January 18, 2017, Omega entered into a plea agreement with the U.S. Attorney's Office for the Western District of Louisiana (the "Louisiana Plea Agreement"). According to the Louisiana Plea Agreement, Omega violated the Clean Water Act in the Company's Abbeville, Louisiana plant by making unauthorized discharges of contaminated water. Omega's Abbeville plant maintains an "effluent" pond – a pond of liquid waste water from the processing plant. The Louisiana Department of Environmental Quality ("LDEQ") issued Omega a permit which allowed the Company to treat water from the effluent pond and then discharge it from a specified geographic location referred to as "Outfall 001" into the Vermillion River. Treatment of the contaminated water was meant to ensure that the water that was discharged from the pond mets the limits set forth in the plant's Clean Water Act permit issued by the LDEQ.

62. According to the Louisiana Plea Agreement, on December 8, 2014, at the direction of a manager at the Abbeville plant, employees violated the LDEQ Clean Water Act permit issued by LDEQ by discharging pollutants from the effluent pond into an area of the water other than Outfall 001 and failing to monitor or sample that water. Similarly, on February 1, 2016, at the direction of a manager at the Abbeville plant, Omega employees again discharged pollutants from the effluent pond into the water in violation of the Clean Water Act permit issued by the LDEQ.

63. The Company's entry into the Louisiana Plea Agreement obligated it to pay a fine in the amount of $1,000,000 and an additional $200,000 in community service, for a total of $1,200,000. The Company further agreed to serve a period of probation of three years during which it (again) agreed to fully comply with the provisions of its environmental and safety compliance plans, *i.e.*, the MS&ECS.

**Defendants Violated Their Disclosure Requirements By Failing to Disclose Probation Violations and Their Attendant Risks**

64. SEC rules and regulations govern the preparation and content of disclosures made by public companies in SEC filings. In failing to disclose material information about the Company's non-compliance with the Virginia Plea Agreement and related risks, Defendants violated these rules and regulations.

65. SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303"). The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

66. Item 303(a)(3) requires that the MD&A section of a company's periodic filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

(a) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(b) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

67. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

68. During the Class Period, Defendants caused Omega to violate its affirmative disclosure obligations imposed by Item 303 of Regulation S-K. Specifically, Omega filed with the SEC Forms 10-Q which were signed by Defendant Johannesen and Forms 10-K which were signed by the Individual Defendants which failed to disclose that the Company had been violating the terms of its probation under the Virginia Plea Agreement. These omissions concealed from the investing public the risks and uncertainties associated therewith, including, but not limited to, significant

financial penalties, reputational harm and, indeed, the Company's ability to continue as a going concern. Moreover, Omega's Forms 10-Q and 10-K failed to disclose, in violation of Item 303 of Regulation S-K, that its reported operating results significantly benefited from its failure to comply with the Virginia Plea Agreement and that Omega's violations thereof were reasonably likely to have a material adverse effect on the Company's future financial performance and continuing operations.

69. Defendants also violated their affirmative disclosure duties imposed by Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), which governs disclosure of risk factors and requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky." Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk." Additionally, the SEC further instructs issuers, in Item 1A to Part I of the General Instructions governing the preparation of an issuer's annual report on Form 10-K, to "[s]et forth, under the caption 'Risk Factors,' where appropriate, the risk factors described in Item 503(c) of Regulation S-K," codified at 17 C.F.R. §229.503(c). Item 1A to Part II of the General Instructions governing the preparation of an issuer's quarterly report on Form 10-Q, similarly requires the issuer to "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10-K (§249.310) in response to Item 1A. to Part [I] of Form 10-K."

70. During the Class Period, Defendants violated their affirmative disclosure duties imposed by Item 503 of Regulation S-K. Specifically, Omega filed with the SEC Forms 10-Q signed by Defendant Johannesen and Forms 10-K signed by the Individual Defendants which failed to disclose that the Company had been violating the terms of its probation under the Virginia Plea

Agreement. This was a substantial "risk factor" which could have an adverse impact on the Company's financial performance and result in significant financial penalties, reputational harm, and affect the Company's ability to continue as a going concern.

**Defendants Failed to Disclose that Omega's Reported Operating Results Significantly Benefited from Its Failure to Comply with the Virginia Plea Agreement**

71. By failing to comply with the terms of the Virginia Plea Agreement, Defendants avoided expending the necessary capital to: (i) adequately train Omega's plant managers and employees on proper waste water disposal; (ii) properly modernize Omega's vessels and supply them with appropriate monitoring equipment; (iii) implement adequate oil level recording practices and procedures; and (iv) implement adequate controls and procedures to ensure that the guidelines of the MS&ECS were complied with. Moreover, as confirmed by FE, Omega avoided costs associated with correcting pH level abnormalities in the water by entirely neglecting its obligations to monitor those levels. As a result, during the Class Period, the Company's expenses were understated and its income was overstated.

**The SEC's Probe into the Company's Violation of Its Probation and Its Accounting Compliance**

72. On March 1, 2017, Omega filed its 2016 Form 10-K and revealed to the market that, several months before, in December 2016, the Company received a SEC subpoena requesting information in connection with an investigation relating to its subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees. The Company further disclosed that "it is possible that the foregoing matter could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition."

73. The market reacted to this revelation swiftly. On this news, shares of Omega fell $6.25 per share, or over 23.81%, from its previous closing price to close at $20.00 per share on March 2, 2017, causing substantial losses to investors.

74. Then, on May 17, 2017, Omega disclosed that it received an additional subpoena from the SEC that called for, among other things, the production of documents concerning Omega's calculation of its cost of sales for fiscal years 2014 through 2016, including documents related to its statement that: "[t]he decrease in cost per unit of sales is primarily due to lower cost per unit for beginning of year inventory as a result of higher fish catch and production in the 2015 fishing season compared to 2014." The subpoena also sought documents reflecting Omega's accounting policies and procedures for inventories and cost of sales for fiscal years 2014 through 2016, including its methodologies for calculating and allocating direct and indirect costs.

75. In response to this disclosure, shares of Omega declined as much as $1.63 per share, or 8.5%, from the previous day's closing price of $19.10, to a low of $17.47 per share.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

### August 6, 2013 Earnings Press Release and Form 10-Q

76. The Class Period begins on August 6, 2013. On that day, Omega issued a press release reporting its financial results for the second quarter, the period ended June 30, 2013, which it filed with the SEC on Form 8-K. The Company reported revenues of $41.8 million for the quarter (compared to $48.9 million in the first quarter and $47.5 million in the 2012 second quarter), gross profit margin of 31.8% for the quarter (an increase from 24.7% in the first quarter and 14.4% in the 2012 second quarter), earnings per diluted share of $0.19 for the quarter (compared to $0.14 in the first quarter and $0.13 in the 2012 second quarter), net income of $4.0 million for the quarter (compared to $2.8 million in the first quarter and $2.5 million in the 2012 second quarter) and adjusted EBITDA of $11.8 million for the quarter (compared to $10.0 million for the first quarter and $5.2 million in the 2012 second quarter). Commenting on these results, Defendant Scholtes stated: "[w]e are pleased with the Company's increased earnings in the second quarter as we

continued to benefit from better animal nutrition sales prices which helped drive higher revenue per ton and consolidated gross margin expansion versus the comparable period last year."

77. The statements referenced above in ¶76 regarding the Company's positive financial performance and growth were materially false and misleading and/or omitted material information when made because the following true facts that were concealed from investors were known by Defendants or recklessly disregarded by them during the Class Period:

(a) that Omega continued to violate its obligations under the Virginia Plea Agreement by failing to properly dispose of contaminated water and monitor the pH level of water that was discharged into waterways;

(b) that the Company was not adequately maintaining the environmental, safety or reporting controls that were mandated by the terms of its probation;

(c) that the Company's reported operating results significantly benefited from Omega's failure to comply with the Virginia Plea Agreement;

(d) that there was a reasonable possibility that Defendants would be forced to admit wrongdoing and/or otherwise incur material financial penalties and/or reputational harm as a result of further regulatory scrutiny or censure;

(e) that Omega's violations were significant and were reasonably likely to have a material adverse effect on the Company's future financial performance and continuing operations;

(f) that in failing to disclose material information about the Company's violation of its probation under the Virginia Plea Agreement and the extent of such violations: (i) Defendants were violating their disclosure obligations under SEC regulations; and (ii) the likelihood that the SEC would open an investigation into the Company had dramatically increased; and

(g) as a result of the foregoing, Defendants' statements regarding the Company's financial condition and operations were materially false and misleading when made.

78. On August 6, 2013, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the second quarter, the period ended June 30, 2013 ("Q2 2013 10-Q"). In addition to reiterating the results reported in the press release, the Q2 2013 10-Q addressed the cost of environmental compliance, as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that newly enacted or existing environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations.

79. The statement above in ¶78 that "[i]t is possible that newly enacted or existing environmental laws and regulations could require material expenditures" was materially misleading in the absence of additional disclosures regarding the Company's failure to implement environmental, safety or reporting controls, Omega's active and ongoing violations of its probation and the attendant risk that these violations would adversely affect Omega.

80. With respect to the Virginia Plea Agreement, the Q2 2013 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility.
>
> In June 2013, the Company's subsidiary, Omega Protein, Inc., resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2 million contribution to the National Fish and

> Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013.

81. Defendants' statements referenced above in ¶80 regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made because by mentioning and describing the terms of the Virginia Plea Agreement, Defendants were also required to disclose facts set forth in ¶77.

**November 6, 2013 Earnings Press Release and Form 10-Q**

82. On November 6, 2013, Omega issued a press release announcing its financial results for the third quarter, the period ended September 30, 2013, which it filed with the SEC on Form 8-K. The Company reported revenues of $87.6 million for the quarter (compared to $84.0 million in the same period of the prior year and $41.8 million in the second quarter of 2013), gross profit margin of 33.6% for the quarter (an increase from 16.0% in the same period of the prior year and 31.8% in the second quarter of 2013), net income of $14.0 million for the quarter (compared to $0.2 million in the same period of the prior year and $4.0 million in the second quarter of 2013), earnings per diluted share of $0.66 for the quarter (compared to $0.01 in the same period of the prior year and $0.19 in the second quarter 2013) and adjusted EBITDA of $27.1 million for the quarter (compared to $11.6 million in the same period of the prior year and $11.8 million in the second quarter of 2013). Commenting on these results, Defendant Scholtes stated: "[i]n the third quarter, we reported the highest quarterly revenues and gross profits in the Company's history, reflecting strong pricing and yields in our animal nutrition segment and contributions from the protein business recently acquired by our human nutrition segment."

83. The statements set forth above in ¶82 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

84. On November 6, 2013, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the third quarter, the period ended September 30, 2013 ("Q3 2013 10-Q"). In addition to reiterating the quarterly results reported in the Company's press release, the Q3 2013 10-Q addressed the cost of environmental compliance, as set forth in ¶78.

85. The statement that "[i]t is possible that newly enacted or existing environmental laws and regulations could require material expenditures" was materially misleading in the absence of additional disclosures regarding the Company's failure to implement environmental and safety controls, Omega's active and ongoing violations of its probation and the attendant risks that these violations would adversely affect Omega.

86. With respect to the Virginia Plea Agreement, the Q3 2013 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility.
>
> In June 2013, the Company's subsidiary, Omega Protein, Inc., resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein, Inc. will be on probation until June 2016, unless the probation period is terminated earlier by the court.

87. Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information for the reasons set forth in ¶77.

**March 10, 2014 Earnings Press Release and Form 10-K**

88. On March 10, 2014, the Company issued a press release reporting its financial results for the fourth quarter and the full year, the periods ended December 31, 2013. The Company reported revenues of $66.0 million for the quarter and $244.3 million for the year, gross profit margin of 42.4% for the quarter and 33.9% for the year, net income of $9.7 million for the quarter and $30.5 million for the year, earnings per diluted share of $0.45 for the quarter and $1.45 for the year, adjusted EBITDA of $26.7 million for the quarter and $75.6 million for the year.

89. Commenting on these results, Defendant Scholtes stated: "[w]e are pleased with the progress made on our strategic objectives in 2013, as we continued to build a more balanced nutrition company focused on value-added products that allow families to live healthier lives through nutrition. Our strong financial performance during the year included increased revenues, as well as record gross profit and gross margin."

90. The statements set forth above in ¶¶88-89 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

91. On March 10, 2014, the Company filed its Annual Report on Form 10-K, which formally presented its financial results for the fourth quarter and full-year, the periods ended December 31, 2013 ("2013 Form 10-K"). In addition to reiterating the results reported in the March 10, 2014 press release, the 2013 Form 10-K addressed the cost of environmental compliance, as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that newly enacted or existing environmental laws

> and regulations could require material expenditures or otherwise adversely affect the Company's operations.

92. The statement set forth above in ¶91 that "[i]t is possible that newly enacted or existing environmental laws and regulations ***could*** require material expenditures" was materially misleading in the absence of additional disclosures regarding the Company's failure to implement environmental, safety and reporting controls, Omega's active and ongoing violations of its probation and the attendant risk that these violations would adversely affect Omega.

93. With respect to the Virginia Plea Agreement, the 2013 Form 10-K stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, the Company's subsidiary, Omega Protein, resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016, unless the probation period is terminated earlier by the court. The Company recorded charges related to the investigation of $8.0 million and $0.5 million for the years ended 2012 and 2011, respectively.

94. Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information for the reasons set forth in ¶77.

95. In the "Item 1A. Risk Factors" of the Company's 2013 Form 10-K, it represented as follows:

> ***If our Omega Protein subsidiary fails to comply with the terms of its probation under a plea agreement entered into in June 2013, we could be subject to criminal prosecution***. In June 2013, Omega Protein, the Company's principal subsidiary, entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia to resolve the previously disclosed government investigation related to its Reedville, Virginia fishing vessels and operations. Consistent with the terms of the plea agreement, the subsidiary pled guilty in the United States District Court for the Eastern District of Virginia to two felony counts under the Clean Water Act, paid a fine of $5.5 million, and made a $2.0 million contribution to an environmental fund.
>
> The plea agreement and the terms of the court's sentencing order require Omega Protein to develop and implement an environmental compliance program at all of its facilities, and also imposed a three year period of probation. ***The Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement.*** The U.S. Probation Office, in consultation with the U.S. Attorney's Office for the Eastern District of Virginia and the Environmental Protection Agency, as necessary, have the right to monitor our compliance with these requirements during the term of probation.

96. Defendants' statements referenced above which affirmatively represented that the Company had "implemented a comprehensive compliance program which covers the areas addressed by the plea agreement" were materially false and misleading and/or omitted material information when made because contrary to this statement, Omega did not implement the controls and procedures as required by the Virginia Plea Agreement. Specifically, the following true facts that were concealed from investors were known by Defendants or recklessly disregarded by them during the Class Period:

(a) that Omega continued to violate its obligations under the Virginia Plea Agreement by failing to properly dispose of contaminated water and monitor the pH level of water that was discharged into waterways;

(b) that the Company was not adequately maintaining the environmental, safety or reporting controls that were mandated by the terms of its probation;

(c) that the Company's reported operating results significantly benefited from Omega's failure to comply with the Virginia Plea Agreement;

(d) that there was a reasonable possibility that Defendants would be forced to admit wrongdoing and/or otherwise incur material financial penalties and/or reputational harm as a result of further regulatory scrutiny or censure;

(e) that Omega's violations were significant and were reasonably likely to have a material adverse effect on the Company's future financial performance and continuing operations;

(f) that in failing to disclose material information about the Company's violations of its probation under the Virginia Plea Agreement and the extent of such violations: (i) Defendants were violating their disclosure obligations under SEC regulations; and (ii) the likelihood that the SEC would open an investigation into the Company had dramatically increased; and

(g) as a result of the foregoing, Defendants' statements regarding the Company's financial condition and operations were materially false and misleading when made.

**May 7, 2014 Earnings Press Release and Form 10-Q**

97. On May 7, 2014, the Company issued a press release reporting its financial results for the first quarter, the period ended March 31, 2014. The Company reported revenues of $63.5 million for the quarter (compared to $48.9 million in the same period of the prior year), gross profit margin of 32.3% for the quarter (compared to 24.7% in the same period of the prior year), net income of $8.0 million (compared to $2.8 million in the same period of the prior year), earnings per diluted

share of $0.37 (compared to $0.14 in the same period of the prior year) and adjusted EBITDA of $19.1 million for the quarter (compared to $10.0 million in the same period of the prior year).

98. Commenting on these results, defendant Scholtes stated: "[w]e continue to see strong momentum in both our animal and human nutrition segments. These results helped us generate yet another quarter of year-over-year margin and earnings growth." Defendant Scholtes further stated that: "[o]ur business continues to benefit from favorable animal nutrition supply and demand dynamics and we are increasingly pleased with our improved human nutrition results as we further execute on our strategic initiatives to expand our value-added product offering for consumers."

99. The statements set forth in ¶¶97-98 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

100. On May 7, 2014, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the first quarter, the period ended March 31, 2014 ("Q1 2014 10-Q"). In addition to reiterating the quarterly results reported in the Company's press release, the Q1 2014 10-Q addressed the cost of environmental compliance, as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations.

101. Defendants' statement in ¶100 that "[i]t is possible that environmental laws and regulations could require material expenditures" was materially misleading in the absence of additional disclosures regarding the Company's failure to implement environmental, safety and reporting controls, Omega's active and ongoing violations of its probation and the attendant risk that these violations would adversely affect Omega.

102. With respect to the Virginia Plea Agreement, the Q1 2014 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, the Company's subsidiary, Omega Protein, resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016, unless the probation period is terminated earlier by the court.

103. Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

**August 6, 2014 Earnings Press Release and Form 10-Q**

104. On August 6, 2014, the Company issued a press release reporting its financial results for the second quarter, the period ended June 30, 2014. The Company reported revenues of $71.9 million for the quarter (compared to $41.8 million in the same period of the prior year), gross profit margin of 28.4% for the quarter (compared to 31.8% in the same period of the prior year), net income of $6.6 million (compared to $4.0 million in the same period of the prior year), earnings per diluted share of $0.31 (compared to $0.19 in the same period of the prior year) and adjusted EBITDA of $18.3 million for the quarter (compared to $11.8 million in the same period of the prior

year). Commenting on the Company's performance, Defendant Scholtes stated: "[w]e are pleased with our solid performance in the second quarter. Positive supply and demand fundamentals in our animal nutrition segment fueled our strong revenue and earnings performance."

105. The statements set forth in ¶104 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

106. On August 6, 2014, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the second quarter, the period ended June 30, 2014 ("Q2 2014 10-Q"). In addition to reiterating the quarterly results reported in the Company's press release, the Q2 2014 10-Q addressed the cost of environmental compliance, as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations.

107. The statement in ¶106 above was materially false and misleading for the reasons set forth in ¶101.

108. With respect to the Virginia Plea Agreement, the Q2 2014 10-Q stated in substance the same representations as set forth in ¶102.

109. Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information for the reasons set forth in ¶77.

**November 17, 2014 Earnings Press Release and Form 10-Q**

110. On November 17, 2014, the Company issued a press release reporting its earnings for the third quarter, the period ended September 30, 2014. The Company reported revenues of $70.8 million for the quarter (compared to $87.6 million in the prior year), gross profit margin of 20.0% for quarter (compared to 33.6% in the same period in the prior year), net income of

$0.7 million (compared to $14.0 million in same period of the prior year), earnings per diluted share of $0.03 (compared to $0.66 in the same period of the prior year) and adjusted EBITDA of $9.3 million for the quarter (compared to $27.1 million in the same period of the prior year).

111. The statements set forth in ¶110 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

112. On November 17, 2014, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the third quarter, the period ended September 30, 2014 ("Q3 2014 10-Q"). In addition to reiterating the quarterly results reported in the Company's press release, the Q3 2014 10-Q addressed the cost of environmental compliance, as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations.

113. The statement in ¶112 above was materially false and misleading for the reasons set forth in ¶101.

114. With respect to the Virginia Plea Agreement, the Q3 2014 10-Q stated in substance the same representations set forth in ¶102.

115. Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

**March 11, 2015 Earnings Press Release and Form 10-K**

116. On March 11, 2015, Omega issued a press release reporting the Company's earnings for the year and fourth quarter, the periods ended December 31, 2014. The Company reported revenues of $102.5 million for the quarter and $308.6 million for the year, gross profit margin of 22.0% for the quarter and 25.1% for the year, net income of $3.2 million for the quarter and $18.5

million for the year, earnings per diluted share of $0.14 for the quarter and $0.85 for the year and adjusted EBITDA of $19.7 million for the quarter and $70.1 million for the year. Commenting on these results, Defendant Scholtes stated: "[t]he fourth quarter of 2014 concluded a successful year for Omega Protein, both in terms of consolidated financial results and progress towards achieving our strategic objectives. While we faced headwinds in certain aspects of our business, the Company managed to generate its second highest annual gross profit and adjusted EBITDA." Defendant Scholtes continued saying: "[w]e believe that we are better positioned than ever before to capitalize on the positive fundamentals in the specialty protein and oil sectors of the animal and human nutrition markets to increase profitability and enhance shareholder value long-term."

117. The statements set forth in ¶116 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

118. On March 11, 2015, the Company filed its Annual Report on Form 10-K, which formally presented its financial results for the fourth quarter and full-year, the periods ended December 31, 2014 ("2014 Form 10-K"). In addition to reiterating the results reported in the press release, the Company's 2014 Form 10-K included disclosures regarding its environmental compliance as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations.

119. The statement above in ¶118 was materially false and misleading for the reasons set forth in ¶101.

120. With respect to the Virginia Plea Agreement, the 2014 Form 10-K stated in substance the same representations as set forth in ¶93.

121. Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

122. In the "Item 1A. Risk Factors" of the Company's 2014 Form 10-K, it represented as follows:

> ***If our Omega Protein subsidiary fails to comply with the terms of its probation under a plea agreement entered into in June 2013, we could be subject to criminal prosecution***. In June 2013, Omega Protein, the Company's principal subsidiary, entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia to resolve the previously disclosed government investigation related to the fishing vessels and operations of its Reedville, Virginia facility. Consistent with the terms of the plea agreement, the subsidiary pled guilty in the United States District Court for the Eastern District of Virginia to two felony counts under the Clean Water Act, paid a fine of $5.5 million, and made a $2.0 million contribution to an environmental fund.
>
> The plea agreement and the terms of the court's sentencing order require Omega Protein to develop and implement an environmental compliance program at all of its facilities, and also imposed a three year period of probation. ***The Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement.*** The U.S. Probation Office, in consultation with the U.S. Attorney's Office for the Eastern District of Virginia and the Environmental Protection Agency, as necessary, have the right to monitor our compliance with these requirements during the term of probation.

123. Defendants' statements referenced above which affirmatively represented that the Company had "implemented a comprehensive compliance program which covers the areas addressed by the plea agreement" were materially false and misleading and/or omitted material information when made because, contrary to this statement, Omega did not implement the controls and procedures as required by the Virginia Plea Agreement. Moreover, the following true facts that were concealed from investors were known by Defendants or recklessly disregarded by them during the Class Period:

(a) that the Company continued to violate its obligations under the Virginia Plea Agreement by failing to properly dispose of contaminated water and monitor the pH level of water that was discharged into waterways;

(b) that the Company's reported operating results significantly benefited from Omega's failure to comply with the Virginia Plea Agreement;

(c) that there was a reasonable possibility that Defendants would be forced to admit wrongdoing and/or otherwise incur material financial penalties and/or reputational harm as a result of further regulatory scrutiny or censure;

(d) that Omega's violations were significant and were reasonably likely to have a material adverse effect on the Company's future financial performance and continuing operations;

(e) that in failing to disclose material information about the Company's violations of its probation under the Virginia Plea Agreement and the extent of such violations: (i) Defendants were violating their disclosure obligations under SEC regulations; and (ii) the likelihood that the SEC would open an investigation into the Company had dramatically increased; and

(f) as a result of the foregoing, Defendants' statements regarding the Company's financial condition and operations were materially false and misleading when made.

**May 11, 2015 Earnings Press Release and Form 10-Q**

124. On May 11, 2015, the Company issued a press release announcing its financial results for the first quarter, the period ended March 31, 2015. The Company reported revenues of $71.6 million (compared to $63.5 million in the same period of the prior year), gross profit margin of 20.7% for the quarter (compared to 32.3% in the same period of the prior year), net income of $1.7 million (compared to $8.0 million in the same period of the prior year), earnings per diluted share of $0.08 (compared to $0.37 in the same period of the prior year) and adjusted EBITDA of $10.4 million for the quarter (compared to $19.1 million in the same period of the prior year).

125. The statements set forth in ¶124 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

126. On May 11, 2015, the Company filed its Quarterly Report on Form 10-Q, which formally presented its financial results for the first quarter, the period ended March 31, 2015 (the "Q1 2015 10-Q"). In addition to reiterating the results reported in the May 11, 2015 press release, the Q1 2015 10-Q addressed the Company's environmental compliance as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations.

127. The statement in ¶126 above was materially false and misleading for the reasons set forth in ¶101.

128. With respect to the Virginia Plea Agreement, the Q1 2015 10-Q stated in substance the same representations as set forth in ¶102.

129. Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

**August 5, 2015 Earnings Press Release and Form 10-Q**

130. On August 5, 2015, Omega issued a press release reporting the Company's earnings for the second quarter, the period ended June 30, 2015. The Company reported revenues of $93.2 million for the quarter (compared to $71.9 million in the same period of the prior year), gross profit margin of 27.7% for the quarter (compared to 28.4% in the same period of the prior year), net income of $8.8 million (compared to $6.6 million in the same period of the prior year), earnings per diluted share of $0.40 (compared to $0.31 in the same period of the prior year) and adjusted EBITDA of $21.6 million for the quarter (compared to $18.3 million in the same period of the prior

year). Commenting on these results, Defendant Scholtes stated as follows: "[b]oth of our animal and human nutrition segments performed well in the quarter, driving solid growth in consolidated revenues and earnings over the prior year period."

131. The statements set forth in ¶130 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

132. On August 5, 2015, the Company filed its Quarterly Report on Form 10-Q, which formally presented its results for the second quarter, the period ended June 30, 2015 (the "Q2 2015 10-Q"). In addition to reiterating the results reported in the August 5, 2015 press release, the Q2 2015 10-Q addressed the Company's environmental compliance as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations.

133. The statement in ¶132 above was materially false and misleading for the reasons set forth in ¶101.

134. With respect to the Virginia Plea Agreement, the Q2 2015 10-Q stated, in relevant part, as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail water practices used in its fishing operations at its Reedville, Virginia facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail water and bilge water practices at its Reedville facility. The U.S. Attorney's Office for the Eastern District of Virginia subsequently reviewed both the results of the Coast Guard inspection and the EPA request for information.
>
> In June 2013, the Company's subsidiary, Omega Protein, resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5

> million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2.0 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013. Omega Protein will be on probation until June 2016.

135. Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

**November 4, 2015 Earnings Press Release and Form 10-Q**

136. On November 4, 2015, Omega issued a press release reporting the Company's earnings for the third quarter, the period ended September 30, 2015. The Company reported revenues of $112.2 million for the quarter (compared to $70.8 million in the same period of the prior year), gross profit margin of 31.4% for the quarter (compared to 20.0% in the same period of the prior year), net income of $10.6 million (compared to $0.7 million in the same period of the prior year), earnings per diluted share of $0.47 (compared to $0.03 in the same period of the prior year) and adjusted EBITDA of $28.7 million for the quarter (compared to $13.1 million in the same period of the prior year). Commenting on these results, Defendant Scholtes stated: "[w]e are pleased to report the highest quarterly revenues and Adjusted EBITDA in the Company's history." Defendant Scholtes further stated: "[o]ur solid animal nutrition profitability was fueled by strong season-to-date fish catch and pricing for fish meal and fish oil that remains well above levels seen a few years ago. In addition, our ongoing efforts to improve results in the human nutrition business resulted in growth in both revenues and gross margin. Our team remains committed to creating additional value for shareholders through further integration and the disciplined pursuit of organic growth opportunities."

137. The statements set forth in ¶136 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

138. On November 4, 2015, the Company filed its Quarterly Report on Form 10-Q, which formally presented its results for the third quarter, the period ended September 30, 2015 (the "Q3 2015 10-Q"). In addition to reiterating the results reported in the November 4, 2015 press release, the Q3 2015 10-Q addressed the Company's environmental compliance as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations.

139. The statement in ¶138 above was materially false and misleading for the reasons set forth in ¶101.

140. With respect to the Virginia Plea Agreement, the Q3 2015 10-Q stated in substance the same representations as set forth in ¶134.

141. Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information for the reasons set forth in ¶77.

**March 9, 2016 Earnings Press Release and Form 10-K**

142. On March 9, 2016, the Company issued a press release announcing its financial results for the fourth quarter and year, the periods ended December 31, 2015. The Company reported revenues of $82.3 million for the quarter and $359.3 million for the year, gross profit margin of 28.0% for the quarter and 27.5% for the year, net income of $2.9 million for the quarter and $24.0 million for the year, earnings per diluted share of $0.13 for the quarter and $1.07 for the year and adjusted EBITDA of $18.9 million for the quarter and $79.6 million for the year. Commenting on the Company's results, Defendant Scholtes stated: "2015 was a transformational

year for Omega Protein as our financial results, including a record Adjusted EBITDA, reflect contributions from a robust fish harvest, continued strong demand for our products, efficient operational performance and the Bioriginal acquisition." Defendant Scholtes further stated: "[w]e continue to take strategic actions to build on these accomplishments and better position our business for future growth. These efforts include our plan to invest an additional $18 million of growth capital to further improve the efficiency of our animal nutrition business, and our decision to refocus our human fish oil business by exiting concentrated oils manufacturing. We remain confident about our opportunities to generate improved volumes and profitability, and in turn increase shareholder value in 2016."

143. The statements set forth in ¶142 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

144. On March 9, 2016, the Company filed its Annual Report on Form 10-K, which formally presented its financial results for the fourth quarter and full-year, the periods ended December 31, 2015 ("2015 Form 10-K"). In addition to reiterating the results reported in the press release, the Company's 2015 Form 10-K included disclosures regarding its environmental compliance setting forth as follows:

> The Company has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters. It is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations, financial condition and results of operations.

145. The statement above stating that "[i]t is ***possible*** that environmental laws and regulations could require material expenditures" is materially false and misleading in the absence of additional disclosures regarding the Company's failure to implement environmental, safety and reporting controls, Omega's active and ongoing environmental violations and the attendant risks that the these violations would adversely affect the Company.

146. With respect to the Virginia Plea Agreement, the 2015 Form 10-K stated in substance the same representations as set forth in ¶134.

147. Defendants' statements regarding the Virginia Plea Agreement and the Company's probation were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

148. In the "Item 1A. Risk Factors" of the Company's 2015 Form 10-K, it represented as follows:

> ***If the Company's Omega Protein subsidiary fails to comply with the terms of its probation under a plea agreement entered into in June 2013, we could be subject to criminal prosecution.*** In June 2013, Omega Protein, the Company's principal subsidiary, entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia to resolve the previously disclosed government investigation related to the fishing vessels and operations of its Reedville, Virginia facility. Consistent with the terms of the plea agreement, the subsidiary pled guilty in the United States District Court for the Eastern District of Virginia to two felony counts under the Clean Water Act, paid a fine of $5.5 million, and made a $2.0 million contribution to an environmental fund.
>
> The plea agreement and the terms of the court's sentencing order require Omega Protein to develop and implement an environmental compliance program at all of its facilities, and also imposed a three year period of probation which will end in June 2016. ***The Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement.*** The U.S. Probation Office, in consultation with the U.S. Attorney's Office for the Eastern District of Virginia and the E.P.A., as necessary, have the right to monitor the Company's compliance with these requirements during the term of probation.

149. Defendants' statements referenced above which affirmatively represented that the Company had "implemented a comprehensive compliance program which covers the areas addressed by the plea agreement" were materially false and misleading and/or omitted material information when made because, contrary to this statement, Omega did not implement the controls and procedures required by the Virginia Plea Agreement. Specifically, the true facts set forth in ¶123 were known by Defendants or recklessly disregarded by them.

**May 4, 2016 Earnings Press Release and Form 10-Q**

150. On May 4, 2016, Omega issued a press release announcing the Company's financial results for the first quarter, the period ended March 31, 2016. The Company reported revenues of $84.8 million (compared to $71.6 million in the same period of the prior year), gross profit margin of 29.3% (compared to 20.7% in the same period of the prior year), net income of $8.4 million (compared to $1.7 million in the same period of the prior year), earnings per diluted share of $0.37 (compared to $0.08 in the same period of the prior year) and adjusted EBITDA of $20.4 million (compared to $10.4 million in the same period of the prior year). Commenting on these results, Defendant Scholtes stated: "[w]e saw great momentum across our business as we started 2016 with $20 million of Adjusted EBITDA, the highest operating profitability seen in any of the Company's first quarter results. These strong financial results reflect our ability to leverage our core nutritional capabilities to supply customers in the feed, food and supplement sectors."

151. The statements set forth in ¶150 were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

**August 3, 2016 Earnings Press Release and Form 10-Q**

152. On August 3, 2016, Omega issued a press release announcing the Company's financial results for the second quarter, the period ended June 30, 2016. The Company reported revenues of $112.7 million (compared to $93.2 million in the same period of the prior year), gross profit margin of 29.6% (compared to 27.7% in the same period of the prior year), net income of $5.7 million (compared to $8.8 million of the same period of the prior year), earnings per diluted share of $0.25 (compared to $0.40 in the same period of the prior year) and adjusted EBITDA of $28.6 million (compared to $21.6 million of the same period in the prior year). Commenting on these results, Defendant Scholtes stated: "[o]ur second quarter consolidated financial results reflect the continued strength in our animal nutrition segment."

153. The statements set forth in ¶152 above were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77.

154. On August 3, 2016, the Company filed a Quarterly Report on Form 10-Q which formally presented its financial results for the second quarter, the period ended June 30, 2016 ("Q2 2016 10-Q"). The Q2 2016 10-Q disclosed as follows:

> The Company has received a petition on probation filed by the U.S. Attorney's Office for the Eastern District of Virginia and as a result of that petition has become aware of a criminal investigation being conducted by the U.S. Attorney's Office for the Western District of Louisiana into the waste water discharge practices of the Abbeville, Louisiana facility of its Omega Protein subsidiary. The petition on probation seeks to revoke the subsidiary's probation based on alleged Clean Act Water Violations. A hearing on the petition is expected to occur in September 2016. The Company is unable to determine its potential outcome or its effects on the Company's probation status. As such, no liability has been recognized as of June 30, 2016 relating to this matter. In the event that Omega Protein is found to be not in compliance with the probation terms of the plea agreement and the court's sentencing order, Omega Protein could be subject to additional criminal penalties or prosecution in the Eastern District of Virginia. In addition, if the United States Attorney in the Western District of Louisiana were to file new criminal charges regarding the waste water disposal operations of the Abbeville facility as a result of that office's investigation, then Omega Protein could be subject to additional criminal penalties or prosecution in that district.

155. Although the above statement disclosed the Company's receipt of a petition on probation for environmental violations at the Louisiana plant, the market was not aware of the breadth of Omega's ongoing probation violations which, as the public later learned, resulted in an SEC investigation.

**November 2, 2016 Earnings Press Release and Form 10-Q**

156. On November 2, 2016, Omega issued a press release announcing the Company's financial results for the third quarter, the period ended September 30, 2016. The Company reported revenues of $108.8 million (compared to $112.2 million in the same period of the prior year), gross profit margin of 30.4% (compared to 31.4% of the same period of the prior year), net income of $14.6 million (compared to $10.6 million of the same period of the prior year), earnings per diluted

share of $0.64 (compared to $0.47 of the same period of the prior year) and adjusted EBITDA of $29.0 million (compared to $28.7 million of the same period of the prior year). Commenting on these results, Defendant Scholtes stated: "[w]e are generally pleased with the strength of our third quarter operational and financial performance."

157. The statements set forth in ¶156 above were materially false and misleading and/or omitted material information when made for the reasons set forth in ¶77 .

158. On November 2, 2016, the Company filed a Quarterly Report on Form 10-Q which formally presented its financial results for the third quarter, the period ended September 30, 2016 ("3Q 2016 10-Q"). The 3Q 2016 Form 10-Q disclosed as follows:

> In June 2013, Omega Protein, the Company's principal subsidiary, entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia, in which the subsidiary pled guilty to two felony counts under the Clean Water Act in order to resolve an investigation related to the fishing vessels and operations of its Reedville, Virginia facility. In connection with that plea agreement, Omega Protein paid a fine of $5.5 million, and made a $2.0 million contribution to an environmental fund. The plea agreement and the terms of the court's sentencing order imposed a three-year period of probation that was scheduled to end in June 2016.
>
> In June 2016, the Company received a petition on probation filed by the U.S. Attorney's Office for the Eastern District of Virginia and as a result of that petition became aware of a criminal investigation being conducted by the U.S. Attorney's Office for the Western District of Louisiana into the waste water discharge practices of the Abbeville, Louisiana facility of its Omega Protein subsidiary. The petition on probation seeks to revoke the subsidiary's probation based on alleged Clean Water Act Violations. A hearing on the petition was originally scheduled for September 2016 and was rescheduled to December 2016. In the event that Omega Protein is found to be not in compliance with the probation terms of the plea agreement and the court's sentencing order, Omega Protein could be subject to additional criminal penalties or prosecution in the Eastern District of Virginia.
>
> Since the receipt of the petition, the Company has initiated its own investigation and has been cooperating with the U.S Attorney's Office for the Western District of Louisiana. The Company has reviewed and is continuing to review its Abbeville facility's waste water handling operations to determine compliance with applicable laws and regulations and has been in discussions with the United State Attorney's Office regarding the investigation. Based on preliminary findings and information to date, the Company believes that it is probable that a liability has been incurred and

> some financial fine or penalty in connection with the Abbeville facility's wastewater discharges practices may be imposed. However, the Company cannot reasonably estimate the amount of any such fine or penalty. The Company is also unable to determine the effect of this matter on Omega Protein's probation status. As such, no liability has been recognized as of September 30, 2016 relating to this matter. If the United States Attorney in the Western District of Louisiana were to file new criminal charges regarding the waste water disposal operations of the Abbeville facility as a result of that office's investigation, then Omega Protein could be subject to additional criminal penalties or prosecution in that district. Depending on the specific details of the disposition, it is possible that the disposition could have a material adverse effect on the Company's business, results of operations or financial condition.

159. Although the above statement disclosed the Company's receipt of a petition on probation for environmental violations at the Louisiana plant and informed the market that "the Company believes that it is probable that a liability has been incurred and some financial fine or penalty in connection with the Abbeville facility's wastewater discharges practices may be imposed," Defendants continued to conceal the breadth of Omega's ongoing probation violations which, as the public later learned, resulted in an investigation by the SEC.

**THE COMPANY DISCLOSES THE SEC'S INVESTIGATION INTO OMEGA'S PROBATION VIOLATIONS**

160. On March 1, 2017, after the close of regular trading, Omega filed the 2016 Form 10-K with the SEC disclosing that several months earlier, in December 2016, the Company received a subpoena from the SEC requesting information in connection with an investigation relating to its subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees. Omega further revealed that "it is possible that the foregoing matter could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition."

161. On this news, shares of Omega fell $6.25 per share, or over 23.81% from its previous closing price, to close at $20.00 per share on March 2, 2017, causing substantial loss to investors. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market

value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

162. Following the issuance of the 2016 Form 10-K, Omega held a conference call with analysts and investors to discuss the Company's financial performance. Defendants Scholtes and Johannesen participated in the call. During the question and answer period, Mitch Pinheiro, an analyst at Wunderlich, raised questions about the SEC investigation. The following exchange took place:

> **Mitch Pinheiro** - Wunderlich – Analyst
>
> Okay. And then, two more questions, again another regulatory issues. Reading the K, you disclosed that you received the subpoena from the SEC relating to I guess your probation terms. And that was back in December. Why wouldn't that have been something you had disclosed back at that time? I mean it is two months. Why so long or is it not material?
>
> **John Held** - Omega Protein Corporation - EVP and General Counsel
>
> Hi, It is John Held, General Counsel. There is no requirement to disclose an event like that. We have put that in voluntarily just as additional information. And again, language in the 10-K really would have been the same in December as it is now. We received a subpoena and we are in the process of responding to it.
>
> **Mitch Pinheiro** - Wunderlich - Analyst
>
> Okay. So, just curious, is there some element of materiality in the decision to disclose that or is that not part of the decision, just curious how that works? Does it imply immateriality?
>
> **John Held** - Omega Protein Corporation - EVP and General Counsel
>
> It could. I mean, there is some element of materiality in making that decision. Yes.

163. John Held's statements in response to an analyst question about the disclosure of the SEC investigation acknowledges that the Company's decision to disclose the SEC investigation regarding probation compliance was itself an admission of the investigation's materiality.

164. In response to the Company's announcement of the SEC investigation, analysts further expressed surprise over the Company's repeated environmental violations and the SEC investigation. On March 2, 2017, Pivotal Research Group issued a report, noting that the disclosure of the SEC investigation presented an additional risk to the Company commenting: "[w]e are uncomfortable with the company violating its probation and negotiating criminal pleas twice in the past five years."

165. On May 17, 2017, the Company disclosed that it had drawn more regulatory scrutiny and that it had received an additional subpoena from the SEC that called for, among other things, the production of documents concerning Omega's calculation of its cost of sales for fiscal years 2014 through 2016, including documents related to its statement that: "[t]he decrease in cost per unit of sales is primarily due to lower cost per unit for beginning of year inventory as a result of higher fish catch and production in the 2015 fishing season compared to 2014." The subpoena also sought documents reflecting Omega's accounting policies and procedures for inventories and cost of sales for fiscal years 2014 through 2016, including its methodologies for calculating and allocating direct and indirect costs.

## ADDITIONAL SCIENTER ALLEGATIONS

166. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Omega, their control over, and/or receipt and/or modification of Omega's allegedly materially misleading misstatements and/or their associations with the Company which made them

privy to confidential proprietary information concerning Omega, participated in the fraudulent scheme alleged herein.

167. Moreover, knowledge of the Company's ongoing violation of its obligations under the Virginia Plea Agreement can be imputed to each of the Individual Defendants whom, as executive officers, knew or recklessly ignored facts related to a core aspect of the Company's operations – its menhaden processing plants. In 2016, 67.2% of Omega's revenue was derived from its processing of menhaden into fish meal, fish oil, refined oil and fish solubles. Moreover, the Company operated only ***three*** menhaden processing plants – one in Louisiana, Mississippi and Virginia.

168. In June of 2013, Omega entered in the Virginia Plea Agreement to resolve the myriad violations of the Clean Water Act and agreed to develop and implement MS&ESC, which provided rules and guidelines regarding, among other things, the maintenance of oil record books, bilge water management and bail water management. Omega's management, including the Individual Defendants, was then on high alert of the severity of the Company's past criminal violations of the Clean Water Act, the importance of future compliance and the impact that further violation could have on Omega going forward. As such, the Individual Defendants had a duty to closely monitor the activities at the Company's three menhaden processing plants.

169. In the Company's annual Form 10-K filings, Defendants confirmed that they were aware of the risks to Omega if they failed to ensure that the Company complied with the terms of its probation. Specifically, Defendants acknowledged they were required to develop and implement an

environmental compliance program for all of the Company's facilities, claimed that they had successfully done so. The Company's 2013 Form 10-K set forth the following representation:[2]

> The plea agreement and the terms of the court's sentencing order require Omega Protein to develop and implement an environmental compliance program at all of its facilities, and also imposed a three year period of probation. ***The Company has implemented a comprehensive compliance program which covers the areas addressed by the plea agreement.*** The U.S. Probation Office, in consultation with the U.S. Attorney's Office for the Eastern District of Virginia and the Environmental Protection Agency, as necessary, have the right to monitor our compliance with these requirements during the term of probation.

170. Defendants also acknowledged that they understood the serious harm could result if the Company failed to implement the required procedures. The Company's 2013 Form 10-K stated, in pertinent part, as follows:[3]

> In the event that Omega Protein does not comply with the terms of the plea agreement and the court's sentencing order, including the terms of probation, Omega Protein could be subject to additional criminal penalties or prosecution (including for the matters covered and resolved by the plea agreement). In addition, if Omega Protein fails to maintain compliance with the Clean Water Act or other similar environmental regulatory requirements in the future, Omega Protein could become subject to additional criminal or civil liability in
>
> connection with any such non-compliance. Omega Protein could also experience increased compliance costs, or alterations to the conduct of its normal course operations, in connection with these matters. Any of the foregoing could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition.
>
> In addition, the convictions under the Clean Water Act will adversely affect the Company's ability to secure government contracts with the United States, and possibly secure future loans under the NFMS Title XI loan program. The subsidiary has received notice from the EPA that it is ineligible, as a result of the convictions under the Clean Water Act, for receipt of government contracts or benefits if any part of the work will be performed at the facility where the offense occurred.

---

[2] The other Class Period Annual Reports of Form 10-K set forth substantially similar representations.

[3] The other Class Period Annual Reports of Form 10-K set forth substantially similar representations.

171. Moreover, as Defendants were aware, the Company's ability to obtain financing was impacted by its perpetual environmental violations. Specifically, the Company's 2013 Form 10-K stated as follows:[4]

> In June 2011, pursuant to the Title XI program, the FFP approved a financing application made by the Company in the amount of $10.0 million (the "Approval Letter") which expires on June 20, 2016. To date, the Company has not borrowed any amounts under the Approval Letter and ***its ability to do so may be adversely affected by an E.P.A. notice that the Company's Omega Protein subsidiary is ineligible, as a result of its previous convictions under the Clean Water Act, for receipt of government contracts or benefits in certain cases.***

172. Defendant Johannesen's scienter is further supported by the substantial and suspicious nature of his sales of stock during the Class Period. While Omega was violating its probation under the Virginia Plea Agreement, Defendant Johannsen sold 33,998 shares of his personally held Omega stock at artificially inflated prices, yielding $754,639 in proceeds (including one sale in December 2016, around the time that the Company had received – but not disclosed – a subpoena from the SEC). Defendant Johannesen's trading is set forth below:

**Johannesen's Trading During Class Period**

| | | | |
|---|---|---|---|
| 07/18/14 | 2,700 | $13.96 | $37,692 |
| 08/25/14 | 1,100 | $15.00 | $16,500 |
| 08/26/14 | 1,900 | $15.03 | $28,557 |
| 04/01/15 | 1,000 | $14.00 | $14,000 |
| 08/05/15 | 1,000 | $14.50 | $14,500 |
| 08/06/15 | 1,000 | $15.24 | $15,240 |
| 08/10/15 | 1,000 | $16.00 | $16,000 |
| 12/04/15 | 1,170 | $23.84 | $27,893 |
| 12/04/15 | 4,128 | $23.10 | $95,357 |
| 09/08/16 | 17,000 | $25.70 | $436,900 |
| 12/13/16 | 2,000 | $26.00 | $52,000 |
| | 33,998 | | $754,639 |

4 The other Class Period Annual Reports of Form 10-K set forth substantially similar representations.

## LOSS CAUSATION

173. As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Omega securities and operated as a fraud or deceit on purchasers of such securities by failing to disclose and misrepresenting adverse facts. As such misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Omega securities declined significantly as the prior artificial inflation came out of the Company's share price.

174. As a result of its purchases of Omega securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Omega securities to trade at artificially inflated levels throughout the Class Period.

175. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Omega's business and future financial prospects. When the truth about the Company was revealed to the market, the price of Omega securities fell significantly. Such declines removed the inflation from the price of Omega securities, causing real economic loss to investors who had purchased Omega securities during the Class Period.

176. The declines in the price of Omega securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Omega securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

177. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Omega

securities and the subsequent significant declines in the value of Omega securities when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

178. Specifically, on March 1, 2017, the Company announced that several months before, in December of 2016, it received a subpoena "requesting information in connection with an investigation relating to a Company subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees." On this news, shares of Omega fell $6.25 per share, or over 23.81%, from its previous closing price to close at $20.00 per share on March 2, 2017, causing substantial loss to investors. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

179. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Omega securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

180. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Omega securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified

from records maintained by Omega or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

181. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

182. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

183. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Omega;
- whether the Individual Defendants caused Omega to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Omega securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

184. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

185. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Omega securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased or acquired Omega securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

186. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

187. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

188. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

189. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

190. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Omega securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Omega securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

191. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Omega securities. Such reports, filings, releases and statements were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about Omega's finances and business prospects.

192. By virtue of their positions at Omega, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

193. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives of Omega, the Individual Defendants had knowledge of the details of Omega's internal affairs.

194. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Omega. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Omega's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Omega securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Omega's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Omega securities at

artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

195. During the Class Period, Omega securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Omega securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Omega securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Omega securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

196. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and acquisitions of the Company's securities during the Class Period, upon the disclosure at the end of the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

197. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

198. During the Class Period, the Individual Defendants participated in the operation and management of Omega, and conducted and participated, directly and indirectly, in the conduct of Omega's business affairs. Because of their senior positions, they knew the adverse non-public information about Omega.

199. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Omega's financial condition and results of operations, and to correct promptly any public statements issued by Omega which had become materially false or misleading.

200. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Omega disseminated in the marketplace during the Class Period concerning Omega. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Omega to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Omega within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Omega securities.

201. Each of the Individual Defendants, therefore, acted as a controlling person of Omega. By reason of their senior management positions and/or being directors of Omega, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Omega to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Omega and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

202. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Omega.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED: October 27, 2017

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
AVITAL O. MALINA

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
amalina@rgrdlaw.com

*Lead Counsel for Plaintiff*

MARINO ASSOCIATES
STEVEN F. MARINO
301 Wharton Street
Philadelphia, PA 19147
Telephone: 215/462-3200
215/462-4763 (fax)

*Additional Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that on October 27, 2017, I authorized a true and correct copy of the Second Consolidated Amended Complaint for Violations of the Federal Securities Laws, to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

/s/ *David A. Rosenfeld*
David A. Rosenfeld