UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DANIEL DIEHL, Individually and on Behalf of
All Others Similarly Situated, et al.,

       Plaintiffs,      17-cv-2448 (PKC)

   -against-

               OPINION
               AND ORDER

OMEGA PROTEIN CORPORATION, BRET D.
SCHOLTES, and ANDREW C. JOHANNESEN,

       Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

     Lead plaintiff IBEW Local 98 Pension Fund ("IBEW") has filed this federal

securities fraud suit against defendants Omega Protein Corp. ("Omega"), Bret D. Scholtes, and

Andrew C. Johannesen on behalf of itself and all others who purchased Omega stock from

August 6, 2013 to March 1, 2017. After the Court consolidated multiple separate suits with

IBEW's suit, defendants moved to dismiss the Consolidated Second Amended Complaint.

Because IBEW has not alleged an actionable misrepresentation or omission, the motion will be

granted.

BACKGROUND

     Omega was a publically traded nutritional products company that operated in two

primary industry segments, human nutrition and animal nutrition.[1] (Consolidated Second

Amended Complaint ("CSAC") ¶¶ 2, 13, 25). It conducted the majority of its operations in the

animal nutrition segment through a wholly-owned subsidiary, Omega Protein, Inc. ("Omega's

---

[1] A third-party acquired all of Omega's outstanding shares in 2017. (See CSAC ¶ 35).

Subsidiary"), which was responsible for sixty-one to ninety-one percent of Omega's revenue from 2012 to 2016. (CSAC ¶¶ 25–26). To produce certain animal nutrition products, Omega's Subsidiary harvested menhaden, a species of fish found in the coastal waters of the Atlantic Ocean and the Gulf of Mexico. (CSAC ¶ 26). The harvesting and production process generated "fish waste" and bilge water (which is water that collects in the lowest part of a ship) containing oil that required disposal. (CSAC ¶¶ 36–43).

The Clean Water Act establishes requirements for monitoring and disposing of fish waste and oily bilge water, and in 2011, United States Attorney's Office for the Eastern District of Virginia filed a criminal information charging Omega's Subsidiary with violating these requirements at its Reedville, Virginia facility. (CSAC ¶¶ 39, 43, 45). Two years later, Omega's Subsidiary entered into a plea agreement (the "Virginia Plea Agreement"), which required it to plead guilty to "knowingly discharging pollutants from a point source into waters of the United States without a permit" and "knowingly discharging oil into waters of the United States in a quantity that may be harmful on numerous and discrete occasions." (CSAC ¶ 46). Omega's Subsidiary agreed to pay a $5.5 million fine and $2 million for community service and to serve three years on probation. (CSAC ¶ 47).

The Virginia Plea Agreement also required Omega's Subsidiary to develop and implement at all of its facilities an environmental compliance program. (CSAC ¶¶ 4, 50–51). Omega's Subsidiary established rules and guidelines pertaining to, among other things, "the maintenance of oil record books, safety inspections and equipment, bilge management, bilge off-loading and bail water management." (CSAC ¶ 51). In addition, it created a reporting system that ostensibly allowed employees to report anonymously any non-compliance or suspected non-compliance with any applicable law or regulation, and Omega's Subsidiary stated that "[n]o

employee may be terminated or otherwise retaliated against for reporting deficiencies except where an employee abuses the system or intentionally submits false reports." (CSAC ¶ 51).

On August 6, 2013, which is the start of the class period, Omega filed a press release with the Securities and Exchange Commission ("SEC") on Form 8-K, reporting Omega's financial results for the second quarter of 2013. (CSAC ¶ 76). Scholtes, who was Omega's CEO and President during the class period, commented on the financial results, stating that "[w]e are pleased with [Omega's] increased earnings in the second quarter as we continued to benefit from better animal nutrition sales prices which helped drive higher revenue per ton and consolidated gross margin expansion versus the comparable period last year." (CSAC ¶¶ 17, 76). Omega also filed on the same day its Form 10–Q, in which Omega explained that it "has made, and anticipates that it will make in the future, expenditures in the ordinary course of its business in connection with environmental and regulatory matters" and that "[i]t is possible that newly enacted or existing environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations." (CSAC ¶ 78).

Omega addressed the Virginia Plea Agreement in its Form 10–Q filing as well. It stated as follows:

> In April 2010, the Company received a request for information from the EPA concerning its bail wastewater practices used in its fishing operations at its Reedville facility. In February 2011, the U.S. Coast Guard conducted inspections at the Company's Reedville facility regarding the Reedville vessels' bilge water discharge practices. Based on these inquiries, both agencies commenced investigations of the Company's bail waste water and bilge water practices at its Reedville facility.
>
> In June 2013, the Company's subsidiary, Omega Protein, Inc., resolved both the U.S. Coast Guard and EPA investigations by entering into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. Pursuant to terms of the plea agreement, the Company's subsidiary

pled guilty to two Clean Water Act violations. The plea agreement required the subsidiary to pay a $5.5 million fine, be placed on a three year term of probation, and implement an environmental compliance program. In addition to the $5.5 million fine, the subsidiary was required to make a $2 million contribution to the National Fish and Wildlife Foundation to fund projects in Virginia related to the protection of the environmental health of the Chesapeake Bay. The plea agreement was approved by the U.S. District Court for the Eastern District of Virginia in June 2013 and the subsidiary paid both the $5.5 million fine and the $2.0 million contribution in July 2013.

(CSAC ¶ 80). Omega made similar disclosures on several other Forms 10–Q during the class period, each of which Johannesen (Omega's CFO) signed. (CSAC ¶¶ 68, 86, 93, 102, 134). Omega varied this language only slightly and added on some Forms 10–Q that Omega's Subsidiary "will be on probation until June 2016, unless the probation period is terminated earlier by the court." (CSAC ¶¶ 68, 86, 93, 102; see CSAC ¶ 134). Scholtes commented on Omega's financial results on Omega's Form 8-K several more times during the class period, sometimes stating the results were "fueled" by, "benefit[ed] from," or "reflect[ed]" some benign aspect of Omega's business. (CSAC ¶¶ 82, 98, 136, 142, 150, 152).

On all but the last Form 10–K filed during the class period, each of which Scholtes and Johannesen signed, Omega addressed the risk of Omega's Subsidiary failing to comply with the terms of its probation. (CSAC ¶¶ 68, 95, 122, 148). Omega explained that "[i]f [Omega's Subsidiary] fails to comply with the terms of its probation under a plea agreement entered into in June 2013, we could be subject to criminal prosecution." (CSAC ¶¶ 95, 122, 148). Omega also reiterated that "[t]he plea agreement and the terms of the court's sentencing order require [Omega's Subsidiary] to develop and implement an environmental compliance program at all of its facilities" and stated that "[t]he Company has implemented a comprehensive

compliance program which covers the areas addressed by the plea agreement." (CSAC ¶¶ 95, 122, 148, 169).

On August 3, 2016, Omega disclosed on its Form 10–Q that it had "received a petition on probation . . . and as a result of that petition ha[d] become aware of a criminal investigation . . . into the waste water discharge practices" of Omega's Subsidiary at its Abbeville, Louisiana facility. (CSAC ¶ 154). Omega noted that "[t]he petition on probation seeks to revoke the subsidiary's probation based on alleged Clean Act Water [sic] [v]iolations" but that Omega was "unable to determine [the petition's] potential outcome or its effects on the Company's probation status." (CSAC ¶ 154). Additionally, Omega stated that if Omega's Subsidiary were found to be out of compliance with its probation terms, Omega's Subsidiary "could be subject to additional criminal penalties or prosecution," including new criminal charges in the Western District of Louisiana. (CSAC ¶ 154).

Omega asserted in its next Form 10–Q, filed on November 2, 2016, that it "ha[d] initiated its own investigation and ha[d] been cooperating with [federal prosecutors]." (CSAC ¶ 158). Based on the information it had obtained, it "believe[d] that it [was] probable that a liability ha[d] been incurred and some financial fine or penalty in connection with the Abbeville facility's wastewater discharges practices may be imposed," although it could not determine whether Omega's Subsidiary's actions would affect Omega's Subsidiary's probation status. (CSAC ¶ 158).

On December 16, 2016 Omega filed a press release with the SEC on Form 8-K, disclosing that Omega's Subsidiary had "entered into a plea agreement" (the "Louisiana Plea Agreement") "with the United States Attorney's Office for the Western District of Louisiana to resolve the previously disclosed government investigation related to [Omega's] Subsidiary's

Abbeville, Louisiana operations." (Doc. 42-8 at 3, 4). It attached the Louisiana Plea Agreement to the Form 8-K. (Doc. 42-8 at 3, 5–10). Omega stated that "[u]nder the [Louisiana] Plea Agreement, [Omega's] Subsidiary agreed to plead guilty to two felony counts under the Clean Water Act" and that the prosecutors and Omega's Subsidiary "will jointly recommend a sentence consisting of (i) a $1.0 million fine, (ii) a 3-year probationary period for [Omega's] Subsidiary, and (iii) a payment by [Omega's] Subsidiary of $200,000 for community service." (Doc. 42-8 at 3). Omega also disclosed that a federal district court in the Eastern District of Louisiana imposed an additional two years of probation following a hearing to determine whether Omega's Subsidiary had violated the terms of its probation. (Doc. 42-8 at 3). These additional two years of probation were to run concurrent with the three year term of probation agreed to in the Louisiana Plea Agreement. (Doc. 42-8 at 3).

Omega's Subsidiary finalized and submitted the Louisiana Plea Agreement to the court on January 18, 2017. (Doc. 42-6). The prosecutors and Omega's Subsidiary stipulated that Omega's Subsidiary, on December 8, 2014 and February 1, 2016, improperly discharged waste water from an effluent pond by failing to monitor or sample the discharged waste water and by using a pump instead of the outfall designated in its discharge permit. (Doc. 42-6). Omega's Subsidiary agreed to plead guilty to two counts of "knowingly discharg[ing] a pollutant from a point source into a water of the United States in violation of a permit" in violation of 33 U.S.C. § 1319(c)(2)(A). See id.; Bill of Information, United States v. Omega Protein, Inc., No. 16 Cr. 292 (DEW) (CBW), (W.D. La. Dec. 6, 2016). The court accepted the plea agreement, imposed a $1 million fine and $200,000 for community service, and placed Omega's Subsidiary on a three year term of probation. Judgment, United States v. Omega Protein, Inc., No. 16 Cr. 292 (DEW) (CBW), (W.D. La. Jan. 27, 2017).

After regular trading had closed on March 1, 2017, Omega filed its Form 10–K for 2016.  (CSAC ¶ 160).  In this filing, Omega disclosed, in addition to adjusted earnings per diluted share purportedly lower than expected, that "[i]n December 2016, the Company received a subpoena from the SEC requesting information in connection with an investigation relating to a Company subsidiary's compliance with its probation terms and the Company's protection of whistleblower employees."  (Doc. 42-12; Doc. 42-13); <u>SEC Form 10–K for Year Ended Dec. 31, 2016</u>.[2]  Omega noted that it was "in the process of producing responsive documents to the SEC." <u>SEC Form 10–K for Year Ended Dec. 31, 2016</u>.  And it warned that it could not "predict the outcome of the investigation or the effect of the findings of the investigation on the Company, but [that] it is possible that the foregoing matter could result in a material adverse effect on the Company's business, reputation, results of operation and financial condition."  <u>Id.</u>  The next day, Omega's stock fell $6.25 per share, a decrease of 23.81% from its previous closing price. (CSAC ¶ 161).

Several investors that acquired stock from August 6, 2013 to March 1, 2017 filed suit against Omega, Scholtes, and Johannesen.  Those cases were consolidated with the present case, and IBEW was appointed lead plaintiff.  (Doc. 25).  IBEW, in the Consolidated Second Amended Complaint, alleges on behalf of itself and others similarly situated that defendants knowingly made material misrepresentations and omissions in Omega's filings with the SEC during the class period, ultimately causing Omega's stock price to decline on March 2, 2017. (CSAC ¶¶ 178, 188–202).  It asserts a claim for securities fraud against all defendants under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), through section 10(b)'s implementing regulation, Rule 10b–5, 17 C.F.R. 240.10b–5.  (CSAC ¶¶ 188–96).  IBEW also seeks to hold

---

[2] Available at https://www.sec.gov/Archives/edgar/data/1053650/000143774917003546/ome20161231_10k.htm.

Scholtes and Johannesen liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as the individuals controlling Omega.  (CSAC ¶¶ 197–202).

It predicates these claims not only on defendants' non-disclosure of the two Clean Water Act violations at the Louisiana facility, but also on defendants' failure to disclose that Omega's Subsidiary purportedly did not monitor pH levels or comply with pH level requirements when it disposed of waste water from its Mississippi facility.  (CSAC ¶¶ 53–60; see, e.g., CSAC ¶ 77).  IBEW does not allege that these purported violations at the Mississippi facility have ever been discovered by government officials, investigated, charged, or, until this lawsuit, even disclosed publicly.

Defendants have moved to dismiss the Consolidated Second Amended Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P.  (Doc. 40).  In support, defendants have attached excerpts of reports from a third-party monitor concerning Omega's Subsidiary's compliance with the terms of its probation and referenced these reports in their opening brief.  (Doc. 42-1).  IBEW has moved to strike the attached excerpts and any references to, and any assertions or arguments based on, these excerpts in defendants' briefing.  (Doc. 45).

LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing such a motion, the Court disregards legal conclusions, examines only the well-pleaded factual allegations, which the Court accepts as true, and draws all reasonable inferences in the plaintiff's favor.  See id. at 678–79; Starr Int'l Co. v. Fed. Reserve Bank of N.Y., 742 F.3d 37, 40 (2d Cir. 2014).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Austin v. Town of Farmington, 826 F.3d 622, 630 (2d Cir. 2016) (quoting Iqbal, 556 U.S. at 678). "'[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' however, dismissal is appropriate." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (alteration in original) (quoting Iqbal, 556 U.S. at 679).

In addition, "[a]ny complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act] and [Federal Rule of Civil Procedure] 9(b) by stating with particularity the circumstances constituting fraud." ECA, Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). The Private Securities Litigation Reform Act "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (alteration in original) (quoting 15 U.S.C. § 78u-4(b)(1), (2)). And Rule 9(b) similarly requires that "the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395, 403 (2d Cir. 2015) (quoting Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004)).

DISCUSSION

I.   Section 10(b) Claim

"To sustain a claim under Section 10(b), [a plaintiff] must show (i) a material misrepresentation or omission; (ii) scienter; (iii) 'a connection with the purchase or sale of a security[;]' (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation."  In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 509 (2d Cir. 2010) (second alteration in original) (quoting Dura Pharm., 544 U.S. at 341).  Defendants contend that IBEW has failed to allege adequately a material misrepresentation or omission, scienter, and loss causation.

A.   Material Misrepresentation or Omission

"Under Rule 10b–5, it is unlawful to (1) 'make any untrue statement of a material fact,' or (2) 'omit to state a material fact necessary in order to make the statements made . . . not misleading."  In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 239 (2d Cir. 2016) (quoting § 240.10b–5(b)).  "[S]ilence, absent a duty to disclose, is not misleading under Rule 10b–5," Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100–01 (2d Cir. 2015) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988)), and, accordingly, "a 'pure omission' 'is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts,'" In re Vivendi, 838 F.3d at 239 (citation omitted) (quoting Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 719 (2d Cir. 2011); Stratte-McClure, 776 F.3d at 100).

IBEW asserts that defendants made an affirmative misrepresentation, that several of defendants' statements were misleading because they omitted material facts, and that defendants had an independent duty to disclose Omega's Subsidiary's purportedly ongoing violations of environmental regulations and the terms of its probation.  The Court will address the alleged misrepresentations and omissions in turn.

- 10 -

i.  Statements Concerning the Virginia Plea Agreement

IBEW claims that defendants affirmatively misrepresented on multiple occasions that Omega had "implemented a comprehensive compliance program which cover[ed] the areas addressed by the [Virginia Plea Agreement]."  (E.g., CSAC ¶ 95).  The truth, IBEW maintains, is that Omega had not "properly implemented" a compliance program, as the program "was failing to prevent continued violations of environmental regulations."  (Doc. 44 at 18).  Regardless of whether Omega had properly implemented the compliance program, defendants' statements are "too general to cause a reasonable investor to rely on them" and are, therefore, "not actionable under the securities laws."  In re Sanofi Sec. Litig., 155 F. Supp. 3d 386, 401 (S.D.N.Y. 2016).

Numerous courts that have faced similar statements have so held.  For example, in ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187 (2d Cir. 2009), the Second Circuit held that the defendant's statement that it "had risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process, that it set the standard for integrity, and that it would continue to reposition and strengthen [its] franchises with a focus on financial discipline" were too general to be actionable.  Id. at 205–06 (alterations in original) (citations and quotations omitted).  Similarly, in In re Sanofi, this Court concluded that the defendant's statements that it "maintain[ed] an effective compliance organization" and that it had a "very tight compliance program[] that [it] run[s]" were not actionable even though the plaintiffs had alleged that the defendant "did not actually maintain an effective compliance program . . . at the time the statements were made."  In re Sanofi, 155 F. Supp. 3d at 401.  And in Menaldi v. Och–Ziff Capital Management Group LLC, 277 F. Supp. 3d 500 (S.D.N.Y. 2017), the court concluded that the defendants' statement that the company had "implemented a global compliance program to

address the legal and regulatory requirements" that applied to the company—a compliance program which it stated included "comprehensive policies and supervisory procedures"—was not actionable despite the plaintiffs alleging that the defendants "were not only aware of rampant corruption and the lack of any meaningful compliance function, but [also that] they themselves had circumvented and/or ignored the Company's internal controls and approved illicit transactions despite warnings that bribes would likely be paid." [3] Id. at 512.

The Second Circuit's decision in Meyer v. Jinkosolar Holdings Co., 761 F.3d 245 (2d Cir. 2014), upon which IBEW principally relies, is not to the contrary. In Jinkosolar, the defendant's disclosures were significantly more specific than those at issue here. There, the defendant stated that, as part of its environmental compliance program, it had "installed pollution abatement equipment at [its] facilities to process, reduce, treat, and where feasible, recycle the waste materials before disposal" and that it had "environmental teams at each of [its] manufacturing facilities" on duty twenty-four hours a day "to monitor waste treatment and ensure that [these] waste emissions comply with [Chinese law]." Id. at 247 (third alteration in original). The Second Circuit held that these statements were actionable misrepresentations because "the description of pollution-preventing equipment and 24–hour monitoring teams gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations," comfort which would mislead investors "if in fact the equipment and 24–hour team were then failing to prevent substantial violations of the Chinese regulations," as was alleged to be the case. Id. at 251. As other courts have noted, it is the specificity of the

---

[3] IBEW attempts to distinguish Menaldi by stating that Omega, unlike the defendants in Menaldi, failed to implement a compliance program at all. To the extent that this distinction matters, it is factually inaccurate. IBEW alleges at that "inspections would generally occur every three to six months, . . . [inspections which] were mostly done as a result of the Virginia Plea Agreement." (CSAC ¶ 54). IBEW also alleges that "there may have been a ten minute training video that plant workers were shown as a result of [the Virginia Plea Agreement]." (CSAC ¶ 56).

disclosures in <u>Jinkosolar</u> that makes them actionable, specificity that is not present here.  <u>See</u>

<u>Menaldi</u>, 277 F. Supp. 3d at 513 (distinguishing <u>Jinkosolar</u> on the basis that the statements at

issue were "far more generalized" than those in <u>Jinkosolar</u>); <u>In re Plains All Am. Pipeline, L.P.</u>

<u>Sec. Litig.</u>, 245 F. Supp. 3d 870, 899 (S.D. Tex. 2017) (same).  Defendants' statements

concerning Omega's "comprehensive compliance program" are not actionable.

   IBEW maintains that certain omissions rendered other statements concerning the

Virginia Plea Agreement misleading.  It contends that defendants were required to disclose that

Omega's Subsidiary was violating the terms of its probation and that Omega's Subsidiary had

failed to put in place an effective environmental compliance system because defendants

disclosed that the Virginia Plea Agreement "required" Omega's Subsidiary to "be placed on a

three year term of probation" and to "implement an environmental compliance program."  (<u>E.g.</u>,

CSAC ¶ 80).  This duty arises, IBEW argues, because "when [a company] makes a disclosure

about a particular topic, whether voluntary or required, the representation must be 'complete and

accurate.'"  <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d 347, 366 (2d Cir. 2010)

(quoting <u>Glazer v. Formica Corp.</u>, 964 F.2d 149, 157 (2d Cir. 1992)).

   Although the principle of complete and accurate disclosure is correct, IBEW's

application of it is not.  Defendants' disclosures on this topic—the requirements of the Virginia

Plea Agreement—were complete and accurate.  Defendants stated exactly what the Virginia Plea

Agreement required: for Omega's Subsidiary to serve a three year term of probation and to

implement an environmental compliance program.  IBEW's attempt to pull a duty to disclose

information concerning a different topic—that is, whether Omega was complying with the

requirements of the Virginia Plea Agreement—from the principle that a disclosure must be

complete and accurate "stretches th[is] principle[] past [its] logical breaking point."  <u>Id.</u>

The same is true of IBEW's claim that defendants' repeated statements that Omega's Subsidiary "will be on probation until June 2016, unless the probation period is terminated earlier by the court," required defendants to disclose that Omega's Subsidiary was engaged in activity that presented a risk that its probation would be extended. (E.g., CSAC ¶ 86). Defendants' disclosures were complete and accurate statements of the term of probation that the Virginia Plea Agreement imposed. To the extent that IBEW predicates its argument on the fact that defendants stated that Omega's Subsidiary's probation could terminate earlier than June 2016 without disclosing that its probation could also be extended, no reasonable investor would view the omission of such an obvious potential result of violating a term of probation as "alter[ing] the 'total mix' of information available," and, thus, the omission is not actionable. In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

ii. Risk Disclosures

IBEW also argues that defendants misled investors in Omega's Forms 10–K and 10–Q by stating that "if [Omega's Subsidiary] fails to comply with the terms of its probation . . . , we could be subject to criminal prosecution" and that "[i]t is possible that environmental laws and regulations could require material expenditures or otherwise adversely affect the Company's operations." (E.g., CSAC ¶¶ 95, 100). IBEW contends that these statements misled investors into believing that Omega's Subsidiary was only possibly violating the terms of its probation and that environmental laws would only possibly adversely affect Omega when Omega's Subsidiary was, in fact, actually violating those terms, violations which, if discovered, would likely adversely affect Omega.

"In all cases, . . . the court must keep in mind that a complaint fails to state a claim of securities fraud if no reasonable investor could have been misled" by the statements at issue, considered together and in context, "about the nature of the risk when he invested." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002) (emphasis removed). Generic risk disclosures, like those at issue here, are unlikely to mislead a reasonable investor. In re Mylan N.V. Sec. Litig., No. 16 Civ. 7926 (JPO), 2018 WL 1595985, at *9 (S.D.N.Y. Mar. 28, 2018) (observing that "[i]n many cases, general or boilerplate disclosures of future regulatory risk would not cause a reasonable investor to believe that the company faced no current regulatory risks" and that "the more specific the caution, the more likely it is to mislead a reasonable investor").

This is especially so when the omission is the legal conclusion that Omega's Subsidiary had likely violated its probation. "'[D]isclosure is not a rite of confession,' and companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014) (footnote omitted) (quoting In re Morgan Stanley, 592 F.3d at 365; Ciresi v. Citicorp, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), aff'd, 956 F.2d 1161 (2d Cir. 1992)); accord In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc., 165 F. App'x 928 (2d Cir. 2006)) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."). No reasonable investor would have construed these generic risk disclosures as representations that Omega's Subsidiary had conducted itself in a manner that negated the risk of future adverse action, including a claim that it had violated the terms of its probation. Defendants' statements regarding the Virginia Plea Agreement are not actionable.

iii.    <u>Statements Concerning the Source of Financial Success</u>

IBEW contends that defendants misled investors about the source of Omega's financial success.[4]  Specifically, it points to defendants' statements (1) that "[o]ur business continues to benefit from favorable animal nutrition supply and demand dynamics," (CSAC ¶ 98), (2) that "[o]ur solid animal nutrition profitability was fueled by strong season-to-date fish catch and pricing for fish meal and fish oil that remains well above levels seen a few years ago," (CSAC ¶ 136), (3) that "our financial results, including a record Adjusted EBITDA, reflect contributions from a robust fish harvest, continued strong demand for our products, efficient operational performance and the Bioriginal acquisitions," (CSAC ¶ 142), (4) that "[t]hese strong financial results reflect our ability to leverage our core nutritional capabilities to supply customers in the feed, food and supplement sectors," (CSAC ¶ 150), and (5) that "[o]ur second quarter consolidated financial results reflect the continued strength in our animal nutrition segment," (CSAC ¶ 152).  IBEW maintains that once defendants made these statements, "[d]efendants were obligated to disclose that Omega's operating results had significantly benefited from its continued violations of environmental laws."  (Doc. 44 at 20–21).

Courts in this district have held that "[w]here a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices."  <u>In re Mylan</u>, 2018 WL 1595985, at *6 (quoting <u>In re FBR Inc. Sec. Litig.</u>, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008); <u>accord</u> <u>In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.</u>, 859 F. Supp. 2d 572, 579

---

[4] IBEW appears to allege in the Consolidated Second Amended Complaint that Omega's actual financial results were also misleading, but it has affirmatively abandoned that claim in its briefing.  (Doc. 44 at 20 n.5 ("[T]he [CSAC] does not allege that Omega's financial results were misstated.  Rather, the [CSAC] alleges that [d]efendants misled investors by reporting positive financial results while misrepresenting the source of Omega's financial success."  (citations omitted)); <u>see, e.g.</u>, CSAC ¶¶ 110–11, 124–25).

(S.D.N.Y. 2012) ("[W]hen a company puts at issue the cause of its financial success, 'the alleged failure to disclose the true sources of such revenue could give rise to liability under Section 10(b).'" (quoting In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005))). In determining whether there is a duty to disclose omitted information, "[t]he critical consideration . . . is whether 'the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading.'" In re Sanofi, 155 F. Supp. 3d at 403 (third alteration in original) (quoting In re Marsh & McLennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006)).

IBEW has failed to allege, plausibly, a nexus between these statements and the omission of Omega's Subsidiary's illegal conduct. In support of its claim, IBEW alleges only that Omega's "reported operating results significantly benefited from Omega's failure to comply with the Virginia Plea Agreement." (CSAC ¶¶ 77, 96, 123). Although IBEW does not need to allege "detailed evidentiary matter" at this stage, In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001), it must plead a plausible claim that the omission of the illegal conduct was sufficiently connected to the existing disclosures that the omission of the illegal conduct rendered those disclosures misleading, and it cannot do so by asserting such a conclusory allegation, Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011).

The only non-conclusory allegation that even remotely indicates the impact of Omega's Subsidiary's illegal conduct on Omega's financial condition during the class period is that Omega's Subsidiary was fined $1.2 million for two violations of the Clean Water Act. (CSAC ¶ 63). This fine amounted to approximately 0.5 percent of Omega's revenue for 2013, Omega's lowest revenue year during the class period. (See CSAC ¶ 26; Doc. 42-6 at 3). The connection between the omitted illegal conduct and defendants' comments on Omega's financial

results "is too tenuous a connection to render [defendants'] statements regarding [Omega's] financial success misleading." In re ITT Educ. Servs., 859 F. Supp. 2d at 579. IBEW has not plausibly alleged that "reasonable investors would find that" disclosure of Omega's Subsidiary's illegal conduct "would significantly alter the mix of available information" concerning "the source of [Omega's] success." City of Brockton Ret. Sys. v. Avon Prod., Inc., No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *17 (S.D.N.Y. Sept. 29, 2014) (quoting Lapin v. Goldman Sachs Grp., Inc., 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006)). Defendants' comments concerning Omega's financial success were not misleading.

     iv.    Item 303 of Regulation S–K

       IBEW contends that Item 303 of Regulation S–K obligated defendants to disclose Omega's Subsidiary's probation violations. Item 303 requires certain issuers of securities to "[d]escribe any known trends or uncertainties . . . that [the issuer] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). The purpose of Item 303 is to provide the market with "information relevant to an assessment of the financial condition and results of operations of the registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources." In re Canandaigua Sec. Litig., 944 F. Supp. 1202, 1210 (S.D.N.Y. 1996) (quoting § 229.303 Instr. 2). It creates an "affirmative duty to disclose" "a trend, demand, commitment, event or uncertainty [that] is both presently known to management and reasonably likely to have material effects on the registrant's financial condition[] or results of operations." Stratte-McClure, 776 F.3d at 101 (quoting Mgmts. Discussion & Analysis of Fin. Condition & Results of Operations, Exchange Act Release No. 6835, 1989 WL 1092885, at

*4 (May 18, 1989)).  The failure to comply with Item 303's disclosure requirements "can serve as the basis for a securities fraud claim under Section 10(b)."  Id.

IBEW asserts that Omega's Subsidiary's illegal conduct caused uncertainty over whether Omega would experience "financial penalties, loss of the financial benefit Omega had been enjoying from its illegal conduct, and reputational harm."  (Doc. 44 at 22; see also CSAC ¶ 68).  As one court in this District has observed, Item 303 is "broad and ambiguous," a result of the SEC's "decision to leave the standard of disclosure 'intentionally general, reflecting the Commission's view that a flexible approach elicits more meaningful disclosure and avoids boilerplate discussions, which a more specific approach could foster.'"  In re Canandaigua, 944 F. Supp. at 1210 (quoting Mgmts. Discussion, 1989 WL 1092885, at *1).  But it is not so broad as to require defendants to disclose uncertainties as speculative as whether Omega's Subsidiary's conduct was reasonably likely to have material effects on Omega's financial condition or on the results of Omega's operations.

The underlying illegal conduct at issue here does not directly pertain to the Omega's operating results or financial condition.  See Lopez v. CTPartners Exec. Search Inc., 173 F. Supp. 3d 12, 34 (S.D.N.Y. 2016).  Rather, for the conduct to impact Omega's operating results or financial condition materially, an attenuated chain of contingencies would have to occur.  Prosecutors or other government agents would have to discover the conduct, proceedings against Omega or Omega's Subsidiary would have to be initiated, and Omega or Omega's Subsidiary would subsequently either have to plead guilty or be found guilty.  Absent these contingencies coming to fruition, neither Omega nor Omega's Subsidiary would have been subject to a fine or to an order requiring them to cease the illegal conduct.

And even then, a fine or an order requiring Omega's Subsidiary to cease the illegal conduct would have *materially* impacted Omega's financial condition or operating results only if the illegal conduct was materially decreasing Omega's operating costs, which—as stated earlier, IBEW has not adequately alleged was the case—if disclosure of the illegal activity would materially impact Omega's reputation in such a way as to hinder its business relationships, or if Omega would be subjected to a substantial fine. Defendants could not have "reasonably expect[ed]" such a chain of contingencies to materialize, § 229.303(a)(3)(ii), and IBEW "may not plead fraud by hindsight," Slayton v. Am. Exp. Co., 604 F.3d 758, 776 (2d Cir. 2010); see also Lopez, 173 F. Supp. 3d at 18, 33 (holding that Item 303 did not impose a duty to disclose "'the true nature' of the Company's 'systemic' hostility to women and its hostile work environment," hostility which exposed the Company to liability and reputational harm).

This case stands in stark contrast to the type of conduct for which the SEC envisioned Item 303 to compel disclosure. The SEC has observed that Item 303's "[r]equired disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." Mgmts. Discussion, 1989 WL 1092885, at *4 (emphasis removed). The potential discovery of illegal conduct that, if discovered, might only potentially have material effects is substantially "less predictable" than the uncertainties that the SEC contemplated would require disclosure. Id.

Even if the connection between the conduct at issue and an impact on Omega's operating results or financial condition were not so tenuous, it remains true that "courts have been sensitive about forcing a company to damage its own interests as well as those of its

shareholders." Lopez, 173 F. Supp. 3d at 35 (quoting In re Canandaigua, 944 F. Supp. at 1211). The Second Circuit, for example, has construed Item 503, which imposes a similar disclosure requirement that obligates certain companies to include "a discussion of the most significant factors that make the offering speculative or risky" in their Forms 10–K, not to require disclosure of uncharged, unadjudicated wrongdoing. 17 C.F.R. § 229.503(c).

In City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG, 752 F.3d 173 (2d Cir. 2014), the plaintiffs alleged that UBS had been purportedly involved in a tax evasion scheme from 2001 to at least 2007, culminating in 2009 with a Deferred Prosecution Agreement. Id. at 178, 184. The plaintiffs argued that UBS's "failure to disclose the tax scheme violated . . . Item 503(c)." Id. at 183. The Second Circuit disagreed. It noted that "'[d]isclosure is not a rite of confession,' and [that] companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" Id. at 184 (first alteration in original) (footnote omitted) (quoting In re Morgan Stanley, 592 F.3d at 365; Ciresi, 782 F. Supp. at 823). The Second Circuit concluded that "UBS complied with its disclosure obligations under [Second Circuit] case law" "[b]y disclosing," in May 2008—that is, not until the tax fraud had been ongoing for at least six years—"its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose UBS 'to substantial monetary damages and legal defense costs,' as well as 'injunctive relief, criminal and civil penalties[,] and the potential for regulatory restrictions.'" Id. at 184 (third alteration in original).

The reasoning in City of Pontiac extends naturally to the disclosure requirements imposed by Item 303.[5] See In re Barclays Bank PLC Sec. Litig., No. 09 Civ. 1989 (PAC), 2017

---

[5] Indiana Public Retirement System v. SAIC, Inc., 818 F.3d 85 (2d Cir. 2016), is not to the contrary. There, the defendant was "aware that it faced serious, ongoing criminal and civil investigations that exposed it to potential criminal and civil liability and that ultimately did result in criminal charges and substantial liability." Id. at 95 n.8.

WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017) ("The same facts underlying an Item 303 violation

may also support an Item 503 violation, and a court's rationale for determining the former may

also support the same determination of the latter." (citation omitted)). The Court will not read

Item 303 to impose a duty to disclose uncharged, unadjudicated wrongdoing, in particular when

that wrongdoing has only, at best, a tangential relationship to the defendant's financial condition

and operating results. To do so would "stretch[] the language of [Item] 303 beyond its legitimate

scope." Lopez, 173 F. Supp. 3d at 35 (second alteration in original) (quoting In re Canandaigua,

944 F. Supp. at 1212).

v.   <u>Item 503 of Regulation S–K</u>

Nor does Item 503 of Regulation S–K create an affirmative duty to disclose that

Omega's Subsidiary "had been violating the terms of its probation under the Virginia Plea

Agreement." (CSAC ¶ 70). Item 503, as noted, requires certain companies to include "a

discussion of the most significant factors that make the offering speculative or risky" in their

Forms 10–K. § 229.503(c). Defendants disclosed numerous times during the class period that

"we could be subject to criminal prosecution" if Omega's Subsidiary violated the terms of its

probation. (CSAC ¶¶ 95, 122, 148). Defendants also disclosed shortly after Omega received a

petition on probation that Omega's Subsidiary was under a criminal investigation and that "it

[was] probable that a liability ha[d] been incurred and some financial fine or penalty in

connection with the Abbeville facility's wastewater discharges practices may be imposed."

Despite knowing that it was under investigation, and despite having received an internal audit disclosing that it had defrauded the City of New York of $600 million, the defendant did not disclose that it was under investigation in its Form 10–K. Id. at 89–90. In addition, the underlying fraud being investigated was reasonably likely to impact the defendant's operating results and financial condition directly and materially: it was reasonably likely that the fraud would hinder the defendant's ability to obtain contracts with other governments, an opportunity which the defendant valued at approximately $2 billion (equating to twenty percent of the defendant's yearly revenue), and it was reasonably likely that the defendant would have to return the $600 million in proceeds from the fraud to the City of New York. Id. at 95.

- 22 -

(CSAC ¶¶ 148, 154, 158, 159).  As with the defendant in <u>City of Pontiac</u>, defendants were not required by Item 503 to admit to uncharged, unadjudicated wrongdoing, and, as with the disclosures in <u>City of Pontiac</u>, these disclosures satisfied Item 503's requirements.

### B.  Scienter and Loss Causation

IBEW has not alleged any actionable misrepresentation or omission.  Because IBEW's failure to do so warrants dismissal, the Court does not reach defendants' scienter and loss causation arguments.  The Court will grant defendants' motion to dismiss IBEW's section 10(b) claim.

## II.  Section 20(a) Claim

To establish liability under section 20(a), a plaintiff "must first establish a primary violation."  <u>In re Omnicom</u>, 597 F.3d 501, 514 n.6 (2d Cir. 2010).  Because IBEW has not adequately alleged a section 10(b) claim, the Court will grant Scholtes and Johannesen motion to dismiss the section 20(a) claim.

## III.  Motion to Strike

In reaching its conclusion, the Court "has not relied in any fashion" on the excerpts at issue or on any references to, or any assertions or arguments based on, these excerpts in defendants' briefing.  <u>Kowalski v. YellowPages.com, LLC</u>, No. 10 Civ. 7318 (PGG), 2012 WL 1097350, at *9 (S.D.N.Y. Mar. 31, 2012); <u>accord</u> <u>Bakalar v. Vavra</u>, 819 F. Supp. 2d 293, 307 (S.D.N.Y. 2011), <u>aff'd,</u> 500 F. App'x 6 (2d Cir. 2012).  Accordingly, the Court will deny IBEW's motion to strike as moot.  (Doc. 45).

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Consolidated Second

Amended Complaint is GRANTED. (Doc. 40). IBEW's motion to strike is DENIED as moot.

(Doc. 45).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       September 7, 2018